JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 4522

- - - - - - - - - - - - - - - - - - - - - - - - - - x

DEUTSCHE BANK TRUST COMPANY
AMERICAS, in its capacity as successor
indenture trustee for certain series of Senior
Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity
as successor indenture trustee for certain series
of Senior Notes, and WILMINGTON TRUST
COMPANY, in its capacity as successor
indenture trustee for the PHONES Notes,

          Plaintiffs,

      - against -

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB; ALLIANCE
BERNSTEIN; ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD; AM
INTERNATIONAL EMAC 63 LTD/VOL
ARB; AM MASTER FUND III, LP; AMPERE
CAPITAL MANAGEMENT LP; AQR
CAPITAL AQRREV; BANC OF AMERICA
SECURITIES LLC; BANK OF AMERICA,
N.A.; BANK OF NEW YORK; BANK OF
NEW YORK MELLON; BANK OF NEW
YORK MELLON CORPORATION; BANK
OF NEW YORK MELLON EMPLOYEE
BENEFIT COLLECTIVE INVESTMENT
FUND PLAN; BANK OF NEW YORK
MELLON / MIDCAP SPDRS; BAR CAP
EQUITY FINANCE; BARCLAYS BANK
PLC; BARCLAYS CAPITAL GROUP;
BARCLAYS CAPITAL, INC.; BARCLAYS
CAPITAL SECURITIES LIMITED;
BARCLAYS CAPITAL SECURITIES
LIMITED as successor to BZW SECURITIES
LIMITED; BARCLAYS GLOBAL
INVESTORS LTD.; BARCLAYS GLOBAL
INVESTORS NA REF INDUSTRY ALPHA
LTD; BEAR STEARNS & CO. INC.; BEAR
STEARNS EQUITY STRATEGIES RT LLC;
BEAR STEARNS SECURITIES CORP.;

Case No. _____

NOTICE OF REMOVAL OF
ACTION PURSUANT TO
12 U.S.C. § 632,
28 U.S.C. §§ 1334, 1441, 1446
and 1452



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEUTSCHE BANK TRUST COMPANY
AMERICAS, in its capacity as successor
indenture trustee for certain series of Senior
Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity
as successor indenture trustee for certain series
of Senior Notes, and WILMINGTON TRUST
COMPANY, in its capacity as successor
indenture trustee for the PHONES Notes,

          Plaintiffs,

      - against -

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB; ALLIANCE
BERNSTEIN; ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD; AM
INTERNATIONAL EMAC 63 LTD/VOL
ARB; AM MASTER FUND III, LP; AMPERE
CAPITAL MANAGEMENT LP; AQR
CAPITAL AQRREV; BANC OF AMERICA
SECURITIES LLC; BANK OF AMERICA,
N.A.; BANK OF NEW YORK; BANK OF
NEW YORK MELLON; BANK OF NEW
YORK MELLON CORPORATION; BANK
OF NEW YORK MELLON EMPLOYEE
BENEFIT COLLECTIVE INVESTMENT
FUND PLAN; BANK OF NEW YORK
MELLON / MIDCAP SPDRS; BAR CAP
EQUITY FINANCE; BARCLAYS BANK
PLC; BARCLAYS CAPITAL GROUP;
BARCLAYS CAPITAL, INC.; BARCLAYS
CAPITAL SECURITIES LIMITED;
BARCLAYS CAPITAL SECURITIES
LIMITED as successor to BZW SECURITIES
LIMITED; BARCLAYS GLOBAL
INVESTORS LTD.; BARCLAYS GLOBAL
INVESTORS NA REF INDUSTRY ALPHA
LTD; BEAR STEARNS & CO. INC.; BEAR
STEARNS EQUITY STRATEGIES RT LLC;
BEAR STEARNS SECURITIES CORP.;

Case No. _____

NOTICE OF REMOVAL OF
ACTION PURSUANT TO
12 U.S.C. § 632,
28 U.S.C. §§ 1334, 1441, 1446
and 1452

BHF-BANK AKTIENGESELLSCHAFT;                    :
BLACKROCK; BLACKROCK, INC.; BNP                 :
PARIBAS PRIME BROKERAGE, INC.; BNP              :
PARIBAS SECURITIES CORP.; BNY                   :
MELLON; BON SECOURS HEALTH                      :
SYSTEM, INC.; CARLYLE MULTI-                    :
STRATEGY MASTER FUND LTD.;                      :
CAXTON ASSOCIATES LLC; CHICAGO                  :
TRADING; CITIBANK; CITIBANK, N.A.;              :
CITIBANK, N.A. EQUITY DERIVATIVES;              :
CITIGROUP GLOBAL MARKETS, INC.;                 :
CITIGROUP GLOBAL MARKETS,                       :
INC./SALOMON BROTHERS; CITIGROUP                :
GLOBAL MARKETS LTD.; CITIGROUP                  :
PRIVATE BANK & TRUST; CLAUDIA F.                :
GASPARINI I.R.A. f/b/o CLAUDIA F.               :
GASPARINI; COLLECTIVE TRUST OF                  :
THE BANK OF NEW YORK; COUTTS EIP                :
US EQUITY INDEX BGI, AIB BNY;                   :
CREDIT SUISSE FIRST BOSTON; CREDIT              :
SUISSE SECURITIES (USA) LLC; CSFB               :
PROPRIETARY TRADING US; DB BANK                 :
AG AMSTERDAM; DEEPHAVEN;                        :
DEEPHAVEN CAPITAL MANAGEMENT;                   :
DEL MAR ASSET MANAGEMENT;                       :
DEUTSCHE BANK AG; DEUTSCHE BANK                 :
AG FRANKFURT; DEUTSCHE BANK                     :
AQRREV; DEUTSCHE BANK                           :
SECURITIES, INC.; DEUTSCHE                      :
LUFTHANSA AG; FORRESTAL FUNDING                 :
MASTER TRUST; GALLEON                           :
MANAGEMENT LP / GALLEON                         :
BUCCANEERS OFFSHORE BANK OF                     :
BERMUDA (CAYMAN) LTD.; GENERAL                  :
ELECTRIC COMPANY; GOLDMAN,                      :
SACHS & CO.; GOLDMAN, SACHS & CO.,              :
INC.; GOLDMAN SACHS EXECUTION &                 :
CLEARING; GOLDMAN SACHS                         :
EXECUTION & CLEARING, L.P.;                     :
GOLDMAN SACHS INVESTMENT                        :
STRATEGIES, LLC; GRYPHON HIDDEN                 :
VALUE VIII LP; HALCYON DIVERSIFIED              :
FUND LP; HALCYON MANAGEMENT CO.                 :
LLC; HALCYON SPECIAL SITUATIONS                 :
LP; HAVENS ADVISORS LLC;                        :
HIGHBRIDGE CAPITAL MANAGEMENT,                  :

2

LLC; HIGHBRIDGE INT LLC (NO 3) / A/C           :
HIGHBRIDGE CAP COP MAPLES &                      :
CALDER; HSBC N.A. HOLDINGS, INC.;                :
IBM NETHERLANDS MSCI US; IBM                     :
PERSONAL PENSION PLAN TRUST; IBM                 :
RETIREMENT FUNDS; INKA MBH FOR                   :
SPERRKONTO; INTERNATIONAL                        :
BUSINESS MACHINES CORPORATION;                   :
J.P. MORGAN; J.P. MORGAN CLEARING                :
CORP.; J.P. MORGAN SECURITIES                    :
LLC/NYSE; J.P. MORGAN SECURITIES                 :
INC.; J.P. MORGAN SERVICES;                      :
JPMORGAN CHASE BANK, NATIONAL                    :
ASSOCIATION; LAURA LYNN FORD;                    :
LIBERTY HARBOR MASTER FUND I, LP;                :
MAGNETAR CAPITAL LLC; MAGNETAR                   :
FINANCIAL LLC / MAGNETAR CAPITAL                 :
MST FD LTD M&C CORPORATE                         :
SERVICES LTD.; MAPLES & CALDER;                  :
MERRILL LYNCH; MERRILL LYNCH                     :
FINANCIAL MARKETS, EQUITY                        :
FINANCING GROUP; MERRILL LYNCH,                  :
PIERCE, FENNER & SMITH, INC. as                  :
successor to BANC OF AMERICA                     :
SECURITIES LLC, SECURITIES LENDING               :
SERVICES; MERRILL LYNCH, PIERCE,                 :
FENNER & SMITH, INC. - SAFEKEEPING;              :
MERRILL LYNCH, PIERCE, FENNER &                  :
SMITH, INC. - SECURITIES LENDING;                :
METROPOLITAN LIFE INSURANCE CO.;                 :
MILTON PARTNERS LLC; MORGAN                      :
STANLEY & CO. INC.; MORGAN                       :
STANLEY & CO. INTL.; MORGAN                      :
STANLEY/PRIME BROKER/CN; MORGAN                  :
STANLEY SMITH BARNEY LLC; MS S&P                 :
500 INDEX FUND; MS SELECT-VALUE                  :
ADDED MARKET; MS VALUE ADDED                     :
MARKET SERIES; NATIONAL                          :
FINANCIAL SERVICES LLC; NEW YORK                 :
LIFE INSURANCE CO.; NEWBROOK                     :
CAPITAL ADVISORS LP; NYC BOARD OF                :
EDUCATION; NYC EMPLOYEES                         :
RETIREMENT SYSTEM; NYC FIRE                      :
RETIREMENT SYSTEM; NYC POLICE                    :
OFICERS VARIABLE; NYC POLICE                     :
RETIREMENT SYSTEM; NYC                           :

RETIREMENT SYSTEMS; ODDO & CIE as      :
successor to BANQUE D'ORSAY;      :
OPPENHEIMER & CO., INC.; PERRY      :
CORP.; PERRY PARTNERS; PERRY      :
PARTNERS L.P.; POTTER, ADAM F.;      :
PRISM PARTNERS OFFSHORE;      :
PRUDENTIAL BACHE SECURITIES, LLC;      :
R K MELLON CTF #3; RABO CAPITAL      :
SERVICES, INC.; RELATIVE VALUE LTD /      :
HIGHBRIDGE EVENT DRIVEN RE      :
HIGHBRIDGE CAP MGMT LLC;      :
SANFORD C. BERNSTEIN & CO., INC.;      :
STATE STREET LUX; TBK PARTNERS,      :
LLC; TD ASSET MANAGEMENT USA,      :
INC.; TD EMERALD HEDGED U.S.      :
EQUITY; TD EMERALD POOLED U.S.      :
FUND; TD EMERALD U.S. MARKET      :
INDEX FUND; TD U.S. INDEX FUND; THE      :
HARTFORD; TIME WARNER INC.      :
MASTER PENSION TRUST; TRIBECA      :
INVESTMENTS LLC; TWEEDY, BROWNE      :
COMPANY, LLC; TWEEDY, BROWNE      :
VALUE FUND; UBS FINANCIAL      :
SERVICES INC.; UBS SECURITIES INC.;      :
UBS SECURITIES LLC - SECURITIES      :
LENDING; USAA FEDERAL SAVINGS      :
BANK; VANDERBILT PARTNERS, LLC;      :
WESTCHESTER CAPITAL      :
MANAGEMENT; WILLIAM H. BROWNE;      :
and WILMINGTON TRUST CO. as owner      :
and trustee for THE US TRUST,      :
     :
    Defendants.      :
     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF REMOVAL

     PLEASE TAKE NOTICE that Defendants J.P. Morgan Securities LLC, J.P.

Morgan Clearing Corp., JPMorgan Chase Bank, N.A., Banc of America Securities LLC,

Bank of America, N.A., Merrill Lynch, Merrill Lynch Financial Markets, Equity

Financing Group, Merrill Lynch, Pierce, Fenner & Smith, Inc. as successor to Banc of

America Securities, LLC, Securities Lending Services, Merrill Lynch, Pierce, Fenner & Smith, Inc.-Safekeeping, Merrill Lynch, Pierce, Fenner & Smith, Inc.-Securities Lending, Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited (the "Removing Defendants") file this Notice of Removal pursuant to 12 U.S.C. § 632, 28 U.S.C. §§ 1334, 1441, 1446, and 1452, and Local Civil Rule 81.1, and remove to this Court the above-entitled action from the Supreme Court of the State of New York, County of New York, and all claims and causes of action asserted therein. This Court has original jurisdiction over this matter pursuant to 12 U.S.C. § 632 and 28 U.S.C. § 1334. In support of this Notice of Removal, the Removing Defendants state as follows:

1.      This action was commenced on June 2, 2011, by the filing of a summons and complaint (the "complaint" or "Compl.") in the Supreme Court of the State of New York, County of New York.

2.      Upon information and belief, plaintiffs have not completed service of process on all defendants. On June 3, 2011, plaintiffs informed the Removing Defendants that certain actions, including this one, had been filed.

3.      In accordance with 28 U.S.C. § 1446(a), Local Civil R. 81.1, and Fed. R. Bankr. P. 9027(a)(1), true and correct copies of all process, pleadings and orders filed in the Supreme Court of the State of New York, County of New York to date are attached as Exhibit A to this Notice of Removal.

4.      Since December 8, 2008, Tribune Company ("Tribune") and certain of its subsidiaries (together, the "Debtors") have been embroiled in a Chapter 11 bankruptcy proceeding pending in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Compl. ¶¶ 12-13. In that bankruptcy proceeding, the Official

5

Committee of Unsecured Creditors (the "UCC"), filed claims against Tribune shareholders to avoid as intentional fraudulent conveyances all proceeds that the shareholders had received in connection with Tribune's 2007 leveraged buyout (the "LBO"). First Amended Complaint, <u>Official Committee of Unsecured Creditors of Tribune Company v. Fitzsimons</u>, Case No. 08-13141 (KJC), Adv. Proceeding No. 10-54010 (KJC) (Bankr. D. Del. filed Dec. 7, 2010), docket item 61 (the "UCC Complaint").

5.      Like the UCC's action in the Bankruptcy Court, plaintiffs here seek to set aside and recover as allegedly fraudulent conveyances the same funds that were transferred to Tribune's shareholders as part of the LBO. Plaintiffs bring their claims pursuant to the state laws of New York, Illinois, and Massachusetts. Compl. ¶ 2.

<b><u>Procedural Background</u></b>

6.      In 2007, as part of the LBO, Tribune entered into two strategic transactions commonly referred to as Step One and Step Two. In Step One, Tribune's employee stock ownership plan (the "ESOP") purchased approximately 50% of the outstanding shares of Tribune common stock at $34 per share in a tender offer. The purchase was financed by an $8.028 billion Credit Agreement (the "Credit Agreement," attached as Exhibit B). The complaint alleges that shareholders were paid $4.3 billion during Step One. Compl. ¶ 6. In Step 2, Tribune survived a merger with a Delaware corporation wholly owned by the ESOP. Upon completion of the merger, the remaining holders of Tribune's issued and outstanding common stock received $34 per share and, in exchange, the shares were cancelled. The Step Two merger was financed through additional borrowings under the Credit Agreement and a bridge loan agreement. The complaint alleges that shareholders were paid $4.0 billion during Step Two. Compl. ¶ 6.

6

7.       On December 8, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Compl. ¶ 12. Whether the Debtors made fraudulent conveyances during the LBO has been a critical issue in the bankruptcy cases since the start of those proceedings.

8.       To help assess the fraudulent conveyance and other issues, the Court appointed an Examiner to evaluate whether the Debtors' estates held any potential claims and causes of action in connection with the LBO.  Agreed Order Directing The Appointment Of An Examiner, In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Apr. 20, 2010), docket item 4120.  The Examiner conducted a thorough investigation, requesting and reviewing hundreds of pages of briefing and tens of thousands of pages of documents.  The Examiner also interviewed 38 witnesses.  On July 26, 2010, the Examiner filed a four-volume report summarizing his conclusions.  The Examiner's report largely focused on fraudulent conveyance issues, including the Debtors' intent in making the conveyances, their solvency, capital adequacy, and ability to repay debts at the time of the LBO, and transferees' defenses to any potential fraudulent conveyance claims.  Examiner's Report of Kenneth N. Klee, as Examiner, In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Aug. 3, 2010), docket items 5247-50.

9.       After a lengthy court-ordered mediation, certain parties agreed to settle some of the fraudulent conveyance claims.  This settlement is embodied in a plan of reorganization proposed by the Debtor, the UCC, and certain senior lenders.  One other plan, proposed by holders of certain Tribune debt, also is before the Bankruptcy Court. At its core, that plan seeks to litigate these fraudulent conveyance claims.

10.     Beginning on March 7, 2011, the Bankruptcy Court conducted an eleven-day confirmation hearing as to the two remaining proposed plans of reorganization. Sixteen witnesses testified, and over one thousand pages of briefs and objections were filed. A central issue at the confirmation hearing was whether the conveyances related to Step One and Step Two could be avoided as fraudulent conveyances and, if so, the value of those claims. Proponents of each plan put on expert witnesses on this issue.

11.     After post-hearing briefing, the Bankruptcy Court heard closing arguments on June 27, 2011. No plan has yet been confirmed.

12.     Fraudulent conveyance issues also have been central to adversary proceedings filed in the Bankruptcy Court. On December 7, 2010, the UCC filed an adversary proceeding in the Bankruptcy Court asserting thirty-six claims against various defendants. See UCC Complaint. Count thirteen seeks to avoid the conveyances made to Tribune's shareholders in connection with the LBO for the purchase, repurchase, or redemption of the outstanding shares as an intentional fraudulent conveyance. Id. at 97.

13.     Because fraudulent conveyance claims have been subject to the automatic stay of 11 U.S.C. § 362, the Bankruptcy Court had to issue an order, at plaintiffs' request, to permit them to file this and other actions against Tribune's former shareholders. Order, In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Apr. 25, 2011), docket item 8740 (the "Claims Order"). The Claims Order, attached as Exhibit B to the complaint, lifted the automatic stay to the limited extent of allowing certain creditors, including plaintiffs in this action, to file state law constructive fraudulent conveyance claims against shareholders to attempt to recover conveyances the shareholders had received in connection with the LBO, without ruling on the standing of such creditors to

bring these claims. Id. Plaintiffs were permitted only to amend their complaint, complete service, and conduct limited discovery as necessary to prevent statutes of limitations or other time-related defenses from barring the claims. Claims Order ¶ 6. The action was to be automatically stayed in accordance with 11 U.S.C. § 362 and the Claims Order, and plaintiffs were required to move to stay any actions not automatically stayed.

14.     Upon information and belief, in accordance with the Claims Order, these plaintiffs and others have filed at least 48 actions with similar allegations in state and federal courts across the country (the "State Law Constructive Fraudulent Conveyance Actions").

15.     On June 13, 2011, plaintiffs moved the Bankruptcy Court to lift the stay to permit them to take steps to consolidate the federal actions pursuant to the federal rules for multi-district litigation ("MDL"). 28 U.S.C. § 1407. In response, on June 21, 2011, the Removing Defendants cross-moved the Bankruptcy Court to lift the stay to permit defendants in state court actions to remove those actions to federal court. On June 29, 2011, the Bankruptcy Court entered an order granting the relief sought by both the plaintiffs and the Removing Defendants. The Removing Defendants now file this Notice of Removal, so as to facilitate consolidation of this action with other State Law Constructive Fraudulent Conveyance Actions before an MDL court.

### Grounds for Removal

16.     Removal is appropriate here on two independent bases. First, removal is appropriate under 28 U.S.C. § 1452(a) because this Court has original bankruptcy jurisdiction under 28 U.S.C. § 1334(b). Second, removal is appropriate under the Edge

Act, 12 U.S.C. § 632, because several of the defendants are United States corporations and this action arises out of transactions involving international banking and international or foreign financial operations.

### A. Bankruptcy Jurisdiction

17. Under 28 U.S.C. § 1452(a) "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Under 28 U.S.C. § 1334(b), this Court has original jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

18. This case "arises in" the Tribune Chapter 11 Case and "aris[es] under" the Bankruptcy Code. Plaintiff's avoidance claims "arise in" the Tribune Chapter 11 Case because, as "proceedings to determine, avoid, or recover fraudulent conveyances," they are "core proceedings." 28 U.S.C. § 157(b)(2)(H). They also "arise in" the Tribune Chapter 11 Case because the conveyances sought to be avoided are also the subject of an adversary proceeding for fraudulent conveyance in the Chapter 11 case.

19. The claims "arise under" the Bankruptcy Code because 11 U.S.C. § 544(b) provides the exclusive cause of action for asserting state-law avoidance claims in connection with bankruptcy cases—subject to the specific limitations imposed by Congress, including the bar on avoiding settlement payments under 11 U.S.C. § 546(e). See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003) ("When the federal statute completely preempts the state-law cause of action, a claim which comes within the scope

of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.").

20.     This case also is "related to" the Tribune Chapter 11 Case because the causes of action are stayed by the Bankruptcy Court's Claims Order.  Claims Order ¶¶ 3, 6.  The case also is "related to" the Tribune Chapter 11 Case because it has a close nexus to the bankruptcy proceedings and the proposed Tribune Plans of reorganization.  The central factual issues in this action are identical to those at issue in the Bankruptcy Court's consideration of the proposed plans of reorganization.

**B.     Edge Act Jurisdiction**

21.     The Edge Act provides that the district courts of the United States have original jurisdiction over "all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations . . . ."  12 U.S.C. § 632.

22.     It further provides that "any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law." 12 U.S.C. § 632.

23.     Plaintiffs filed the Complaint against many national banking associations incorporated under the laws of the United States (the "National Bank Defendants").  These include, but are not limited to, defendants Bank of America, N.A., Citibank, N.A., JPMorgan Chase Bank, N.A.

24.     Additionally, this action is a suit "of a civil nature at common law or in equity" that arises out of transactions involving "international or foreign banking" or "other international or foreign financial operations." Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 214 (S.D.N.Y. 2005) ("A suit satisfies the jurisdictional prerequisites of Section 632 if any part of it arises out of transactions involving international or foreign banking.") (quoting In re Lloyd's Am. Trust Fund Litig., 928 F. Supp. 333, 338 (S.D.N.Y. 1996)).  Plaintiffs' claims against the defendants arise out of the Tribune LBO, which undoubtedly involved international banking transactions.  The approximately $8.3 billion in payments allegedly made to the Tribune shareholders (including payments to the National Bank Defendants) were funded with secured loans provided by a group of United States and foreign banks.  See Credit Agreement (listing foreign companies Barclays Bank PLC and Sumitomo Mitsui Banking Corp. as Credit Agreement Lenders).  Proceeds were distributed globally, including to foreign bank accounts via wire transfers from United States banks.  Moreover, plaintiffs seek to recover proceeds from the two transactions from foreign shareholders, including, but not limited to, Abu Dhabi Investment Authority, Alberta – WCB, Allianz Invest KAG – Siemens, Barclays Bank PLC, BHF-Bank Aktiengesellschaft, Deutsche Bank AG Frankfurt, ODDO & CIE, and State Street Lux.

**Timeliness**

25.     The complaint was filed on June 2, 2011.  The Removing Defendants have timely filed this notice of removal "within thirty days after receipt by the defendant, through service or otherwise, of a copy of the initial pleading" in accordance with 28

U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3).  Further, this notice is timely because, pursuant to 12 U.S.C. § 632, removal under the Edge Act may be made at any time before trial.

26.     Pursuant to 28 U.S.C. § 1446(d) and Fed. R. Bankr. P. 9027(b)-(c), Removing Defendants will file a copy of this Notice of Removal with the Clerk of Court for the Supreme Court of the State of New York, County of New York.  The Removing Defendants also will promptly serve a copy of this Notice on counsel for plaintiffs and (to the extent they have entered an appearance or are otherwise known) counsel for other parties to the removed case.

**Intradistrict Assignment**

27.     Pursuant to 28 U.S.C. § 1446(a), venue in this action is proper in this Court as the division within which the state court action was brought.

WHEREFORE, the Removing Defendants hereby remove this action for the

Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

Dated: New York, New York                 Respectfully submitted,
     July 1, 2011

                              Benjamin S. Kaminetzky
                              Elliot Moskowitz
                              Michael J. Russano
                              DAVIS POLK & WARDWELL LLP
                              450 Lexington Avenue
                              New York, New York 10017
                              Tel: (212) 450-4000
                              benjamin.kaminetzky@davispolk.com
                              elliot.moskowitz@davispolk.com
                              michael.russano@davispolk.com

                              *Attorneys for Defendants J.P. Morgan*
                              *Securities LLC, J.P. Morgan Clearing*
                              *Corp., and JPMorgan Chase Bank, N.A.*

14

Daniel L. Cantor
Daniel S. Shamah
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York  10036
(212) 326-2000
dcantor@omm.com
dshamah@omm.com

-and-

Evan M. Jones
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000
ejones@omm.com

*Attorneys for Banc of America Securities LLC,
Bank of America, N.A.*

Madlyn Gleich Primoff
Jane W. Parver
Daniel Boglioli
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel: (212) 836-8000

*Attorneys for Defendants Merrill Lynch, Merrill Lynch Financial Markets, Equity Financing Group, Merrill Lynch, Pierce, Fenner & Smith, Inc. as successor to Banc of America Securities, LLC, Securities Lending Services, Merrill Lynch, Pierce, Fenner & Smith, Inc.-Safekeeping, and Merrill Lynch, Pierce, Fenner & Smith, Inc.-Securities Lending*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Andrew Gordon (agordon@paulweiss.com)
Stephen J. Shimshak (sshimshak@paulweiss.com)
Elizabeth McColm (emccolm@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000


*Attorneys for Citibank, N.A., Citigroup Global*
*Markets Inc., and Citigroup Global Markets Limited*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in                    :
its capacity as successor indenture trustee for certain series  :
of Senior Notes, LAW DEBENTURE TRUST                        :
COMPANY OF NEW YORK, in its capacity as successor           :                      **SUMMONS**
indenture trustee for certain series of Senior Notes, and       :
WILMINGTON TRUST COMPANY, in its capacity as               :
successor indenture trustee for the PHONES Notes,             :
                                                            :
                        Plaintiffs,                          :
                                                            :
                                                            :
                vs.                                          :                      Index No. 651517/2011
                                                            :
ABU DHABI INVESTMENT AUTHORITY;                             :
ALBERTA - WCB;                                              :
ALLIANCE BERNSTEIN;                                         :
ALLIANCEBERNSTEIN L.P.;                                     :
ALLIANZ INVEST KAG - SIEMENS;                               :
ALLIANZ/SANFORD;                                           :
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;                       :
AM MASTER FUND III, LP;                                     :
AMPERE CAPITAL MANAGEMENT LP;                               :
AQR CAPITAL AQRREV;                                         :
BANC OF AMERICA SECURITIES LLC;                             :
BANK OF AMERICA, N.A.;                                      :
BANK OF NEW YORK;                                           :
BANK OF NEW YORK MELLON;                                    :
BANK OF NEW YORK MELLON CORPORATION;                        :
BANK OF NEW YORK MELLON EMPLOYEE                            :
BENEFIT COLLECTIVE INVESTMENT FUND PLAN;                    :
BANK OF NEW YORK MELLON / MIDCAP SPDRS;                     :
BAR CAP EQUITY FINANCE;                                     :
BARCLAYS BANK PLC;                                          :
BARCLAYS CAPITAL GROUP;                                     :
BARCLAYS CAPITAL, INC.;                                     :
BARCLAYS CAPITAL SECURITIES LIMITED;                        :
BARCLAYS CAPITAL SECURITIES LIMITED as                      :
successor to BZW SECURITIES LIMITED;                        :
BARCLAYS GLOBAL INVESTORS LTD.;                             :
BARCLAYS GLOBAL INVESTORS NA REF                            :
INDUSTRY ALPHA LTD;                                        :
BEAR STEARNS & CO. INC.;                                   :
BEAR STEARNS EQUITY STRATEGIES RT LLC;                      :
*(continued)*

991567.1

BEAR STEARNS SECURITIES CORP.;                          :
BHF-BANK AKTIENGESELLSCHAFT;                            :
BLACKROCK;                                             :
BLACKROCK, INC.;                                        :
BNP PARIBAS PRIME BROKERAGE, INC.;                      :
BNP PARIBAS SECURITIES CORP.;                           :
BNY MELLON;                                             :
BON SECOURS HEALTH SYSTEM, INC.;                        :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;                :
CAXTON ASSOCIATES LLC;                                 :
CHICAGO TRADING;                                       :
CITIBANK;                                              :
CITIBANK, N.A.;                                        :
CITIBANK, N.A. EQUITY DERIVATIVES;                     :
CITIGROUP GLOBAL MARKETS, INC.;                        :
CITIGROUP GLOBAL MARKETS, INC./SALOMON                 :
BROTHERS;                                              :
CITIGROUP GLOBAL MARKETS LTD.;                         :
CITIGROUP PRIVATE BANK & TRUST;                        :
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F.            :
GASPARINI;                                             :
COLLECTIVE TRUST OF THE BANK OF NEW YORK;               :
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;               :
CREDIT SUISSE FIRST BOSTON;                            :
CREDIT SUISSE SECURITIES (USA) LLC;                    :
CSFB PROPRIETARY TRADING US;                           :
DB BANK AG AMSTERDAM;                                  :
DEEPHAVEN;                                             :
DEEPHAVEN CAPITAL MANAGEMENT;                          :
DEL MAR ASSET MANAGEMENT;                              :
DEUTSCHE BANK AG;                                      :
DEUTSCHE BANK AG FRANKFURT;                            :
DEUTSCHE BANK AQRREV;                                  :
DEUTSCHE BANK SECURITIES, INC.;                        :
DEUTSCHE LUFTHANSA AG;                                 :
FORRESTAL FUNDING MASTER TRUST;                        :
GALLEON MANAGEMENT LP / GALLEON                        :
BUCCANEERS OFFSHORE BANK OF BERMUDA                    :
(CAYMAN) LTD.;                                         :
GENERAL ELECTRIC COMPANY;                              :
GOLDMAN, SACHS & CO.;                                  :
GOLDMAN, SACHS & CO., INC.;                            :
GOLDMAN SACHS EXECUTION & CLEARING;                    :
GOLDMAN SACHS EXECUTION & CLEARING, L.P.;              :
*(continued)*                                          :
                                                       :

2

GOLDMAN SACHS INVESTMENT STRATEGIES,      :
LLC;                                                          :
GRYPHON HIDDEN VALUE VIII LP;             :
HALCYON DIVERSIFIED FUND LP;              :
HALCYON MANAGEMENT CO. LLC;               :
HALCYON SPECIAL SITUATIONS LP;            :
HAVENS ADVISORS LLC;                      :
HIGHBRIDGE CAPITAL MANAGEMENT, LLC;       :
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE  :
CAP COP MAPLES & CALDER;                  :
HSBC N.A. HOLDINGS, INC.;                 :
IBM NETHERLANDS MSCI US;                  :
IBM PERSONAL PENSION PLAN TRUST;          :
IBM RETIREMENT FUNDS;                     :
INKA MBH FOR SPERRKONTO;                  :
INTERNATIONAL BUSINESS MACHINES           :
CORPORATION;                              :
J.P. MORGAN;                              :
J.P. MORGAN CLEARING CORP.;               :
J.P. MORGAN SECURITIES LLC/NYSE;          :
J.P. MORGAN SECURITIES INC.;              :
J.P. MORGAN SERVICES;                     :
JPMORGAN CHASE BANK, NATIONAL             :
ASSOCIATION;                              :
LAURA LYNN FORD;                          :
LIBERTY HARBOR MASTER FUND I, LP;         :
MAGNETAR CAPITAL LLC;                     :
MAGNETAR FINANCIAL LLC / MAGNETAR         :
CAPITAL MST FD LTD M&C CORPORATE          :
SERVICES LTD.;                            :
MAPLES & CALDER;                          :
MERRILL LYNCH;                            :
MERRILL LYNCH FINANCIAL MARKETS, EQUITY   :
FINANCING GROUP;                          :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
as successor to BANC OF AMERICA SECURITIES LLC,  :
SECURITIES LENDING SERVICES;              :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
- SAFEKEEPING;                            :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
- SECURITIES LENDING;                     :
METROPOLITAN LIFE INSURANCE CO.;          :
MILTON PARTNERS LLC;                      :
MORGAN STANLEY & CO. INC.;                :
MORGAN STANLEY & CO. INTL.;               :
*(continued)*                             :

3

991567.1

MORGAN STANLEY/PRIME BROKER/CN;                    :
MORGAN STANLEY SMITH BARNEY LLC;                   :
MS S&P 500 INDEX FUND;                             :
MS SELECT-VALUE ADDED MARKET;                      :
MS VALUE ADDED MARKET SERIES;                      :
NATIONAL FINANCIAL SERVICES LLC;                   :
NEW YORK LIFE INSURANCE CO.;                       :
NEWBROOK CAPITAL ADVISORS LP;                      :
NYC BOARD OF EDUCATION;                            :
NYC EMPLOYEES RETIREMENT SYSTEM;                   :
NYC FIRE RETIREMENT SYSTEM;                        :
NYC POLICE OFICERS VARIABLE;                       :
NYC POLICE RETIREMENT SYSTEM;                      :
NYC RETIREMENT SYSTEMS;                            :
ODDO & CIE as successor to BANQUE D'ORSAY;         :
OPPENHEIMER & CO., INC.;                           :
PERRY CORP.;                                       :
PERRY PARTNERS;                                    :
PERRY PARTNERS L.P.;                               :
POTTER, ADAM F.;                                   :
PRISM PARTNERS OFFSHORE;                           :
PRUDENTIAL BACHE SECURITIES, LLC;                  :
R K MELLON CTF #3;                                 :
RABO CAPITAL SERVICES, INC.;                       :
RELATIVE VALUE LTD / HIGHBRIDGE EVENT              :
DRIVEN RE HIGHBRIDGE CAP MGMT LLC;                 :
SANFORD C. BERNSTEIN & CO., INC.;                  :
STATE STREET LUX;                                  :
TBK PARTNERS, LLC;                                 :
TD ASSET MANAGEMENT USA, INC.;                     :
TD EMERALD HEDGED U.S. EQUITY;                     :
TD EMERALD POOLED U.S. FUND;                       :
TD EMERALD U.S. MARKET INDEX FUND;                 :
TD U.S. INDEX FUND;                                :
THE HARTFORD;                                      :
TIME WARNER INC. MASTER PENSION TRUST;             :
TRIBECA INVESTMENTS LLC;                           :
TWEEDY, BROWNE COMPANY, LLC;                       :
TWEEDY, BROWNE VALUE FUND;                         :
UBS FINANCIAL SERVICES INC.;                       :
UBS SECURITIES INC.;                               :
UBS SECURITIES LLC - SECURITIES LENDING;           :
USAA FEDERAL SAVINGS BANK;                         :
VANDERBILT PARTNERS, LLC;                          :
WESTCHESTER CAPITAL MANAGEMENT;                    :
*(continued)*                                      :

4

991567.1

WILLIAM H. BROWNE; and                                      :
WILMINGTON TRUST CO. as owner and trustee for               :
THE US TRUST,                                               :
                                                            :
                              Defendants.                   :
------------------------------------------------------------------- x

**To the above-named defendants:**

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorney an answer to the complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after service is complete if this summons is not personally delivered to you within the State of New York.  In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of the venue designated is CPLR § 503 because one or more of the parties resides in the County of New York, with plaintiff Deutsche Bank Trust Company Americas having its principal office at 60 Wall Street, New York, New York 10005, and plaintiff Law Debenture Trust Company of New York having its principal office at 400 Madison Avenue, New York, New York 10017.

Dated: New York, New York
       June 2, 2011

FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP

By: _____
    Robert J. Lack
    Hal Neier
    Amy C. Brown
    Jeffrey C. Fourmaux

7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Plaintiffs*

991567.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

Plaintiffs,

vs.

Index No. 651517/2011

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB;
ALLIANCE BERNSTEIN;
ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD;
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;
AQR CAPITAL AQRREV;
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, N.A.;
BANK OF NEW YORK;
BANK OF NEW YORK MELLON;
BANK OF NEW YORK MELLON CORPORATION;
BANK OF NEW YORK MELLON EMPLOYEE
BENEFIT COLLECTIVE INVESTMENT FUND PLAN;
BANK OF NEW YORK MELLON / MIDCAP SPDRS;
BAR CAP EQUITY FINANCE;
BARCLAYS BANK PLC;
BARCLAYS CAPITAL GROUP;
BARCLAYS CAPITAL, INC.;
BARCLAYS CAPITAL SECURITIES LIMITED;
BARCLAYS CAPITAL SECURITIES LIMITED as
successor to BZW SECURITIES LIMITED;
BARCLAYS GLOBAL INVESTORS LTD.;
BARCLAYS GLOBAL INVESTORS NA REF
INDUSTRY ALPHA LTD;
BEAR STEARNS & CO. INC.;
BEAR STEARNS EQUITY STRATEGIES RT LLC;
*(continued)*

COMPLAINT

991344.3

BEAR STEARNS SECURITIES CORP.;                               :
BHF-BANK AKTIENGESELLSCHAFT;                                 :
BLACKROCK;                                                   :
BLACKROCK, INC.;                                             :
BNP PARIBAS PRIME BROKERAGE, INC.;                           :
BNP PARIBAS SECURITIES CORP.;                                :
BNY MELLON;                                                  :
BON SECOURS HEALTH SYSTEM, INC.;                             :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;   :
CAXTON ASSOCIATES LLC;                                       :
CHICAGO TRADING;                                             :
CITIBANK;                                                    :
CITIBANK, N.A.;                                              :
CITIBANK, N.A. EQUITY DERIVATIVES;                           :
CITIGROUP GLOBAL MARKETS, INC.;                              :
CITIGROUP GLOBAL MARKETS, INC./SALOMON          :
BROTHERS;                                                    :
CITIGROUP GLOBAL MARKETS LTD.;                               :
CITIGROUP PRIVATE BANK & TRUST;                              :
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F.         :
GASPARINI;                                                   :
COLLECTIVE TRUST OF THE BANK OF NEW YORK;   :
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;               :
CREDIT SUISSE FIRST BOSTON;                                  :
CREDIT SUISSE SECURITIES (USA) LLC;                          :
CSFB PROPRIETARY TRADING US;                                 :
DB BANK AG AMSTERDAM;                                        :
DEEPHAVEN;                                                   :
DEEPHAVEN CAPITAL MANAGEMENT;                                :
DEL MAR ASSET MANAGEMENT;                                    :
DEUTSCHE BANK AG;                                            :
DEUTSCHE BANK AG FRANKFURT;                                  :
DEUTSCHE BANK AQRREV;                                        :
DEUTSCHE BANK SECURITIES, INC.;                              :
DEUTSCHE LUFTHANSA AG;                                       :
FORRESTAL FUNDING MASTER TRUST;                              :
GALLEON MANAGEMENT LP / GALLEON                              :
BUCCANEERS OFFSHORE BANK OF BERMUDA                          :
(CAYMAN) LTD.;                                               :
GENERAL ELECTRIC COMPANY;                                    :
GOLDMAN, SACHS & CO.;                                        :
GOLDMAN, SACHS & CO., INC.;                                  :
GOLDMAN SACHS EXECUTION & CLEARING;                          :
GOLDMAN SACHS EXECUTION & CLEARING, L.P.;   :
*(continued)*                                                :
                                                             :

GOLDMAN SACHS INVESTMENT STRATEGIES,  :
LLC;  :
GRYPHON HIDDEN VALUE VIII LP;  :
HALCYON DIVERSIFIED FUND LP;  :
HALCYON MANAGEMENT CO. LLC;  :
HALCYON SPECIAL SITUATIONS LP;  :
HAVENS ADVISORS LLC;  :
HIGHBRIDGE CAPITAL MANAGEMENT, LLC;  :
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE  :
CAP COP MAPLES & CALDER;  :
HSBC N.A. HOLDINGS, INC.;  :
IBM NETHERLANDS MSCI US;  :
IBM PERSONAL PENSION PLAN TRUST;  :
IBM RETIREMENT FUNDS;  :
INKA MBH FOR SPERRKONTO;  :
INTERNATIONAL BUSINESS MACHINES  :
CORPORATION;  :
J.P. MORGAN;  :
J.P. MORGAN CLEARING CORP.;  :
J.P. MORGAN SECURITIES LLC/NYSE;  :
J.P. MORGAN SECURITIES INC.;  :
J.P. MORGAN SERVICES;  :
JPMORGAN CHASE BANK, NATIONAL  :
ASSOCIATION;  :
LAURA LYNN FORD;  :
LIBERTY HARBOR MASTER FUND I, LP;  :
MAGNETAR CAPITAL LLC;  :
MAGNETAR FINANCIAL LLC / MAGNETAR  :
CAPITAL MST FD LTD M&C CORPORATE  :
SERVICES LTD.;  :
MAPLES & CALDER;  :
MERRILL LYNCH;  :
MERRILL LYNCH FINANCIAL MARKETS, EQUITY  :
FINANCING GROUP;  :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
as successor to BANC OF AMERICA SECURITIES LLC,  :
SECURITIES LENDING SERVICES;  :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
- SAFEKEEPING;  :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.  :
- SECURITIES LENDING;  :
METROPOLITAN LIFE INSURANCE CO.;  :
MILTON PARTNERS LLC;  :
MORGAN STANLEY & CO. INC.;  :
MORGAN STANLEY & CO. INTL.;  :
*(continued)*  :

991344.3

MORGAN STANLEY/PRIME BROKER/CN;                 :
MORGAN STANLEY SMITH BARNEY LLC;                :
MS S&P 500 INDEX FUND;                          :
MS SELECT-VALUE ADDED MARKET;                   :
MS VALUE ADDED MARKET SERIES;                   :
NATIONAL FINANCIAL SERVICES LLC;                :
NEW YORK LIFE INSURANCE CO.;                    :
NEWBROOK CAPITAL ADVISORS LP;                   :
NYC BOARD OF EDUCATION;                         :
NYC EMPLOYEES RETIREMENT SYSTEM;                :
NYC FIRE RETIREMENT SYSTEM;                     :
NYC POLICE OFICERS VARIABLE;                    :
NYC POLICE RETIREMENT SYSTEM;                   :
NYC RETIREMENT SYSTEMS;                         :
ODDO & CIE as successor to BANQUE D'ORSAY;      :
OPPENHEIMER & CO., INC.;                        :
PERRY CORP.;                                    :
PERRY PARTNERS;                                 :
PERRY PARTNERS L.P.;                            :
POTTER, ADAM F.;                                :
PRISM PARTNERS OFFSHORE;                        :
PRUDENTIAL BACHE SECURITIES, LLC;               :
R K MELLON CTF #3;                              :
RABO CAPITAL SERVICES, INC.;                    :
RELATIVE VALUE LTD / HIGHBRIDGE EVENT           :
DRIVEN RE HIGHBRIDGE CAP MGMT LLC;              :
SANFORD C. BERNSTEIN & CO., INC.;               :
STATE STREET LUX;                               :
TBK PARTNERS, LLC;                              :
TD ASSET MANAGEMENT USA, INC.;                  :
TD EMERALD HEDGED U.S. EQUITY;                  :
TD EMERALD POOLED U.S. FUND;                    :
TD EMERALD U.S. MARKET INDEX FUND;              :
TD U.S. INDEX FUND;                             :
THE HARTFORD;                                   :
TIME WARNER INC. MASTER PENSION TRUST;          :
TRIBECA INVESTMENTS LLC;                        :
TWEEDY, BROWNE COMPANY, LLC;                    :
TWEEDY, BROWNE VALUE FUND;                      :
UBS FINANCIAL SERVICES INC.;                    :
UBS SECURITIES INC.;                            :
UBS SECURITIES LLC - SECURITIES LENDING;        :
USAA FEDERAL SAVINGS BANK;                      :
VANDERBILT PARTNERS, LLC;                       :
WESTCHESTER CAPITAL MANAGEMENT;                 :
*(continued)*

WILLIAM H. BROWNE; and            :
WILMINGTON TRUST CO. as owner and trustee for     :
THE US TRUST,                               :
                                  :
                Defendants.          :

\------------------------------------------------------------------ x

Plaintiffs Deutsche Bank Trust Company Americas ("**DBTCA**"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), and with its principal place of business at 60 Wall Street, New York, NY 10005, Law Debenture Trust Company of New York ("**Law Debenture**"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), and with its principal place of business at 400 Madison Avenue, New York, NY 10017, and Wilmington Trust Company ("**Wilmington Trust**" and, together with DBTCA and Law Debenture, "**Plaintiffs**"), in its capacity as successor indenture trustee for the PHONES Notes (as hereinafter defined), and with its principal place of business at 1100 North Market Street, Wilmington, DE 19890, by and through their undersigned counsel, respectfully allege as follows:

## NATURE OF THE ACTION

1.     This action arises from the failed leveraged buyout (the "**LBO**") of Tribune Company ("**Tribune**") in 2007 — a transaction that financial and industry analysts contemporaneously characterized as one of the most highly leveraged in history. The LBO lined the pockets of Tribune's former shareholders (the "**Shareholders**") with $8.5 billion of cash at the expense of Tribune's creditors, and precipitated Tribune's careen into bankruptcy shortly thereafter.

2.     Plaintiffs seek to avoid and recover, as constructively fraudulent conveyances, all transfers of any proceeds received by each defendant in connection with the LBO. These

transfers may be recovered from the defendants because: (a) Tribune made the challenged transfers without receiving reasonably equivalent value or fair consideration in exchange therefor; and (b) the challenged transfers were made when Tribune– (i) was, or was thereby rendered, insolvent, (ii) was engaged, or was about to engage, in a business or a transaction for which any property remaining with Tribune was an unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts that would be beyond Tribune's ability to pay as such debts matured.

*          *          *

3.      In mid-2006, Tribune's consolidated revenue was plummeting, its prospects were dimming, and its stock price had dropped to around $27 per share from a high of nearly $40 just twelve months earlier.  The largest Shareholders desperately wanted, and ultimately found, an exit strategy: On April 1, 2007, Tribune's board of directors (the "**Tribune Board**") approved a bid by billionaire Samuel Zell ("**Zell**") to acquire Tribune through an extraordinarily leveraged buyout.

4.      In its most basic form, a leveraged buyout is a corporate acquisition where the acquirer purchases the outstanding stock of a target company using borrowed funds that are guaranteed by, or secured by the assets of, the target company itself.  Because leveraged buyout transactions replace the target company's outstanding equity with new debt, the law recognizes that LBOs are inherently risky to the target company's existing creditors and invite application of fraudulent-transfer law when the target company is left unable to satisfy its obligations to its pre-LBO creditors.  As aptly described by one court, "[f]rom a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional

kinds of fraudulent transfers." Indeed, it is the cashed-out shareholders who receive the principal benefit in an LBO transaction; the target corporation, on the other hand, receives absolutely no benefit to offset the greater risk of operating as a highly leveraged enterprise.

5.      Before the LBO, Tribune and its direct and indirect subsidiaries (collectively, the "**Company**") had approximately $5.6 billion of funded debt obligations and a positive equity value. As a result of the LBO, however, the Company increased its funded debt obligations by more than $8 billion and Tribune had a negative equity value.

6.      The LBO was designed as a single transaction that would be implemented in two steps. Tribune executed the first step of the LBO ("**Step One**") on June 4, 2007, paying some of the Shareholders $4.3 billion (the "**Step One Shareholder Transfers**") for 52% of the outstanding stock at a premium price of $34 per share. Tribune executed the second step of the LBO ("**Step Two**") on December 20, 2007, paying Shareholders another $4 billion (the "**Step Two Shareholder Transfers**" and, together with the Step One Shareholder Transfers, the "**Shareholder Transfers**") for the remaining outstanding stock, also at the premium price of $34 per share. This transaction was a textbook fraudulent conveyance.

7.      Tribune received, and the Shareholders gave, no value whatsoever in exchange for the Shareholder Transfers. To the contrary, Tribune only received the dubious honor of repurchasing its own stock, and a bloated debtload that tripled to more than $13 billion — billions more than Tribune was actually worth, and nearly ten times the Company's cash flow for 2006 or projected cash flow for 2007. This highly leveraged capital structure was nothing short of reckless.

8.      The Company was a terrible candidate for an LBO. Nearly two-thirds of the Company's cash flow was generated from its newspaper businesses. At the time of the LBO, the

publishing industry was in the midst of a deepening, well-publicized structural decline. Print circulation and advertising revenues were falling at a rapid clip across the entire industry as readership migrated online and to other media outlets. The consensus among analysts, market participants, and rating agencies in 2007 was that these challenges were not cyclical and that the declines in circulation and advertising were not likely to abate anytime soon — if ever.

9.     To make matters worse, the Company significantly underperformed industry averages during the years and months leading up to the LBO. In fact, just months before the close of Step One, both management and independent analysts reported that daily circulation for the Company's largest newspapers was decreasing at a more precipitous rate than the industry average decline. Consequently, management had no reason to assume that circulation or advertising revenue would improve over the long term or that the Company could make up any shortfalls.

10.    At the time Step One closed, the Company had already failed to meet management's projections for the first several months of 2007. As of May 2007, year-to-date operating cash flow for the publishing segment was significantly lower than projected, and less than the prior year's actual results for the same period. In fact, one of Tribune's largest newspapers was reported to have had "one of the worst quarters ever experienced" in the second quarter of 2007. Consequently, just to meet full-year projections for 2007, the Company would have had to achieve an impossible trifecta during the second half of the year: turn around the negative trend, and recoup the performance deficiencies from the first half, and significantly exceed 2006 performance.

11.    The Company did not achieve any of these objectives. Rather, between the close of Step One and Step Two, the Company's financial and operating performance continued to

deteriorate as significantly as it did rapidly.  As a result, financial and industry analysts repeatedly downgraded their expectations for the Company's performance, Tribune's stock price traded below $23 (a discount of more than 25% to the tender offer price of $34 per share), and Tribune's bond prices fell to almost 50 cents on the dollar for certain tranches of Tribune's longer term debt.

12.     Market watchers and the media had long predicted and widely publicized that the LBO would ruin Tribune.  It did.  Before the close of Step Two, it was clear that the Company would be unable to meet its operating expenses from existing resources and shortly would be in a full-blown liquidity crisis.  Less than one year later, buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and the majority of its subsidiaries jointly filed for bankruptcy on December 8, 2008 (the "**Petition Date**").

13.     The jointly administered bankruptcy cases are currently pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 08-13141 (KJC).  On April 25, 2011, the Bankruptcy Court entered an order that, in pertinent part: (a) granted Plaintiffs relief from the automatic stay, to the extent it is applicable, to commence this action and accomplish service; and (b) ordered that this action shall be automatically stayed pending further order of the Bankruptcy Court.  Notwithstanding the foregoing, the Bankruptcy Court authorized Plaintiffs immediately to pursue discovery as necessary to prevent any applicable statutes of limitation or time-related defenses from barring the claims asserted in this action.  A copy of the Bankruptcy Court order is appended hereto as Exhibit B.

## THE PARTIES

### I.   Plaintiffs

14.     Plaintiff DBTCA is a trust company that is incorporated in the State of Delaware with its principal place of business in New York, New York.  DBTCA is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of, the following debt securities issued by Tribune:

(a)     the 6.25% Notes due November 10, 2026, pursuant to the indenture, dated as of March 1, 1992, between Tribune and Citibank, N.A. ("**Citibank**") as trustee, successor to The Bank of New York ("**BNY**"), Bank of Montreal Trust Company ("**BMT**"), and Continental Bank, N.A.;

(b)     the 7.25% Debentures due March 1, 2013, pursuant to the indenture, dated as of January 30, 1995 (the "**1995 Indenture**"), between Tribune, successor to The Times Mirror Company ("**Times Mirror**"), and Citibank as trustee, successor to BNY, Wells Fargo Bank, N.A. and First Interstate Bank of California;

(c)     the 7.50% Debentures due July 1, 2023, pursuant to the 1995 Indenture;

(d)     the 4.875% Notes due August 15, 2010, pursuant to the indenture, dated as of January 1, 1997 (the "**1997 Indenture**"), between Tribune and Citibank, as trustee, successor to BMT;

(e)     the 5.25% Notes due August 15, 2015, pursuant to the 1997 Indenture; and

(f)     the 5.67% Notes due December 8, 2008, pursuant to the 1997 Indenture.

15.     Plaintiff Law Debenture is a trust company that is incorporated in the State of New York with its principal place of business in New York, New York.  Law Debenture is the successor indenture trustee to DBTCA for, and has been duly designated to prosecute and

resolve the claims asserted herein on behalf of, the holders of the following debt securities issued by Tribune:

        (a)    the 6.61% Debentures due September 15, 2027, pursuant to the indenture, dated as of March 19, 1996 (the "**1996 Indenture**"), by and between Tribune, successor to Times Mirror, and Citibank, as trustee; and

        (b)    the 7.25% Debentures due November 15, 2096, pursuant to the 1996 Indenture.

16.     The debt securities referred to in the two preceding paragraphs collectively have a total face amount of approximately $1.263 billion, and collectively are referred to herein as the "**Senior Notes**." As of the Petition Date, Tribune owed $1.283 billion, exclusive of accrued post-petition interest, to the holders of the Senior Notes.

17.     Plaintiff Wilmington Trust is a trust company that is incorporated in the State of Delaware with its principal place of business in Wilmington, Delaware. Wilmington Trust is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of Exchangeable Subordinated Debentures due 2029 (the "**PHONES Notes**"), pursuant to the indenture, dated as of April 1, 1999 between Tribune and BMT, as trustee. As of the Petition Date, Tribune owed $1.197 billion, exclusive of accrued post-petition interest, to the holders of the PHONES Notes.

18.     The holders of the Senior Notes and the PHONES Notes, as well as their respective successors and assigns, collectively are referred to herein as the "**Pre-LBO Noteholders**." The Pre-LBO Noteholders have unsatisfied claims against Tribune for the payment of money on account of the Senior Notes and the PHONES Notes in an amount of no

less than $2.480 billion (the "**Pre-LBO Noteholder Claims**"), exclusive of accrued post-petition interest.

19.     At the time the Step One Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

20.     At the time the Step Two Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

**II.     Defendants**

21.     The caption hereof constitutes a list of defendants who are named parties to this action, and each of whom:

      (a)     either– (i) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received proceeds of the Shareholder Transfers; and

      (b)     either is– (i) a natural person who resides in or is domiciled in this State, (ii) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State, or (iii) a natural person or juridical entity that, upon information or belief, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, derives substantial revenue from interstate or international commerce, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

(collectively, the "**Shareholder Defendants**").  In addition, Exhibit A appended hereto and incorporated herein, includes, upon information and belief, each Shareholder Defendant's last

known address as well as the dates and dollar amounts of proceeds of the Shareholder Transfers received by such defendant.

## JURISDICTION AND VENUE

22.     Pursuant to Article VI of the Constitution of New York State, this Court has original subject-matter jurisdiction over this action.

23.     Pursuant to CPLR 301 or 302, this Court has personal jurisdiction over each of the Shareholder Defendants to the extent that a Shareholder Defendant is: (a) a natural person who resides in or is domiciled in this State; (b) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State; or (c) a natural person or juridical entity that, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, expects or should reasonably have suspected the Shareholder Transfers to have had consequences in this State derives substantial revenue from interstate or international commerce, or maintains relations or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

24.     Pursuant to CPLR 503, venue is proper in this Court because at least one or more of the Plaintiffs or Shareholder Defendants resides in this County.

## FACTUAL BACKGROUND

### I.     The Company's Business and Historical Performance

25.     Founded in 1847, Tribune reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  Headquartered in Chicago, Illinois, Tribune's operations

are conducted through two primary business segments. Tribune's publishing segment owns major newspapers in many of the most significant markets in the United States, including the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, and Newsday. Tribune's broadcasting and entertainment segment owns numerous radio and television stations in major markets.

## II.    The Company's Financial Condition Deteriorates and the Shareholders Begin Agitating for Change.

26.    In June 2000, Tribune merged with Times Mirror, which was owned by the Chandler family. As a result of this merger, the Chandler family, through Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "**Chandler Trusts**"), became Tribune's second largest shareholder and was awarded three seats on the Tribune Board.

27.    The market did not react well to the merger with Times Mirror and, over the course of the next few years, the Company experienced a steady decline in revenues, profitability, and its stock price. In response, Tribune took repeated steps to reduce costs by liquidating assets and shedding jobs. But the numbers continued to drop. By 2006, the Company's profitability was exhibiting quarter-over-quarter declines compared to both 2004 and the majority of 2005.

28.    In or about February 2006, the Chandler Trusts' patience ran out and they began to complain about the Company's performance and to criticize the Tribune Board. The Chandler Trusts admonished the Tribune Board that, absent an upturn in Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

29.    In May 2006, the Tribune Board decided to engage in a leveraged recapitalization pursuant to which it would borrow money to repurchase up to 75 million shares of its common

stock.  The Chandler Trusts' three representatives on the Tribune Board, however, voted against the transaction.

30.     In a publicly filed letter to the Tribune Board on June 13, 2006, the Chandler Trusts advised that they would not participate in the planned repurchase.  The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different."  The Chandler Trusts explained that "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% — substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29%)."  The Chandler Trusts added that "it is the time for prompt, comprehensive action."

31.     On June 27, 2006, Tribune nonetheless announced that it had elected to proceed with the repurchase of 55 million shares through a public tender offer and a private transaction (the "**2006 Repurchase**") with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (collectively, the "**Foundations**" and, together with the Chandler Trusts, the "**Large Shareholders**") at a cost of nearly $1.8 billion which was financed with debt.  As a result of the 2006 Repurchase, the Chandler Trusts became Tribune's largest stockholders and the Foundations continued to be major shareholders.

32.     Unfortunately, the 2006 Repurchase failed to raise Tribune's stock price.  To make matters worse, as a result of the 2006 Repurchase, the Company's debt materially increased by almost 50% and Moody's Investors Service cut Tribune's bond rating to "junk" status.

991344.3                                        15

33.     After the failed 2006 Repurchase, the Large Shareholders redoubled their efforts to effect change at Tribune.  Because of the Chandler Trusts' publicly expressed discontent and their increasing pressure on management, in September 2006, the Tribune Board announced that it had established a special committee to oversee management's exploration of transactions that might maximize the value of Tribune stock.

## III.   The LBO Is Proposed and Approved.

34.     In late January 2007, billionaire investor Zell emerged as a potential buyer for Tribune.  Before Zell's emergence on the scene, the Tribune Board had been considering transactional alternatives to placate the Large Shareholders, including a possible sale of the entire Company or select assets, as well as an internal recapitalization.

35.     Zell proposed a wholly new option.  On or about February 6, 2007, Zell wrote to the Tribune Board and proposed to acquire Tribune in an LBO transaction.

36.     Under Zell's proposal, the Company would borrow nearly $11 billion — while Zell would invest just $315 million of his own money — to buy out the Shareholders.  In other words, Zell sought to acquire the Company by putting up less than 3% of the risk capital and shifting all of the risk of the transaction onto the shoulders of the Company's existing creditors.

37.     On March 10, 2007, management informed Zell that it was skeptical of proceeding with his LBO proposal because of its high degree of leverage.  Only a week before the LBO was announced, a senior Tribune officer wrote to Tribune's treasurer after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the [deal]–i.e., if we are off plan by 2% we have no value in the ESOP for 5 years."  The treasurer responded and confirmed: "yes, if we hit the down 2 case there is no equity value in the first 5 yrs."

38.     However, the prospect of obtaining a windfall for themselves and the

Shareholders was too hard to resist.  Management dismissed the concerns over the Company's

financial future and approved the LBO on April 1, 2007.

39.     The merger agreement contemplated a single transaction in two steps.  In

connection with Step One, Tribune would purchase 52% of Tribune's common stock in a tender

offer at the premium price of $34 per share.  In connection with Step Two, Tribune would

purchase all of the remaining Tribune common stock at the same premium price of $34 per share

in a merger that would ultimately take Tribune private.  To finance the deal, the Company

committed to borrow nearly $11 billion — more than $8.2 billion of which was funneled to the

Shareholders as Shareholder Transfers.  The remainder of the loan proceeds was used to pay

lender and advisor fees, transaction costs and expenses, and to refinance the debt incurred in

connection with the 2006 Repurchase.

40.     Notwithstanding its two-step structure, the LBO was conceived, promoted, and

proceeded as (and, in economic reality, was) an integrated transaction in which neither Step One

nor Step Two was intended to occur on its own.  In fact, had there been a way to structure the

LBO so that only a single step were necessary, the LBO would have been structured accordingly.

41.     The Tribune Board approved both Step One and Step Two at the same time, and

promoted the LBO as a single transaction, indicating that management intended both steps to

constitute one integrated transaction.  For example, on April 2, 2007, Tribune publicly

announced that it had agreed to the Zell proposal.  Tribune's press release stated, in pertinent

part:

> With the completion of its strategic review process, Tribune
> Company today announced a transaction which will result in the
> company going private and Tribune shareholders receiving $34 per
> share.  Sam Zell is supporting the transaction with a $315 million

investment. Shareholders will receive their consideration in a two-stage transaction.

Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.

The first stage of the transaction is a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .

The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

42.     The primary structural mechanism used to execute the LBO was created for the sole purpose of generating certain tax benefits. Those benefits, however, could only be realized upon consummation of Step Two. Thus, the LBO made economic sense only if Step Two closed and the anticipated tax savings could be realized.

43.     The lenders that financed the LBO analyzed Step One and Step Two concurrently, and the commitment letters for both steps of the transaction were executed at the same time, cross-referenced each other, and obligated the lenders to provide financing for Step One and Step Two. Moreover, the same exact lenders financed both steps of the LBO pursuant to a single credit agreement that interlocked the financing of both steps with a loss-sharing provision and based the fees and interest rate associated with the Step One loans upon the Company's debt load following Step Two. On March 28, 2007, Tribune's treasurer instructed that a draft press release should state that "Tribune has received committed financing from Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

44.     As was widely acknowledged by all of the parties involved, shareholder approval for the LBO was virtually guaranteed from the LBO's inception as a result of a voting agreement with the Chandler Trusts. Indeed, after Tribune purchased half of its outstanding common stock in connection with Step One, nearly half of the remaining shares were held by the Large Shareholders and others directly under Zell's control.

45.     At Tribune's shareholder meeting on August 21, 2007, almost 65% of Tribune's common stock outstanding (and 97% of the shares that were voted) approved Step Two. In the press release announcing the results of the shareholder vote, Tribune's former Chairman and CEO was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."

46.     The parties and industry experts also believed that the LBO would obtain regulatory approval from the FCC, one of the closing conditions. As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected. On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals associated with Step Two would be obtained.

## IV.     The Disastrous Consequences of the LBO Were Foreseeable (and Foreseen).

47.     The Shareholders approved the LBO — and reaped the financial benefits of the Shareholder Transfers — even though they knew, should have known, or had reason to know that it would render Tribune insolvent, inadequately capitalized, or unable to satisfy its obligations. Indeed, as made clear by a cascade of contemporaneous news reports and ratings downgrades, the generally unfavorable reaction to the LBO came swiftly and loudly.

48.     On April 3, 2007 — just one day after the deal was announced — a Goldman

Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and

estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this

challenging newspaper operating environment."  The analyst pointed out that the LBO's high

leverage left Tribune in a "precarious financial position."

49.     A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal

leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far too high for

secularly declining businesses. . . .  Debt payments should overwhelm EBITDA, by our

calculations."

50.     On March 16, 2007, that same Lehman Brothers analyst warned that "putting this

much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible

to put the company into bankruptcy with or without the added tax savings" that Zell anticipated.

51.     On March 29, 2007, Standard & Poor's had a similar prediction and sent a letter

to Tribune's treasurer, stating that it would downgrade Tribune's credit rating because "the

company is expected to default in 2009 when its cash flow and revolving credit capacity are

unable to cover its interest expense, capital expenditures, and working capital needs."

52.     On August 14, 2007, a Lehman Brothers analyst once again warned:

> [W]e continue to think the probability of significant financial
> difficulty at Tribune is much, much greater than 50%/50% —
> given the secularly declining fundamentals and the large amount of
> leverage involved which is currently at 9.6 times 2008E EBITDA
> and would rise to nearly 12 times if the second tranche occurs. . . .
> So by our calculations, if the second tranche of the privatization
> deal happens, the company will not be able to cover the estimated
> annual interest expense from operations let alone have excess free
> cash flow to pay down debt each year.

The analyst's cautionary warnings, of course, proved accurate.

53.    Spooked by the enormous leverage being foisted upon the Company in connection with the LBO, all of the major rating agencies consistently and continuously downgraded Tribune's debt ratings — ultimately to "junk" or "near junk" status — on nearly a dozen occasions from the time the deal was announced until Tribune filed for bankruptcy.

54.    Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO.  As soon as the LBO was announced, a growing chorus of news outlets also began reporting the substantial risk of the proposed transaction, openly questioned the proposal's soundness, and highlighted the crushing debtload that the LBO would create.

55.    For example, on April 2, 2007, the Baltimore Sun — one of Tribune's own newspapers — questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues."  Tribune's rivals were "dumbfounded" by the deal, observed the reporter.

56.    On April 3, 2007, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant growth."  The analyst remarked that "There just isn't a scenario that shows how this industry or this company is going to get significantly better."  The article essentially predicted that, absent a miracle, Tribune could not survive the LBO.

57.    The very same day, The New York Times reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline."

58.     In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst who indicated that "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

59.     On April 6, 2007, The New York Times characterized the proposed LBO as "one of the most absurd deals ever."

60.     On April 16, 2007, Businessweek also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged?  The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06—earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion.  Thus its debt exceeds last year's EBITDA by about ten times.  This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six.  And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now.  (Tribune's revenues declined by more than 5% in February.)

61.     On December 3, 2007, Barron's echoed this concern, reporting that "[t]he combination of a weakening economy and heavy debt loads is causing trouble for many companies that went private in leveraged buyouts since the start of 2006."  While noting the general increase in risk of LBOs, Barron's called-out Tribune in particular:  "One pending LBO that could be a financial disaster is Tribune (TRB)."

62.     Financial-market participants also recognized, almost immediately, that Tribune inevitably would crumble under the weight of debtload imposed by the LBO.  Prices for Tribune credit-default swaps ("**CDS**"), a form of "insurance" that would pay out if Tribune defaulted on its obligations, skyrocketed on the day the LBO was announced and continued to soar through the close of Step Two.

63.     A June 7, 2007 Bloomberg News article chronicled the ever-increasing price of a Tribune CDS, and the ever-increasing risk of the LBO to Tribune's creditors:

> Leveraged buyouts are financed by adding debt onto the target company, increasing the risk that existing bonds and loans may not be repaid.  In Tribune's case, the perceived risk of owning its 5-year bonds tripled after Zell's buyout was reported, based on credit-default swap prices.

64.     On July 20, 2007, Bloomberg News reiterated what the climbing CDS price indicated in terms of Tribune's chances of survival after the LBO:

> Tribune Co. has a 50-50 chance of missing interest payments on some of the $13 billion in debt it will have after real estate investor Sam Zell buys the company, trading in the company's credit-default swaps shows.
>
> Prices of the swaps, financial contracts used to speculate on a company's ability to repay debt, have jumped $331,000 since the first step in the sale was completed in May.  It costs $770,000 to protect $10 million of Tribune bonds for five years, according to CMA Datavision, indicating a more than 50 percent risk of default.  That's up from 32 percent on May 24, based on a JPMorgan Chase & Co. pricing model.

The article went on to explain that "Tribune swaps prices imply investors consider the company the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps were quoted this week by London-based CMA."

65.     Although the risks to the Company's creditors were apparent, the Shareholders overwhelmingly supported the LBO: 92% of Tribune's stock was tendered at Step One, and 97% percent of voting Shareholders voted in favor of Step Two.  An August 21, 2007 article in Medill Reports quoted one Tribune shareholder who succinctly summarized the Shareholders' rationale for approving the deal: "If you're making money on [the deal], sure, what the hell."

## V.   **The Company's Financial Impairment and Flawed Solvency Opinions.**

66.     Because of the Company's moribund financial prospects and the extraordinarily leveraged nature of the LBO, one of the closing conditions — securing viable solvency opinions in connection with both Step One and Step Two — was poised to jeopardize the deal. And finding a firm to provide the requisite opinions turned out to be no easy task. Indeed, Valuation Research Corporation ("**VRC**"), the financial advisory firm that ultimately provided Tribune with the necessary solvency opinions, was the last-ditch choice for Tribune after other firms declined the engagement.

67.     Tribune first approached Houlihan Lokey Howard & Zukin ("**Houlihan**"), a prominent solvency opinion firm. Houlihan, however, expressed serious reservations regarding its ability to provide a solvency opinion in connection with such a highly leveraged transaction and declined even to accept the engagement. Tribune scrambled to find another firm that might provide the necessary opinions.

68.     VRC was aware of Houlihan's reservations about the proposed LBO and recognized that Houlihan's reluctance raised the risk profile associated with the project. Due to the risk attached to the highly leveraged deal, and Houlihan's disinclination to get involved, VRC was able to demand among the highest fees VRC had ever received for solvency opinion work. In exchange, VRC provided the Tribune Board with: (a) written opinions, dated May 9, 2007, and May 24, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step One; and (b) a written opinion, dated December 20, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step Two.

69.     Two uncommon aspects of VRC's engagement are noteworthy. First, VRC was instructed to ignore the generally accepted definition of "fair value" and, instead, to measure fair

24

value in relation to a willing buyer and a willing seller <u>both of whom receive the favorable</u> <u>federal income tax treatment of the ESOP</u>. As a result of this built-in limitation, VRC never offered any opinion as to whether Tribune or the Company would be solvent if it were to be acquired by an entity that did not receive the uniquely favorable federal income tax treatment. Second, VRC was excused from the typical obligation to affirmatively investigate and skeptically evaluate any information provided by management. Consequently, VRC never independently assessed the (un)reasonableness of management's unjustifiably optimistic projections upon which all of VRC's solvency opinions were based.

      **(A)**    **<u>Step One</u>**

    70.    VRC's Step One solvency analysis in May 2007 was based upon financial projections that were finalized by management and approved by the Tribune Board in February 2007 (the "**<u>February Projections</u>**").

    71.    The February Projections were substantially higher than the Company's actual operating results. For the three months from March through May 2007, publishing revenues and earnings were below plan by $50.6 million and $29.7 million, respectively. During the same period, broadcasting revenues and earnings were below plan by $9.4 million and $4.6 million, respectively.

    72.    Management, who received weekly "flash reports," was fully aware that the February Projections were outdated and unreliable almost immediately after they were finalized and approved. Despite this awareness, management persistently declined to revise and update the February Projections until long after Step One had closed.

    73.    As a result of the foregoing, the February Projections were unreasonable and unreliable. Notwithstanding management's acknowledgements that the Company's actual results

were lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued. In fact, management failed to provide any updated financial projections to VRC until late September 2007.

74.     The solvency opinions provided by VRC at Step One were substantially flawed and unreliable for a number of reasons, including but not limited to:

(a)     VRC blindly used the outdated, unreasonable, and unwarranted February Projections supplied by management without any critical analysis.

(b)     VRC artificially separated the two steps of the LBO for purposes of its Step One solvency analysis despite the fact that the LBO was conceived of and promoted as a single, integrated transaction for which financing was fully committed.

(c)     VRC improperly modified the conventional definition of "fair market value" to mean that a "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP in connection with the LBO.

(d)     VRC inappropriately reduced the weight given to its discounted cash flow analysis and increased the weight given to its higher comparable transactions analysis to increase Tribune's overall valuation.

(e)     VRC incorrectly assumed that Tribune would be able to refinance its debts as they matured.

75.     As of June 4, 2007, the correct fair market value of the Company's assets was approximately $10.99 billion. Tribune had obligated itself to consummate an LBO that would saddle it with debt and contingent liabilities of approximately $14.03 billion. As a consequence, and as of the closing of Step One, the Company was insolvent to the extent of approximately $3.04 billion.

991344.3                                    26

76.     Of course, the Company had been highly leveraged in comparison to its peers even before the LBO.  After Step One, however, its debt-to-EBITDA ratio further skyrocketed to 11.4 — more than six times that of its most highly leveraged competitor, and more than eight times that of the industry average.  The Company's debt-to-equity ratio (book value) plummeted below zero, to a ratio of approximately negative 3.5.

77.     The Company could not service the significant amount of leverage imposed by the LBO and lacked adequate capital liquidity to operate its business following Step One.  The Company had an interest-coverage ratio of 1:1, the lowest among its peers, and was unlikely to be able to cover its interest expense.  The Company's operating cash flows were also insufficient to meet its debt service obligations.

78.     Following Step One, the Company had insufficient capital resources to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns, and contingencies.

**(B)     Step Two**

79.     VRC's Step Two solvency analysis exhibited many of the same flaws and skewed assumptions as VRC's Step One solvency analysis, including VRC's novel and improper definition of "fair market value" and the inappropriate equal weighting that VRC assigned to its different valuation methodologies.

80.     In addition, VRC's Step Two solvency analysis in December 2007 was based upon unreasonable and unreliable financial projections that were updated by management and presented, in part, to the Tribune Board in October 2007 (the "**October Projections**").

81.     The October Projections were, to some degree and in the near-term, downward revisions of the February Projections.  However, despite the continued deterioration of the

Company's performance after Step One closed, certain critical forecasts in the October Projections were dramatically revised upward from the February Projections.

82.     For example, the October Projections assumed that, as early as 2009, Tribune's internet-based business would generate significantly greater revenues than anticipated in the February Projections and, thereby, mitigate the continuing decline in Tribune's traditional publishing business.  Yet, the internet-based business had already failed to meet management expectations in 2007.

83.     The October Projections also forecasted that, beginning in 2013 and accelerating through 2017, the Company's revenue would significantly outperform the February Projections on a consolidated basis.  It was patently unreasonable, however, for the Company to assume that each of the five years following the 2012 election year would also enjoy the benefit of the bump in revenue occasioned by swells of political advertising.

84.     As a result of the foregoing, the October Projections were unreasonable and unreliable.  Nonetheless, VRC indiscriminately relied upon the October Projections when preparing its Step Two solvency opinion.

85.     As of December 20, 2007, the correct fair market value of the Company's assets was approximately $10.44 billion.  The Company's debt and contingent liabilities totaled approximately $13.76 billion.  As a consequence, as of the closing of Step Two, the Company was insolvent to the extent of approximately $3.32 billion.

86.     Following Step Two, the Company was excessively leveraged, experiencing a debt-to-EBITDA ratio that was nearly double that of its closest peer, and more than eight times higher than the average of its other peers.  In addition, the Company was the only one of its peers

that had a negative debt-to-equity ratio, and had the lowest interest-coverage ratio among its peers.

## VI.    The Aftermath of the LBO

87.    Because of the LBO, Tribune's funded debtload soared from more than $5 billion to nearly $14 billion — ten times greater than the Company's actual cash flow for 2006 or projected cash flow for 2007.

88.    As was widely predicted by a cacophony of financial analysts, industry experts, rating agencies, market participants, and media outlets alike, the Company's financial health deteriorated rapidly after the LBO closed.  On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions because the Company was "struggling to service th[e] debt" taken on in connection with the LBO.  None of Tribune's cost-cutting measures, however, could forestall the inevitable.

89.    Buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and its most valuable operating subsidiaries jointly filed for bankruptcy on December 8, 2008.

90.    Tribune's own publicly filed estimates in the Bankruptcy Court valued the Company at approximately $6.1 billion in 2010 — less than half of the Company's debt load at the close of Step Two.

### COUNT ONE
#### (Constructive Fraudulent Transfer Against the Shareholder Defendants Pursuant to DEBT. & CRED. LAW §§ 273, 278 & 279)

91.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

92.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

93.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

94.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

95.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the present fair salable value of Tribune's assets was less than the amount that would have been required to pay Tribune's probable liabilities on its existing debts as they became absolute and matured.

96.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT TWO
### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to DEBT. & CRED. §§ 274, 278, & 279)

97.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

98.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

99.   On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

100.   Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

101.   At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which the property remaining with Tribune after making the Shareholder Transfers was an unreasonably small capital.

102.   Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT THREE
### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to DEBT. & CRED. LAW §§ 275, 278, & 279)

103.   Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

104.   On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

105.   On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

106.   Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

107.    At the time the Shareholder Transfers were made, Tribune intended or believed that it would incur debts beyond its ability to pay as they matured.

108.    Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT FOUR
### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to 740 ILL. COMP. STAT. 160/5(a)(2), 160/8, & 160/9)

109.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

110.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

111.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

112.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

113.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

114.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

115.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT FIVE
### (Constructive Fraudulent Transfer Against the Shareholder Defendants Pursuant to 740 ILL. COMP. STAT. 160/6(a), 160/8, & 160/9)

116.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

117.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

118.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

119.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

120.    At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation.

121.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT SIX
**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to MASS. GEN. LAWS ch. 109A, §§ 5(a)(2), 8, & 9)**

122.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

123.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

124.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

125.    n connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare Trust Company, N.A. ("Computershare"), located in Braintree, Massachusetts, as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

126    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

127    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

128   At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

129.   Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT SEVEN
### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to MASS. GEN. LAWS ch. 109A, §§ 6(a), 8, & 9)

130.   Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

131.   On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

132.   On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

133.   In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

991344.3

35

134.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

135.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

136.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

137.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted by applicable law or by agreement, to assert any claims relating to the subject matter of this action against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court grant the following relief:

(a)    entering a judgment against the Shareholder Defendants, finding that the Shareholder Transfers constitute constructively fraudulent transfers;

(b)    avoiding the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(c)    granting recovery of all amounts paid to each of the Shareholder Defendants in connection with the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims;

(d)    granting an attachment against the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(e)    imposing a constructive trust on the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(f)    granting an injunction against further disposition of the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(g)    levying execution on the Shareholder Transfers or their proceeds;

(h)    awarding Plaintiffs damages in an amount to be determined at trial;

(i)    awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(j)    awarding Plaintiffs pre- and post-judgment interest at the highest applicable rate; and

(k)    granting such other and further relief as is just and proper.


Dated:   New York, New York
         June 2, 2011


FRIEDMAN KAPLAN SEILER & ADELMAN LLP


By:   _____
       Robert J. Lack
       Hal Neier
       Amy C. Brown
       Jeffrey C. Fourmaux

7 Times Square
New York, New York  10036-6516
Telephone: (212) 833-1000
Facsimile:  (212) 833-1250

*Attorneys for Plaintiffs*

# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | )   Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al.,[1] | )   Case No. 08-13141 (KJC) |
| | ) |
| | )   Jointly Administered |
| Debtors. | ) |
| | )   D.I. 5591, 8201 |

## ORDER GRANTING (I) RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT THE AUTOMATIC STAY BARS COMMENCEMENT BY CREDITORS OF STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS AND (II) LEAVE FROM THE MEDIATION ORDER TO PERMIT COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS

Upon the motion dated March 1, 2011 of Aurelius Capital Management, LP, on

behalf of its managed entities (collectively "Aurelius"), Deutsche Bank Trust Company

Americas, in its capacity as successor indenture trustee for certain series of senior notes issued

by Tribune Company ("Deutsche Bank"), and Law Debenture Trust Company of New York, in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); ChicagoLand Publishing Company (3237); ChicagoLand Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC, KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company ("Law Debenture" and, collectively with Aurelius, Deutsche Bank and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES notes issued by Tribune Company, the "Original Plaintiff Group"), for entry of an order (I) determining that creditors have regained their state law constructive fraudulent conveyance claims to recover stock redemption payments made to Step One Shareholders (as defined below) and Step Two Shareholders (as defined below) due to the expiration of the statute of limitations under 11 U.S.C. § 546(a); (II) determining that the automatic stay does not bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting relief from the automatic stay to permit the commencement of such litigation; and (III) granting leave from this Court's Order Appointing Mediator [*ECF No.* 5591]  (the "Mediation Order") to permit the commencement of such litigation (the "Motion"); and it appearing that good and sufficient notice of the Motion was given and that no other or further notice is necessary; and the Court having considered the Motion at a hearing on March 22, 2011 (the "Hearing"); and the Court having overruled the objections to the Motion for the reasons stated at the Hearing; and after due deliberation and it appearing sufficient cause exists for granting the requested relief, it is therefore

    ORDERED, ADJUDGED AND DECREED that:

    1.       The Motion is GRANTED to the extent set forth herein.

    2.       Because no state law constructive fraudulent conveyance claims against shareholders whose stock was redeemed or purchased in connection with the first step (such shareholders, the "Step One Shareholders") and/or the second step (such shareholders, the "Step Two Shareholders") of the 2007 leveraged buy-out of Tribune Company (the "LBO") were commenced by or on behalf of the Debtors' estates before the expiration of the applicable statute

of limitations under 11 U.S.C. § 546(a), the Debtors' creditors have regained the right, if any, to prosecute their respective state law constructive fraudulent conveyance claims against Step One Shareholders and/or Step Two Shareholders to recover stock redemption/purchase payments made to such shareholders in connection with the LBO (collectively, the "Creditor SLCFC Claims").

3.     To the extent the automatic stay of 11 U.S.C. § 362(a) stays the commencement of any Creditor SLCFC Claims, the automatic stay is hereby lifted to permit the filing of any complaint by or on behalf of creditors on account of such Creditor SLCFC Claims, including, without limitation, any complaint filed by any plaintiff in the Original Plaintiff Group.

4.     To the extent the Mediation Order stays the commencement of any Creditor SLCFC Claims, leave is hereby granted from such Mediation Order to permit the filing of the complaint(s) referenced in paragraph 3 above.

5.     To the extent that a creditor other than a member of the Original Plaintiff Group seeks to file its own complaint with respect to its Creditor SLCFC Claims, such creditor shall file a statement in this Court acknowledging that the creditor shall, except as provided in and in accordance with paragraph 6 below, stay all actions in the state court litigation and will otherwise adhere to the terms of this Order.

6.     Absent further order of this Court, litigation commenced by the filing of any complaint referenced in paragraphs 3 and 5 above shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the Original Plaintiff Group or any other creditor that files its own complaint; provided, however, that during such stay, any party, including any plaintiff in the Original Plaintiff Group, that files such a complaint may: (a) consistent with governing rules, amend such complaint; (b) complete

service of such complaint; and (c) take such steps, including immediately pursuing discovery, as are necessary solely for the purpose of preventing applicable statutes of limitations or other time-related defenses from barring any Creditor SLCFC Claims.

7.    Nothing in this Order shall prejudice the rights of the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") or any trust established under any plan of reorganization that is confirmed in the Debtors' chapter 11 cases, including to, as the case may be, (i) pursue whatever claims are properly asserted by the Creditors' Committee or by such trusts, in any proper venue, or (ii) amend in any way the adversary complaints (Adv. Pro. Nos. 10-53963 and 10-54010) filed by the Creditors' Committee in these chapter 11 cases, or take or seek to take any other action, or assert any rights or arguments, in connection with such claims or complaints.

8.    Nothing in this Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a Creditor SLCFC Claim or any objection to any plan of reorganization currently before this Court.[2]

9.    This Court shall, except with respect to the prosecution of the Creditor SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated: ___April 25___, 2011
        Wilmington, Delaware

                                        _____
                                        HONORABLE KEVIN J. CAREY
                                        Chief United States Bankruptcy Judge

cc: William P. Bowden, Esquire[3]

---

[2] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. § 546(e).

[3] Counsel shall serve a copy of this Order on all interested parties and file a Certificate of Service with this Court.

FILED: NEW YORK COUNTY CLERK 06/03/2011
NYSCEF DOC. NO. 2
INDEX NO. 651517/2011
RECEIVED NYSCEF: 06/03/2011

008278

FEE PAID

JUN 02 2011

NEW YORK
COUNTY CLERK

SUPREME COURT
STATE OF NEW YORK

APPROVED

COMMERCIAL DIVISION
SUPPORT OFFICE

☐ MOT ☒ X-MOT

CLERK'S
INITIALS

CG 6/2/11

At IAS Part ___ of the Supreme
Court of the State of New York, held
in and for the County of New York,
at the Courthouse located at 60
Centre Street, New York, New York,
on the 2 day of June 2011.

013374

PRESENT: HON. EILEEN BRANSTEN

Hon. _____ J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

Plaintiffs,

vs.

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB;
ALLIANCE BERNSTEIN;
ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD;
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;
AQR CAPITAL AQRREV;
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, N.A.;
BANK OF NEW YORK;
BANK OF NEW YORK MELLON;
BANK OF NEW YORK MELLON CORPORATION;
BANK OF NEW YORK MELLON EMPLOYEE
BENEFIT COLLECTIVE INVESTMENT FUND PLAN;
BANK OF NEW YORK MELLON / MIDCAP SPDRS;
BAR CAP EQUITY FINANCE;
*(continued)*

MOTION SEQUENCE # 001

Index No. 2011 / 651517

This document has
NOT been
E-Filed

ORDER TO SHOW
CAUSE

991438.3

BARCLAYS BANK PLC;                      :
BARCLAYS CAPITAL GROUP;               :
BARCLAYS CAPITAL, INC.;                 :
BARCLAYS CAPITAL SECURITIES LIMITED;   :
BARCLAYS CAPITAL SECURITIES LIMITED as    :
successor to BZW SECURITIES LIMITED;
BARCLAYS GLOBAL INVESTORS LTD.;      :
BARCLAYS GLOBAL INVESTORS NA REF
INDUSTRY ALPHA LTD;                   :
BEAR STEARNS & CO. INC.;              :
BEAR STEARNS EQUITY STRATEGIES RT LLC; :
BEAR STEARNS SECURITIES CORP.;       :
BHF-BANK AKTIENGESELLSCHAFT;      :
BLACKROCK;                        :
BLACKROCK, INC.;                    :
BNP PARIBAS PRIME BROKERAGE, INC.;   :
BNP PARIBAS SECURITIES CORP.;        :
BNY MELLON;                     :
BON SECOURS HEALTH SYSTEM, INC.;    :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.; :
CAXTON ASSOCIATES LLC;             :
CHICAGO TRADING;                 :
CITIBANK;                       :
CITIBANK, N.A.;                     :
CITIBANK, N.A. EQUITY DERIVATIVES;    :
CITIGROUP GLOBAL MARKETS, INC.;      :
CITIGROUP GLOBAL MARKETS, INC./SALOMON
BROTHERS;                        :
CITIGROUP GLOBAL MARKETS LTD.;      :
CITIGROUP PRIVATE BANK & TRUST;      :
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F.
GASPARINI;                       :
COLLECTIVE TRUST OF THE BANK OF NEW YORK; :
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;  :
CREDIT SUISSE FIRST BOSTON;        :
CREDIT SUISSE SECURITIES (USA) LLC;   :
CSFB PROPRIETARY TRADING US;       :
DB BANK AG AMSTERDAM;           :
DEEPHAVEN;                     :
DEEPHAVEN CAPITAL MANAGEMENT;     :
DEL MAR ASSET MANAGEMENT;        :
DEUTSCHE BANK AG;                 :
DEUTSCHE BANK AG FRANKFURT;       :
DEUTSCHE BANK AQRREV;           :
DEUTSCHE BANK SECURITIES, INC.;      :
*(continued)*                      :

DEUTSCHE LUFTHANSA AG;                              :
FORRESTAL FUNDING MASTER TRUST;                     :
GALLEON MANAGEMENT LP / GALLEON                     :
BUCCANEERS OFFSHORE BANK OF BERMUDA                 :
(CAYMAN) LTD.;                                      :
GENERAL ELECTRIC COMPANY;                           :
GOLDMAN, SACHS & CO.;                               :
GOLDMAN, SACHS & CO., INC.;                         :
GOLDMAN SACHS EXECUTION & CLEARING;                 :
GOLDMAN SACHS EXECUTION & CLEARING, L.P.;           :
GOLDMAN SACHS INVESTMENT STRATEGIES,                :
LLC;                                                :
GRYPHON HIDDEN VALUE VIII LP;                       :
HALCYON DIVERSIFIED FUND LP;                        :
HALCYON MANAGEMENT CO. LLC;                         :
HALCYON SPECIAL SITUATIONS LP;                      :
HAVENS ADVISORS LLC;                                :
HIGHBRIDGE CAPITAL MANAGEMENT, LLC;                 :
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE          :
CAP COP MAPLES & CALDER;                            :
HSBC N.A. HOLDINGS, INC.;                           :
IBM NETHERLANDS MSCI US;                            :
IBM PERSONAL PENSION PLAN TRUST;                    :
IBM RETIREMENT FUNDS;                               :
INKA MBH FOR SPERRKONTO;                            :
INTERNATIONAL BUSINESS MACHINES                     :
CORPORATION;                                        :
J.P. MORGAN;                                        :
J.P. MORGAN CLEARING CORP.;                         :
J.P. MORGAN SECURITIES LLC/NYSE;                    :
J.P. MORGAN SECURITIES INC.;                        :
J.P. MORGAN SERVICES;                               :
JPMORGAN CHASE BANK, NATIONAL                       :
ASSOCIATION;                                        :
LAURA LYNN FORD;                                    :
LIBERTY HARBOR MASTER FUND I, LP;                   :
MAGNETAR CAPITAL LLC;                               :
MAGNETAR FINANCIAL LLC / MAGNETAR                   :
CAPITAL MST FD LTD M&C CORPORATE SERVICES           :
LTD.;                                               :
MAPLES & CALDER;                                    :
MERRILL LYNCH;                                      :
MERRILL LYNCH FINANCIAL MARKETS, EQUITY             :
FINANCING GROUP;                                    :
*(continued)*                                       :
                                                    :

991438.3                             3

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.   :
as successor to BANC OF AMERICA SECURITIES LLC,   :
SECURITIES LENDING SERVICES;   :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. -   :
SAFEKEEPING;   :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. -   :
SECURITIES LENDING;   :
METROPOLITAN LIFE INSURANCE CO.;   :
MILTON PARTNERS LLC;   :
MORGAN STANLEY & CO. INC.;   :
MORGAN STANLEY & CO. INTL.;   :
MORGAN STANLEY/PRIME BROKER/CN;   :
MORGAN STANLEY SMITH BARNEY LLC;   :
MS S&P 500 INDEX FUND;   :
MS SELECT-VALUE ADDED MARKET;   :
MS VALUE ADDED MARKET SERIES;   :
NATIONAL FINANCIAL SERVICES LLC;   :
NEW YORK LIFE INSURANCE CO.;   :
NEWBROOK CAPITAL ADVISORS LP;   :
NYC BOARD OF EDUCATION;   :
NYC EMPLOYEES RETIREMENT SYSTEM;   :
NYC FIRE RETIREMENT SYSTEM;   :
NYC POLICE OFICERS VARIABLE;   :
NYC POLICE RETIREMENT SYSTEM;   :
NYC RETIREMENT SYSTEMS;   :
ODDO & CIE as successor to BANQUE D'ORSAY;   :
OPPENHEIMER & CO., INC.;   :
PERRY CORP.;   :
PERRY PARTNERS;   :
PERRY PARTNERS L.P.;   :
POTTER, ADAM F.;   :
PRISM PARTNERS OFFSHORE;   :
PRUDENTIAL BACHE SECURITIES, LLC;   :
R K MELLON CTF #3;   :
RABO CAPITAL SERVICES, INC.;   :
RELATIVE VALUE LTD / HIGHBRIDGE EVENT   :
DRIVEN RE HIGHBRIDGE CAP MGMT LLC;   :
SANFORD C. BERNSTEIN & CO., INC.;   :
STATE STREET LUX;   :
TBK PARTNERS, LLC;   :
TD ASSET MANAGEMENT USA, INC.;   :
TD EMERALD HEDGED U.S. EQUITY;   :
TD EMERALD POOLED U.S. FUND;   :
TD EMERALD U.S. MARKET INDEX FUND;   :
TD U.S. INDEX FUND;   :
*(continued)*   :

991438.3                                    4

THE HARTFORD;                                :
TIME WARNER INC. MASTER PENSION TRUST;    :
TRIBECA INVESTMENTS LLC;                    :
TWEEDY, BROWNE COMPANY, LLC;            :
TWEEDY, BROWNE VALUE FUND;              :
UBS FINANCIAL SERVICES INC.;             :
UBS SECURITIES INC.;                       :
UBS SECURITIES LLC - SECURITIES LENDING;   :
USAA FEDERAL SAVINGS BANK;             :
VANDERBILT PARTNERS, LLC;              :
WESTCHESTER CAPITAL MANAGEMENT;      :
WILLIAM H. BROWNE; and                  :
WILMINGTON TRUST CO. as owner and trustee for  :
THE US TRUST,                                  :
                      Defendants.           :
-----------------------------------------------------------------x

        UPON the reading and filing of the annexed affirmation of plaintiffs' counsel,

Jeffrey C. Fourmaux, Esq., dated June 2, 2011, and the exhibits annexed thereto,

        LET the defendants hereinabove captioned show cause before this court, at IAS

Part _3_ thereof, at the Courthouse located at 60 Centre Street, Room _442_ New York, New

York, on the _19_ day of September 2011,[1] at _10_ o'clock in the _fore_ noon, or as soon

thereafter as the parties or their counsel may be heard, why an order should not be issued and

entered granting plaintiffs' motion for an order, pursuant to 22 NYCRR § 216.1, directing the

Office of the Clerk of the County of New York to partially seal the file in this action to the sole

extent of Exhibit A to the complaint; and it is

        ORDERED that, sufficient cause ~~appearing~~ _being alleged_ therefor, the Clerk of the County of

New York is hereby directed to immediately accept ~~the summons and complaint with~~ _only, attached to the Summons a_ Exhibit A _complaint_

for filing under seal ~~and to immediately issue an index number for this action upon payment of~~

~~the requisite fee~~; and it is further

_J.S.C_

---

[1] For the reason set forth in the supporting affirmation at ¶ 12.

being alleged

ORDERED that, sufficient cause ~~appearing~~ therefor, pending the hearing ~~and~~ ~~determination~~ of this motion, Exhibit A shall remain under seal; and it is further

ORDERED that service of a copy of this order and the papers upon which it is granted upon the Office of the Clerk of the County of New York, by hand delivery, so as to be received by said office on or before _August 5, 2011_, be deemed good and sufficient service thereof upon said office; and it is further

ORDERED that service of a copy of this order and the papers upon which it is granted upon the defendants hereinabove captioned, by personal service or U.S. first class mail, on or before August 5, 2011,[2] be deemed good and sufficient service thereof, except that, pending the hearing ~~and determination~~ of this motion, plaintiffs are authorized to redact Exhibit A to the complaint served pursuant to this paragraph so as to redact any information unrelated to the particular defendant to whom the service is addressed;[3] and it is further

ORDERED that answering papers, if any, be served upon plaintiffs' counsel, Friedman Kaplan Seiler & Adelman LLP, Seven Times Square, New York, New York 10036, so as to be received by said counsel on or before Sept 8, 2011.

ENTER:

_____
Justice of the Supreme Court

HON. EILEEN BRANSTEN

ORAL ARGUMENT DIRECTED

HON. EILEEN BRANSTEN J.S.C.

All papers with PROPER TABS must be delivered to the courtroom (442) by 3 pm on or before 9-8-11

J.S.C.

J.S.C.

[2] *See id.*

[3] For the reason set forth in the supporting affirmation at ¶ 13.

INDEX NO. 651517/2011
RECEIVED NYSCEF: 06/03/2011

FILED: NEW YORK COUNTY CLERK 06/03/2011
NYSCEF DOC. NO. 3

**EXHIBIT A**

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| ABU DHABI INVESTMENT AUTHORITY | | REDACTED | | | |
| ALBERTA - WCB | | | | | |
| ALLIANCEBERNSTEIN L.P. | | | | | |
| ALLIANZ INVEST KAG - SIEMENS | | | | | |
| AM INTERNATIONAL EMAC 63 LTD/ VOL ARB | | | | | |
| AM MASTER FUND III, LP | | | | | |
| AMPERE CAPITAL MANAGEMENT LP | | | | | |
| BANC OF AMERICA SECURITIES LLC | | | | | |
| BANK OF AMERICA NA | | | | | |
| BANK OF NEW YORK | | | | | |
| BANK OF NEW YORK MELLON /MIDCAP SPDRS | | | | | |

991181.6

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| BANK OF NEW YORK MELLON CORPORATION | | REDACTED | | | |
| BANK OF NEW YORK MELLON EMP BENEFIT COLL INVSTMNT FND PLN | | | | | |
| BANK OF NEW YORK MELLON EMP BENEFIT COLL INVSTMNT FND PLN | | | | | |
| BAR CAP EQUITY FINANCE | | | | | |
| BARCLAYS BANK PLC | | | | | |
| BARCLAYS BANK PLC | | | | | |
| BARCLAYS CAPITAL INC. | | | | | |
| BARCLAYS CAPITAL SECURITIES LIMITED | | | | | |
| BARCLAYS CAPITAL SECURITIES LIMITED AS SUCCESSOR TO BZW SECURITIES LIMITED | | | | | |
| BARCLAYS GBL INVESTORS LTD A/C CHS0036498 | | | | | |
| BARCLAYS GBL INVESTORS LTD A/C CSAM945416 | | | | | |
| BARCLAYS GBL INVESTORS LTD A/C SEB0567995 | | | | | |

| | | | Shareholder Transfers | | |
|---|---|---|---|---|---|
| Name | Name2 | Address | Step One | Step Two | Date Unknown |
| BEAR STEARNS & CO INC | | REDACTED | | | |
| BEAR STEARNS EQUITY STRATEGIES RT LLC | | | | | |
| BEAR STEARNS SECURITIES CORP. | | | | | |
| BHF-BANK AKTIENGESELLSCHAF | | | | | |
| BLACKROCK | | | | | |
| BNP PARIBAS PRIME BROKERAGE, INC. | | | | | |
| BNP PARIBAS SECURITIES CORP. | | | | | |
| BON SECOURS HEALTH SYSTEM, INC | | | | | |
| BROWNE, WILLIAM H. | | | | | |
| CARLYLE MULTI-STRATEGY MASTER FUND LTD | | | | | |
| CAXTON ASSOCIATES LLC | | | | | |
| CITIBANK, N.A. | | | | | |
| CITIBANK, N.A. | | | | | |

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| CITIGROUP GLOBAL MARKETS INC. | | REDACTED | | | |
| CITIGROUP GLOBAL MARKETS INC. | | | | | |
| CITIGROUP GLOBAL MARKETS LTD. | | | | | |
| CITIGROUP GLOBAL MARKETS, INC./SALOMON BROTHERS | | | | | |
| CITIGROUP PRIVATE BANK & TRUST | | | | | |
| COLLECTIVE TRUST OF THE BANK OF NEW YORK | | | | | |
| COUTTS EIP US EQUITY INDEX BGI, C/O AIB BNY, GUILD ST, 1FSC | | | | | |
| CREDIT SUISSE FIRST BOSTON | | | | | |
| CREDIT SUISSE SECURITIES (USA) LLC | | | | | |
| CSFB PROPRIETARY TRADING US | | | | | |
| DB BANK AG AMSTERDAM | | | | | |
| DEEPHAVEN | | | | | |
| DEEPHAVEN CAPITAL MANAGEMENT | | | | | |

991181.6

4

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| DEUTSCHE BANK AG FRANKFURT | | REDACTED | | | |
| DEUTSCHE BANK AQRREV | | | | | |
| DEUTSCHE BANK SECURITIES, INC. | | | | | |
| DEUTSCHE LUFTHANSA AG | | | | | |
| FORRESTAL FUNDING MASTER TRUST | | | | | |
| GASPARINI, CLAUDIA F IRA  FBO CLAUDIA F GASPARINI | | | | | |
| GALLEON MANAGEMENT LP / GALLEON BUCCANEERS OFFSHORE BANK OF BERMUDA (CAYMAN) LTD | | | | | |
| GENERAL ELECTRIC COMPANY | | | | | |
| GOLDMAN SACHS & CO. | | | | | |
| GOLDMAN SACHS & CO. | | | | | |

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| GOLDMAN SACHS & CO. INC. | | REDACTED | | | |
| GOLDMAN SACHS EXECUTION & CLEARING, L.P. | | | | | |
| GOLDMAN SACHS EXECUTION & CLEARING, L.P. | | | | | |
| GOLMAN SACHS & CO. | | | | | |
| GRYPHON HIDDEN VALUE VIII LP | | | | | |
| LIBERTY HARBOR MASTER FUND I LP | | | | | |
| HALCYON DIVERSIFIED FUND LP | | | | | |
| HALCYON SPECIAL SITUATIONS LP | | | | | |
| HAVENS ADVISORS LLC | | | | | |
| HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE CAP COP MAPLES & CALDER | | | | | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION | | | | | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION | | | | | |

991181.6

| Name | Name2 | Address | Shareholder Transfers | | |
|---|---|---|---|---|---|
| | | | Step One | Step Two | Date Unknown |
| IBM NETHERLANDS MSCI US | | REDACTED | | | |
| IBM PERSONAL PENSION PLAN TRUST | | | | | |
| IBM RETIREMENT FUNDS | | | | | |
| INKA MBH FOR SPERRKONTO | | | | | |
| J. P. MORGAN | | | | | |
| J. P. MORGAN | | | | | |
| J.P. MORGAN CLEARING CORP. | | | | | |
| J.P. MORGAN SECURITIES LLC/NYSE | | | | | |
| JP MORGAN SECURITIES INC. | | | | | |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | | | | | |
| MERRILL LYNCH | | | | | |

| Name | Name2 | Address | Shareholder Transfers | | |
|---|---|---|---|---|---|
| | | | Step One | Step Two | Date Unknown |
| MAGNETAR FINANCIAL LLC / MAGNETAR CAPITAL MST FD LTD M&C CORPORATE SERVICES LTD | | REDACTED | | | |
| MERRILL LYNCH FINANCIAL MARKETS | | | | | |
| MERRILL LYNCH FINANCIAL MARKETS | | | | | |
| MERRILL LYNCH | | | | | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH | | | | | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. – SAFEKEEPING | | | | | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. - SECURITIES LENDING | | | | | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. AS SUCCESSOR TO BANC OF AMERICA SECURITIES LLC | | | | | |
| METROPOLITAN LIFE INSURANCE CO. | | | | | |
| METROPOLITAN LIFE INSURANCE CO | | | | | |

| Name | Name2 | Address | Shareholder Transfers | | |
| --- | --- | --- | --- | --- | --- |
| | | | Step One | Step Two | Date Unknown |
| MILTON PARTNERS LLC | | REDACTED | | | |
| MORGAN STANLEY & CO. | | | | | |
| MORGAN STANLEY & CO. INTL. | | | | | |
| MORGAN STANLEY & CO. INTL. LTD. | | | | | |
| MORGAN STANLEY & CO. INTERNATIONAL PLC | | | | | |
| MORGAN STANLEY SMITH BARNEY LLC | | | | | |
| MS S&P 500 INDEX FUND | | | | | |
| MS SELECT-VALUE ADDED MARKET | | | | | |
| MS VALUE ADDED MARKET SERIES | | | | | |
| NATIONAL FINANCIAL SERVICES LLC | | | | | |
| NEW YORK LIFE INSURANCE CO. | | | | | |
| NEWBROOK CAPITAL ADVISORS LP | | | | | |
| NYC BOARD OF EDUCATION | | | | | |
| NYC EMPLOYEES RETIREMENT SYSTEM | | | | | |
| NYC FIRE RETIREMENT SYSTEM | | | | | |

| Name | Name2 | Address | | Shareholder Transfers | | |
|---|---|---|---|---|---|---|
| | | | | Step One | Step Two | Date Unknown |
| NYC POLICE RETIREMENT SYSTEM | | REDACTED | | | | |
| NYC RETIREMENT SYSTEMS | | | | | | |
| ODDO & CIE AS SUCCESSOR TO BANQUE D'ORSAY | | | | | | |
| OPPENHEIMER & CO., INC. | | | | | | |
| PERRY PARTNERS L.P. | | | | | | |
| POTTER, ADAM F. | | | | | | |
| PRISM PARTNERS OFFSHORE | | | | | | |
| PRUDENTIAL BACHE SECURITIES, LLC | | | | | | |
| RABO CAPITAL SERVICES, INC. | | | | | | |
| R K MELLON CTF #3 | | | | | | |
| RELATIVE VALUE LTD / HIGHBRIDGE EVENT DRIVEN RE HIGHBRIDGE CAP MGMT LLC | | | | | | |
| SANFORD C. BERNSTEIN & CO., INC. | | | | | | |
| SANFORD C. BERNSTEIN & CO., INC. | | | | | | |

| Name | Name2 | Address | Shareholder Transfers | | |
|---|---|---|---|---|---|
| | | | Step One | Step Two | Date Unknown |
| STATE STREET LUX | | REDACTED | | | |
| TBK PARTNERS, LLC | | | | | |
| TD EMERALD HEDGED U.S. EQUITY | | | | | |
| TD EMERALD POOLED U.S. FUND | | | | | |
| TD EMERALD U.S. MARKET INDEX FUND | | | | | |
| TD U.S. INDEX FUND | | | | | |
| THE HARTFORD | | | | | |
| THE HARTFORD | | | | | |
| TIME WARNER INC MASTER PENSION TRUST | | | | | |
| TRIBECA INVESTMENTS LLC | | | | | |
| TWEEDY, BROWNE VALUE FUND | | | | | |
| UBS FINANCIAL SERVICES INC. | | | | | |
| UBS SECURITIES INC | | | | | |
| UBS SECURITIES LLC - SECURITIES LENDING | | | | | |
| VANDERBILT PARTNERS, LLC | | | | | |

At IAS Part _____ of the Supreme
Court of the State of New York, held
in and for the County of New York,
at the Courthouse located at 60
Centre Street, New York, New York,
on the ____ day of June 2011.

P R E S E N T :

Hon. _____, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

Plaintiffs,

vs.                                                    Index No. _____

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB;
ALLIANCE BERNSTEIN;
ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD;
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;                          **ORDER TO SHOW**
AQR CAPITAL AQRREV;                                     **CAUSE**
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, N.A.;
BANK OF NEW YORK;
BANK OF NEW YORK MELLON;
BANK OF NEW YORK MELLON CORPORATION;
BANK OF NEW YORK MELLON EMPLOYEE
BENEFIT COLLECTIVE INVESTMENT FUND PLAN;
BANK OF NEW YORK MELLON / MIDCAP SPDRS;
BAR CAP EQUITY FINANCE;
*(continued)*

991438.3

BARCLAYS BANK PLC;                                          :
BARCLAYS CAPITAL GROUP;                                     :
BARCLAYS CAPITAL, INC.;                                     :
BARCLAYS CAPITAL SECURITIES LIMITED;                        :
BARCLAYS CAPITAL SECURITIES LIMITED as                      :
successor to BZW SECURITIES LIMITED;                        :
BARCLAYS GLOBAL INVESTORS LTD.;                             :
BARCLAYS GLOBAL INVESTORS NA REF                            :
INDUSTRY ALPHA LTD;                                         :
BEAR STEARNS & CO. INC.;                                    :
BEAR STEARNS EQUITY STRATEGIES RT LLC;                      :
BEAR STEARNS SECURITIES CORP.;                              :
BHF-BANK AKTIENGESELLSCHAFT;                                :
BLACKROCK;                                                  :
BLACKROCK, INC.;                                            :
BNP PARIBAS PRIME BROKERAGE, INC.;                          :
BNP PARIBAS SECURITIES CORP.;                               :
BNY MELLON;                                                 :
BON SECOURS HEALTH SYSTEM, INC.;                            :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;                    :
CAXTON ASSOCIATES LLC;                                      :
CHICAGO TRADING;                                            :
CITIBANK;                                                   :
CITIBANK, N.A.;                                             :
CITIBANK, N.A. EQUITY DERIVATIVES;                          :
CITIGROUP GLOBAL MARKETS, INC.;                             :
CITIGROUP GLOBAL MARKETS, INC./SALOMON                      :
BROTHERS;                                                   :
CITIGROUP GLOBAL MARKETS LTD.;                              :
CITIGROUP PRIVATE BANK & TRUST;                             :
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F.                :
GASPARINI;                                                  :
COLLECTIVE TRUST OF THE BANK OF NEW YORK;  :
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;                    :
CREDIT SUISSE FIRST BOSTON;                                 :
CREDIT SUISSE SECURITIES (USA) LLC;                         :
CSFB PROPRIETARY TRADING US;                                :
DB BANK AG AMSTERDAM;                                       :
DEEPHAVEN;                                                  :
DEEPHAVEN CAPITAL MANAGEMENT;                               :
DEL MAR ASSET MANAGEMENT;                                   :
DEUTSCHE BANK AG;                                           :
DEUTSCHE BANK AG FRANKFURT;                                 :
DEUTSCHE BANK AQRREV;                                       :
DEUTSCHE BANK SECURITIES, INC.;                             :
*(continued)*                                               :

DEUTSCHE LUFTHANSA AG;     :  
FORRESTAL FUNDING MASTER TRUST;  :  
GALLEON MANAGEMENT LP / GALLEON  :  
BUCCANEERS OFFSHORE BANK OF BERMUDA :  
(CAYMAN) LTD.;        :  
GENERAL ELECTRIC COMPANY;    :  
GOLDMAN, SACHS & CO.;      :  
GOLDMAN, SACHS & CO., INC.;     :  
GOLDMAN SACHS EXECUTION & CLEARING; :  
GOLDMAN SACHS EXECUTION & CLEARING, L.P.; :  
GOLDMAN SACHS INVESTMENT STRATEGIES, :  
LLC;            :  
GRYPHON HIDDEN VALUE VIII LP;   :  
HALCYON DIVERSIFIED FUND LP;   :  
HALCYON MANAGEMENT CO. LLC;   :  
HALCYON SPECIAL SITUATIONS LP;   :  
HAVENS ADVISORS LLC;      :  
HIGHBRIDGE CAPITAL MANAGEMENT, LLC; :  
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE :  
CAP COP MAPLES & CALDER;    :  
HSBC N.A. HOLDINGS, INC.;     :  
IBM NETHERLANDS MSCI US;    :  
IBM PERSONAL PENSION PLAN TRUST;  :  
IBM RETIREMENT FUNDS;     :  
INKA MBH FOR SPERRKONTO;    :  
INTERNATIONAL BUSINESS MACHINES  :  
CORPORATION;       :  
J.P. MORGAN;        :  
J.P. MORGAN CLEARING CORP.;    :  
J.P. MORGAN SECURITIES LLC/NYSE;   :  
J.P. MORGAN SECURITIES INC.;    :  
J.P. MORGAN SERVICES;      :  
JPMORGAN CHASE BANK, NATIONAL   :  
ASSOCIATION;       :  
LAURA LYNN FORD;      :  
LIBERTY HARBOR MASTER FUND I, LP;  :  
MAGNETAR CAPITAL LLC;     :  
MAGNETAR FINANCIAL LLC / MAGNETAR  :  
CAPITAL MST FD LTD M&C CORPORATE SERVICES :  
LTD.;           :  
MAPLES & CALDER;      :  
MERRILL LYNCH;       :  
MERRILL LYNCH FINANCIAL MARKETS, EQUITY :  
FINANCING GROUP;      :  
*(continued)*        :  
           :

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.    :
as successor to BANC OF AMERICA SECURITIES LLC,    :
SECURITIES LENDING SERVICES;    :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. -    :
SAFEKEEPING;    :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. -    :
SECURITIES LENDING;    :
METROPOLITAN LIFE INSURANCE CO.;    :
MILTON PARTNERS LLC;    :
MORGAN STANLEY & CO. INC.;    :
MORGAN STANLEY & CO. INTL.;    :
MORGAN STANLEY/PRIME BROKER/CN;    :
MORGAN STANLEY SMITH BARNEY LLC;    :
MS S&P 500 INDEX FUND;    :
MS SELECT-VALUE ADDED MARKET;    :
MS VALUE ADDED MARKET SERIES;    :
NATIONAL FINANCIAL SERVICES LLC;    :
NEW YORK LIFE INSURANCE CO.;    :
NEWBROOK CAPITAL ADVISORS LP;    :
NYC BOARD OF EDUCATION;    :
NYC EMPLOYEES RETIREMENT SYSTEM;    :
NYC FIRE RETIREMENT SYSTEM;    :
NYC POLICE OFICERS VARIABLE;    :
NYC POLICE RETIREMENT SYSTEM;    :
NYC RETIREMENT SYSTEMS;    :
ODDO & CIE as successor to BANQUE D'ORSAY;    :
OPPENHEIMER & CO., INC.;    :
PERRY CORP.;    :
PERRY PARTNERS;    :
PERRY PARTNERS L.P.;    :
POTTER, ADAM F.;    :
PRISM PARTNERS OFFSHORE;    :
PRUDENTIAL BACHE SECURITIES, LLC;    :
R K MELLON CTF #3;    :
RABO CAPITAL SERVICES, INC.;    :
RELATIVE VALUE LTD / HIGHBRIDGE EVENT    :
DRIVEN RE HIGHBRIDGE CAP MGMT LLC;    :
SANFORD C. BERNSTEIN & CO., INC.;    :
STATE STREET LUX;    :
TBK PARTNERS, LLC;    :
TD ASSET MANAGEMENT USA, INC.;    :
TD EMERALD HEDGED U.S. EQUITY;    :
TD EMERALD POOLED U.S. FUND;    :
TD EMERALD U.S. MARKET INDEX FUND;    :
TD U.S. INDEX FUND;    :
*(continued)*    :

THE HARTFORD;                                                    :
TIME WARNER INC. MASTER PENSION TRUST;                           :
TRIBECA INVESTMENTS LLC;                                         :
TWEEDY, BROWNE COMPANY, LLC;                                     :
TWEEDY, BROWNE VALUE FUND;                                       :
UBS FINANCIAL SERVICES INC.;                                     :
UBS SECURITIES INC.;                                             :
UBS SECURITIES LLC - SECURITIES LENDING;                         :
USAA FEDERAL SAVINGS BANK;                                       :
VANDERBILT PARTNERS, LLC;                                        :
WESTCHESTER CAPITAL MANAGEMENT;                                  :
WILLIAM H. BROWNE; and                                           :
WILMINGTON TRUST CO. as owner and trustee for                   :
THE US TRUST,                                                    :
                                                                 :
                         Defendants.                             :
-------------------------------------------------------------- x

UPON the reading and filing of the annexed affirmation of plaintiffs' counsel,

Jeffrey C. Fourmaux, Esq., dated June 1, 2011, and the exhibits annexed thereto,

LET the defendants hereinabove captioned show cause before this court, at IAS

Part _____ thereof, at the Courthouse located at 60 Centre Street, Room _____, New York, New

York, on the _____ day of September 2011,[1] at _____ o'clock in the _____noon, or as soon

thereafter as the parties or their counsel may be heard, why an order should not be issued and

entered granting plaintiffs' motion for an order, pursuant to 22 NYCRR § 216.1, directing the

Office of the Clerk of the County of New York to partially seal the file in this action to the sole

extent of Exhibit A to the complaint; and it is

ORDERED that, sufficient cause appearing therefor, the Clerk of the County of

New York is hereby directed to immediately accept the summons and complaint with Exhibit A

for filing under seal and to immediately issue an index number for this action upon payment of

the requisite fee; and it is further

-----------------------

[1] For the reason set forth in the supporting affirmation at ¶ 12.

991438.3                                   5

ORDERED that, sufficient cause appearing therefor, pending the hearing and determination of this motion, Exhibit A shall remain under seal; and it is further

ORDERED that service of a copy of this order and the papers upon which it is granted upon the Office of the Clerk of the County of New York, by hand delivery, so as to be received by said office on or before _____, 2011, be deemed good and sufficient service thereof upon said office; and it is further

ORDERED that service of a copy of this order and the papers upon which it is granted upon the defendants hereinabove captioned, by personal service or U.S. first class mail, on or before August _____, 2011,[2] be deemed good and sufficient service thereof, except that, pending the hearing and determination of this motion, plaintiffs are authorized to redact Exhibit A to the complaint served pursuant to this paragraph so as to redact any information unrelated to the particular defendant to whom the service is addressed;[3] and it is further

ORDERED that answering papers, if any, be served upon plaintiffs' counsel, Friedman Kaplan Seiler & Adelman LLP, Seven Times Square, New York, New York 10036, so as to be received by said counsel on or before _____, 2011.

E N T E R :

_____
Justice of the Supreme Court

---

[2] *See id.*

[3] For the reason set forth in the supporting affirmation at ¶ 13.

Case 1:11-cv-04522-NRB   Document 1   Filed 07/01/11   Page 90 of 128

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (3/2011)

Supreme _____ COURT, COUNTY OF New York

Index No: __651517/2011__    Date Index Issued: __6/2/11__

<table>
<tr><td></td><td>For Court Clerk Use Only</td></tr>
<tr><td></td><td>IAS Entry Date</td></tr>
<tr><td></td><td>Judge Assigned</td></tr>
<tr><td></td><td>RJI Date</td></tr>
</table>

DEUTSCHE BANK TRUST COMPANY AMERICAS, in its capacity as successor indenture trustee for certain series of Senior Notes, LAW DEBENTURE TRUST COMPANY OF NEW YORK, in its capacity as successor indenture trustee for certain series of Senior Notes, and WILMINGTON TRUST COMPANY, in its capacity as successor indenture trustee for the PHONES Notes,

Plaintiff(s)/Petitioner(s)

-against-

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA – WCB;
ALLIANCE BERNSTEIN;
ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD;
[continued on attached Rider to RJI]

Defendant(s)/Respondent(s)

## MATRIMONIAL
- ○ Contested
- ○ Uncontested

**NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum**.

## TORTS
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____
  (specify)
- ○ Other Negligence: _____
  (specify)
- ○ Other Professional Malpractice: _____
  (specify)
- ○ Other Tort: _____
  (specify)

## OTHER MATTERS
- ○ Certificate of Incorporation/Dissolution    [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____
  (specify)

## COMMERCIAL
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ◉ Other Commercial: Constructive Fraudulent Transfer
  (specify)

**NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum**.

## REAL PROPERTY   How many properties does the application include? ___
- ○ Condemnation
- ○ Foreclosure
Property Address: _____
  Street Address     City     State     Zip

**NOTE:** For Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum**.

- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Other Real Property: _____
  (specify)

## SPECIAL PROCEEDINGS
- ○ CPLR Article 75 (Arbitration)   [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____
  (specify)
- ○ Other Special Proceeding: _____
  (specify)

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ○ | ◉ | If yes, date filed: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**

- ⦿ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion                    Relief Sought: _____    Return Date: _____
- ○ Notice of Petition                  Relief Sought: _____    Return Date: _____
- ○ Order to Show Cause                 Relief Sought: Seal _____    Return Date: _____
- ⦿ Other Ex Parte Application          Relief Sought: Seal _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other  (specify): _____

| Case Title | Index/Case No. | Court | Judge (Assigned) | Relationship of Instant Case |
|---|---|---|---|---|
| See attached Rider 2 to RJI | | | | |

| | Parties | Attorney(s) | Issue Joined (Y/N) | Insurance Carrier(s) |
|---|---|---|---|---|
| ☐ | Deutsche Bank Trust Company Americas<br>Last Name<br>First Name<br>Primary Role: Plaintiff<br>Secondary Role (if any): | Fourmaux, Last Name    Jeffrey First Name<br>Friedman Kaplan Seiler & Adelman LLP Firm Name<br>7 Times Square    New York    New York    10036<br>Street Address    City    State    Zip<br>212-833-1100    212-833-1250    jfourmaux@fklaw.com<br>Phone    Fax    e-mail | ○ YES<br>⦿ NO | N/A |
| ☐ | Law Debenture Trust Company of N.Y.<br>Last Name<br>First Name<br>Primary Role: Plaintiff<br>Secondary Role (if any): | Fourmaux, Last Name    Jeffrey First Name<br>Friedman Kaplan Seiler & Adelman LLP Firm Name<br>7 Times Square    New York    New York    10036<br>Street Address    City    State    Zip<br>212-833-1100    212-833-1250    jfourmaux@fklaw.com<br>Phone    Fax    e-mail | ○ YES<br>⦿ NO | N/A |
| ☐ | Wilmington Trust Company<br>Last Name<br>First Name<br>Primary Role: Plaintiff<br>Secondary Role (if any): | Fourmaux, Last Name    Jeffrey First Name<br>Friedman Kaplan Seiler & Adelman LLP Firm Name<br>7 Times Square    New York    New York    10036<br>Street Address    City    State    Zip<br>212-833-1100    212-833-1250    jfourmaux@fklaw.com<br>Phone    Fax    e-mail | ○ YES<br>⦿ NO | N/A |
| ☐ | [Defendants listed above and on attached Rider to RJI]<br>Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name    First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ○ YES<br>⦿ NO | Unknown |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: 06/02/2011

_____    _____ SIGNATURE

NY 3064284                    Jeffrey C. Fourmaux

ATTORNEY REGISTRATION NUMBER    PRINT OR TYPE NAME

**RIDER TO RJI**

*(caption continued)*
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;
AQR CAPITAL AQRREV;
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, N.A.;
BANK OF NEW YORK;
BANK OF NEW YORK MELLON;
BANK OF NEW YORK MELLON CORPORATION;
BANK OF NEW YORK MELLON EMPLOYEE BENEFIT COLLECTIVE INVESTMENT
FUND PLAN;
BANK OF NEW YORK MELLON / MIDCAP SPDRS;
BAR CAP EQUITY FINANCE;
BARCLAYS BANK PLC;
BARCLAYS CAPITAL GROUP;
BARCLAYS CAPITAL, INC.;
BARCLAYS CAPITAL SECURITIES LIMITED;
BARCLAYS CAPITAL SECURITIES LIMITED as successor to BZW SECURITIES
LIMITED;
BARCLAYS GLOBAL INVESTORS LTD.;
BARCLAYS GLOBAL INVESTORS NA REF INDUSTRY ALPHA LTD;
BEAR STEARNS & CO. INC.;
BEAR STEARNS EQUITY STRATEGIES RT LLC;
BEAR STEARNS SECURITIES CORP.;
BHF-BANK AKTIENGESELLSCHAFT;
BLACKROCK;
BLACKROCK, INC.;
BNP PARIBAS PRIME BROKERAGE, INC.;
BNP PARIBAS SECURITIES CORP.;
BNY MELLON;
BON SECOURS HEALTH SYSTEM, INC.;
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;
CAXTON ASSOCIATES LLC;
CHICAGO TRADING;
CITIBANK;
CITIBANK, N.A.;
CITIBANK, N.A. EQUITY DERIVATIVES;
CITIGROUP GLOBAL MARKETS, INC.;
CITIGROUP GLOBAL MARKETS, INC./SALOMON BROTHERS;
CITIGROUP GLOBAL MARKETS LTD.;
CITIGROUP PRIVATE BANK & TRUST;
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F. GASPARINI;
*(continued)*

COLLECTIVE TRUST OF THE BANK OF NEW YORK;
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;
CREDIT SUISSE FIRST BOSTON;
CREDIT SUISSE SECURITIES (USA) LLC;
CSFB PROPRIETARY TRADING US;
DB BANK AG AMSTERDAM;
DEEPHAVEN;
DEEPHAVEN CAPITAL MANAGEMENT;
DEL MAR ASSET MANAGEMENT;
DEUTSCHE BANK AG;
DEUTSCHE BANK AG FRANKFURT;
DEUTSCHE BANK AQRREV;
DEUTSCHE BANK SECURITIES, INC.;
DEUTSCHE LUFTHANSA AG;
FORRESTAL FUNDING MASTER TRUST;
GALLEON MANAGEMENT LP / GALLEON BUCCANEERS OFFSHORE BANK OF
BERMUDA (CAYMAN) LTD.;
GENERAL ELECTRIC COMPANY;
GOLDMAN, SACHS & CO.;
GOLDMAN, SACHS & CO., INC.;
GOLDMAN SACHS EXECUTION & CLEARING;
GOLDMAN SACHS EXECUTION & CLEARING, L.P.;
GOLDMAN SACHS INVESTMENT STRATEGIES, LLC;
GRYPHON HIDDEN VALUE VIII LP;
HALCYON DIVERSIFIED FUND LP;
HALCYON MANAGEMENT CO. LLC;
HALCYON SPECIAL SITUATIONS LP;
HAVENS ADVISORS LLC;
HIGHBRIDGE CAPITAL MANAGEMENT, LLC;
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE CAP COP MAPLES & CALDER;
HSBC N.A. HOLDINGS, INC.;
IBM NETHERLANDS MSCI US;
IBM PERSONAL PENSION PLAN TRUST;
IBM RETIREMENT FUNDS;
INKA MBH FOR SPERRKONTO;
INTERNATIONAL BUSINESS MACHINES CORPORATION;
J.P. MORGAN;
J.P. MORGAN CLEARING CORP.;
J.P. MORGAN SECURITIES LLC/NYSE;
J.P. MORGAN SECURITIES INC.;
J.P. MORGAN SERVICES;
JPMORGAN CHASE BANK, NATIONAL ASSOCIATION;
LAURA LYNN FORD;
LIBERTY HARBOR MASTER FUND I, LP;
*(continued)*

MAGNETAR CAPITAL LLC;
MAGNETAR FINANCIAL LLC / MAGNETAR CAPITAL MST FD LTD M&C
CORPORATE SERVICES LTD.;
MAPLES & CALDER;
MERRILL LYNCH;
MERRILL LYNCH FINANCIAL MARKETS, EQUITY FINANCING GROUP;
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. as successor to BANC OF AMERICA
SECURITIES LLC, SECURITIES LENDING SERVICES;
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. - SAFEKEEPING;
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. - SECURITIES LENDING;
METROPOLITAN LIFE INSURANCE CO.;
MILTON PARTNERS LLC;
MORGAN STANLEY & CO. INC.;
MORGAN STANLEY & CO. INTL.;
*(continued)*
MORGAN STANLEY/PRIME BROKER/CN;
MORGAN STANLEY SMITH BARNEY LLC;
MS S&P 500 INDEX FUND;
MS SELECT-VALUE ADDED MARKET;
MS VALUE ADDED MARKET SERIES;
NATIONAL FINANCIAL SERVICES LLC;
NEW YORK LIFE INSURANCE CO.;
NEWBROOK CAPITAL ADVISORS LP;
NYC BOARD OF EDUCATION;
NYC EMPLOYEES RETIREMENT SYSTEM;
NYC FIRE RETIREMENT SYSTEM;
NYC POLICE OFICERS VARIABLE;
NYC POLICE RETIREMENT SYSTEM;
NYC RETIREMENT SYSTEMS;
ODDO & CIE as successor to BANQUE D'ORSAY;
OPPENHEIMER & CO., INC.;
PERRY CORP.;
PERRY PARTNERS;
PERRY PARTNERS L.P.;
POTTER, ADAM F.;
PRISM PARTNERS OFFSHORE;
PRUDENTIAL BACHE SECURITIES, LLC;
R K MELLON CTF #3;
RABO CAPITAL SERVICES, INC.;
RELATIVE VALUE LTD / HIGHBRIDGE EVENT DRIVEN RE HIGHBRIDGE CAP MGMT
LLC;
SANFORD C. BERNSTEIN & CO., INC.;
STATE STREET LUX;
TBK PARTNERS, LLC;
TD ASSET MANAGEMENT USA, INC.;
*(continued)*

TD EMERALD HEDGED U.S. EQUITY;
TD EMERALD POOLED U.S. FUND;
TD EMERALD U.S. MARKET INDEX FUND;
TD U.S. INDEX FUND;
THE HARTFORD;
TIME WARNER INC. MASTER PENSION TRUST;
TRIBECA INVESTMENTS LLC;
TWEEDY, BROWNE COMPANY, LLC;
TWEEDY, BROWNE VALUE FUND;
UBS FINANCIAL SERVICES INC.;
UBS SECURITIES INC.;
UBS SECURITIES LLC - SECURITIES LENDING;
USAA FEDERAL SAVINGS BANK;
VANDERBILT PARTNERS, LLC;
WESTCHESTER CAPITAL MANAGEMENT;
WILLIAM H. BROWNE; and
WILMINGTON TRUST CO. as owner and trustee for THE US TRUST,

Defendants.

R-4

## RIDER 2 TO RJI

**Related Cases:**

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| *Deutsche Bank Trust Company Americas, et al. v. Alady Opportunity Fund TD Securities, Inc.* | Index No. 651515/2011 | N.Y. Supreme Court, N.Y. County | | Same plaintiffs, same causes of action, different defendants |
| *In re Tribune Co., et al.* | Case No.08-13141 (KJC) | U.S. Bankruptcy Court for the District of Delaware | Hon. Kevin J. Carey | The instant action is being filed pursuant to an order of the Bankruptcy Court lifting the automatic stay to allow the filing of actions against shareholders of the Debtor, Tribune Co. |



SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF __New York_____

UCS-840C
3/2011

|  |  |
|---|---|
| Deutsche Bank Trust Company Americas, et al. | x |

Plaintiff(s)/Petitioner(s)

-against-
Abu Dhabi Investment Authority, et al.

Defendant(s)/Respondent(s)
x

Index No. _____

RJI No. (if any) _____

## COMMERCIAL DIVISION
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE [add additional pages if needed]:**

**Plaintiff/Petitioner's cause(s) of action [check all that apply]:**

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages [exclusive of punitive damages, interest, costs and counsel fees claimed]:**

$ An amount to be determined, but not less than $2,480,000,000

**Plaintiff/Petitioner's claim for equitable or declaratory relief [brief description]:**

Declaration of constructively fraudulent transfers, avoidance of such transfers, attachment, levy, imposition of constructive trust, granting injunction against disposition of the transferred assets.

**Defendant/Respondent's counterclaim(s) [brief description, including claim for monetary relief]:**

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: __06/02/2011_____

_____
SIGNATURE

__Jeffrey C. Fourmaux_____
PRINT OR TYPE NAME

Case 1:11-cv-04523-NRB   Document 1   Filed 07/01/11   Page 98 of 128

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

                    Plaintiffs,

          vs.                                                Index No. 651517/2011

ABU DHABI INVESTMENT AUTHORITY;
ALBERTA - WCB;
ALLIANCE BERNSTEIN;
ALLIANCEBERNSTEIN L.P.;
ALLIANZ INVEST KAG - SIEMENS;
ALLIANZ/SANFORD;
AM INTERNATIONAL EMAC 63 LTD/VOL ARB;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;
AQR CAPITAL AQRREV;
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, N.A.;
BANK OF NEW YORK;
BANK OF NEW YORK MELLON;                                     **AFFIRMATION OF**
BANK OF NEW YORK MELLON CORPORATION;                         **JEFFREY C. FOURMAUX**
BANK OF NEW YORK MELLON EMPLOYEE                             **IN SUPPORT OF**
BENEFIT COLLECTIVE INVESTMENT FUND PLAN;                     **MOTION FOR AN**
BANK OF NEW YORK MELLON / MIDCAP SPDRS;                      **ORDER PARTIALLY**
BAR CAP EQUITY FINANCE;                                      **SEALING THE FILE**
BARCLAYS BANK PLC;
BARCLAYS CAPITAL GROUP;
BARCLAYS CAPITAL, INC.;
BARCLAYS CAPITAL SECURITIES LIMITED;
BARCLAYS CAPITAL SECURITIES LIMITED as
successor to BZW SECURITIES LIMITED;
BARCLAYS GLOBAL INVESTORS LTD.;
BARCLAYS GLOBAL INVESTORS NA REF
INDUSTRY ALPHA LTD;
BEAR STEARNS & CO. INC.;
BEAR STEARNS EQUITY STRATEGIES RT LLC;
*(continued)*

991415.3

BEAR STEARNS SECURITIES CORP.;                          :
BHF-BANK AKTIENGESELLSCHAFT;                            :
BLACKROCK;                                              :
BLACKROCK, INC.;                                        :
BNP PARIBAS PRIME BROKERAGE, INC.;                      :
BNP PARIBAS SECURITIES CORP.;                           :
BNY MELLON;                                             :
BON SECOURS HEALTH SYSTEM, INC.;                        :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;                :
CAXTON ASSOCIATES LLC;                                  :
CHICAGO TRADING;                                        :
CITIBANK;                                               :
CITIBANK, N.A.;                                         :
CITIBANK, N.A. EQUITY DERIVATIVES;                      :
CITIGROUP GLOBAL MARKETS, INC.;                         :
CITIGROUP GLOBAL MARKETS, INC./SALOMON                  :
BROTHERS;                                               :
CITIGROUP GLOBAL MARKETS LTD.;                          :
CITIGROUP PRIVATE BANK & TRUST;                         :
CLAUDIA F. GASPARINI I.R.A. f/b/o CLAUDIA F.            :
GASPARINI;                                              :
COLLECTIVE TRUST OF THE BANK OF NEW YORK;               :
COUTTS EIP US EQUITY INDEX BGI, AIB BNY;                :
CREDIT SUISSE FIRST BOSTON;                             :
CREDIT SUISSE SECURITIES (USA) LLC;                     :
CSFB PROPRIETARY TRADING US;                            :
DB BANK AG AMSTERDAM;                                   :
DEEPHAVEN;                                              :
DEEPHAVEN CAPITAL MANAGEMENT;                           :
DEL MAR ASSET MANAGEMENT;                               :
DEUTSCHE BANK AG;                                       :
DEUTSCHE BANK AG FRANKFURT;                             :
DEUTSCHE BANK AQRREV;                                   :
DEUTSCHE BANK SECURITIES, INC.;                         :
DEUTSCHE LUFTHANSA AG;                                  :
FORRESTAL FUNDING MASTER TRUST;                         :
GALLEON MANAGEMENT LP / GALLEON                         :
BUCCANEERS OFFSHORE BANK OF BERMUDA                     :
(CAYMAN) LTD.;                                          :
GENERAL ELECTRIC COMPANY;                               :
GOLDMAN, SACHS & CO.;                                   :
GOLDMAN, SACHS & CO., INC.;                             :
GOLDMAN SACHS EXECUTION & CLEARING;                     :
GOLDMAN SACHS EXECUTION & CLEARING, L.P.;               :
*(continued)*                                           :
                                                        :

GOLDMAN SACHS INVESTMENT STRATEGIES,    :
LLC;                                     :
GRYPHON HIDDEN VALUE VIII LP;            :
HALCYON DIVERSIFIED FUND LP;             :
HALCYON MANAGEMENT CO. LLC;              :
HALCYON SPECIAL SITUATIONS LP;           :
HAVENS ADVISORS LLC;                     :
HIGHBRIDGE CAPITAL MANAGEMENT, LLC;      :
HIGHBRIDGE INT LLC (NO 3) / A/C HIGHBRIDGE :
CAP COP MAPLES & CALDER;                 :
HSBC N.A. HOLDINGS, INC.;                :
IBM NETHERLANDS MSCI US;                 :
IBM PERSONAL PENSION PLAN TRUST;         :
IBM RETIREMENT FUNDS;                    :
INKA MBH FOR SPERRKONTO;                 :
INTERNATIONAL BUSINESS MACHINES          :
CORPORATION;                             :
J.P. MORGAN;                             :
J.P. MORGAN CLEARING CORP.;              :
J.P. MORGAN SECURITIES LLC/NYSE;         :
J.P. MORGAN SECURITIES INC.;             :
J.P. MORGAN SERVICES;                    :
JPMORGAN CHASE BANK, NATIONAL            :
ASSOCIATION;                             :
LAURA LYNN FORD;                         :
LIBERTY HARBOR MASTER FUND I, LP;        :
MAGNETAR CAPITAL LLC;                    :
MAGNETAR FINANCIAL LLC / MAGNETAR        :
CAPITAL MST FD LTD M&C CORPORATE SERVICES :
LTD.;                                    :
MAPLES & CALDER;                         :
MERRILL LYNCH;                           :
MERRILL LYNCH FINANCIAL MARKETS, EQUITY  :
FINANCING GROUP;                         :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. :
as successor to BANC OF AMERICA SECURITIES LLC, :
SECURITIES LENDING SERVICES;             :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. - :
SAFEKEEPING;                             :
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. - :
SECURITIES LENDING;                      :
METROPOLITAN LIFE INSURANCE CO.;         :
MILTON PARTNERS LLC;                     :
MORGAN STANLEY & CO. INC.;               :
MORGAN STANLEY & CO. INTL.;              :
*(continued)*                            :

MORGAN STANLEY/PRIME BROKER/CN;                    :
MORGAN STANLEY SMITH BARNEY LLC;                   :
MS S&P 500 INDEX FUND;                             :
MS SELECT-VALUE ADDED MARKET;                      :
MS VALUE ADDED MARKET SERIES;                      :
NATIONAL FINANCIAL SERVICES LLC;                   :
NEW YORK LIFE INSURANCE CO.;                       :
NEWBROOK CAPITAL ADVISORS LP;                      :
NYC BOARD OF EDUCATION;                            :
NYC EMPLOYEES RETIREMENT SYSTEM;                   :
NYC FIRE RETIREMENT SYSTEM;                        :
NYC POLICE OFICERS VARIABLE;                       :
NYC POLICE RETIREMENT SYSTEM;                      :
NYC RETIREMENT SYSTEMS;                            :
ODDO & CIE as successor to BANQUE D'ORSAY;         :
OPPENHEIMER & CO., INC.;                           :
PERRY CORP.;                                       :
PERRY PARTNERS;                                    :
PERRY PARTNERS L.P.;                               :
POTTER, ADAM F.;                                   :
PRISM PARTNERS OFFSHORE;                           :
PRUDENTIAL BACHE SECURITIES, LLC;                  :
R K MELLON CTF #3;                                 :
RABO CAPITAL SERVICES, INC.;                       :
RELATIVE VALUE LTD / HIGHBRIDGE EVENT              :
DRIVEN RE HIGHBRIDGE CAP MGMT LLC;                 :
SANFORD C. BERNSTEIN & CO., INC.;                  :
STATE STREET LUX;                                  :
TBK PARTNERS, LLC;                                 :
TD ASSET MANAGEMENT USA, INC.;                     :
TD EMERALD HEDGED U.S. EQUITY;                     :
TD EMERALD POOLED U.S. FUND;                       :
TD EMERALD U.S. MARKET INDEX FUND;                 :
TD U.S. INDEX FUND;                                :
THE HARTFORD;                                      :
TIME WARNER INC. MASTER PENSION TRUST;             :
TRIBECA INVESTMENTS LLC;                           :
TWEEDY, BROWNE COMPANY, LLC;                       :
TWEEDY, BROWNE VALUE FUND;                         :
UBS FINANCIAL SERVICES INC.;                       :
UBS SECURITIES INC.;                               :
UBS SECURITIES LLC - SECURITIES LENDING;           :
USAA FEDERAL SAVINGS BANK;                         :
VANDERBILT PARTNERS, LLC;                          :
WESTCHESTER CAPITAL MANAGEMENT;                    :
*(continued)*                                      :

WILLIAM H. BROWNE; and            :
WILMINGTON TRUST CO. as owner and trustee for    :
THE US TRUST,                               :
                       :
              Defendants.          :
-------------------------------------------------------------- x

JEFFREY C. FOURMAUX, an attorney admitted to practice before this honorable Court, affirms the truth of the following statements under the penalties of perjury:

1.      I am an attorney with the firm of Friedman Kaplan Seiler & Adelman LLP, attorneys for the plaintiffs in this action. I respectfully submit this affirmation in support of plaintiffs' motion for an order, pursuant to 22 NYCRR § 216.1, directing the Office of the Clerk of the County of New York to partially seal the file in this action to the sole extent of Exhibit A to the complaint,[1] and for an order directing said office to immediately accept the summons and complaint with Exhibit A for filing under seal and to immediately issue an index number for this action upon payment of the requisite fee, and pending the hearing and determination of this motion, directing said office to maintain Exhibit A under seal.

### Background

2.      Annexed as Exhibit 1 hereto is a copy of the summons and complaint in this individual and putative class action, including a full and unredacted Exhibit A to the complaint. Briefly stated, and as explained in the complaint, this action arises from the failed leveraged buyout ("LBO") of Tribune Company ("Tribune") in 2007. The LBO diverted $8.3 billion to Tribune's then current shareholders at the expense of Tribune's creditors, causing Tribune to file for bankruptcy shortly thereafter (Complaint ¶¶ 1-13).

---

[1] As will be explained, Exhibit A to the complaint sets forth relevant address and transactional information of certain defendants, but which information is subject to a confidentiality agreement endorsed by the United States Bankruptcy Court in a related case.

3.     In the complaint, plaintiffs – indenture trustees for bondholders of Tribune –
assert causes of action seeking to avoid and recover, as constructively fraudulent conveyances,
all transfers of any proceeds received by each defendant/shareholder in connection with the LBO.
As alleged, these transfers may be recovered from the defendants because: (a) Tribune made the
challenged transfers without receiving reasonably equivalent value or fair consideration in
exchange therefor; and (b) the challenged transfers were made when Tribune (i) was, or was
thereby rendered, insolvent, (ii) was engaged, or was about to engage, in a business or a
transaction for which any property remaining with Tribune was an unreasonably small capital,
and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond
Tribune's ability to pay as they matured.  This establishes valid and meritorious claims under the
fraudulent transfer provisions of the New York Debtor and Creditor Law (§§ 273, 274, 275, 278,
279), as well as under similar statutes in Illinois (740 ILCS §§ 160/5, 160/8, 160/9) and
Massachusetts (MGL ch. 109A §§ 5, 6, 8, 9) (Complaint ¶¶ 113-57).

4.     The named defendants were (i) either the legal or beneficial owners of
Tribune common stock that was purchased, repurchased, or redeemed by Tribune in connection
with the LBO, or (ii) received proceeds of the Shareholder Transfers (as defined in the complaint)
(Complaint ¶¶ 21-43).

6.     As indicated, and as alleged in the complaint, the LBO led to Tribune's filing of a
Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware (*In re
Tribune Co., et al.,* Case No. 08-13141 [KJC]) on December 8, 2008.  As further alleged in the
complaint, and as shown on Exhibit B thereto, the Bankruptcy Court has lifted Tribune's
automatic stay for the specific purpose of enabling plaintiffs to commence this very lawsuit.
However, as explained immediately hereafter, at the request of certain entities, the Bankruptcy

Court has directed plaintiffs to abide by certain strictures of confidentiality which necessitate the sealing of the file to the extent of Exhibit A to the complaint.

## The Bankruptcy Court Protective Order

7.     At the request of certain entities in the related federal bankruptcy case, the Bankruptcy Court issued a protective order dated May 19, 2011, copy annexed as Exhibit 2 hereto.  The protective order acknowledges the Bankruptcy Court's earlier authorization to commence this State Court litigation and recognizes, as Exhibit A thereto, a confidentiality agreement assented to by plaintiffs herein at the request of certain entities in the event of plaintiffs' commencement of any such state litigation.  Paragraph 6 of the confidentiality agreement provides:

> Notwithstanding any other provision in this Agreement:
> (a) parties who have been identified in Documents produced in response to the Subpoena[2] may be publicly named as parties in the State-Law Actions or related proceedings, provided, however, that any such publicly-named party shall not in any way be publicly associated, linked, or otherwise identified as having been at any point in time related to or a customer of the Originating Party;[3] and (b) information concerning the timing and amount of payment to such parties may be included in any pleading filed by the Requesting Party[4] or its local counsel in connection with the State-Law Actions or related proceedings, provided that the Requesting Party or its local counsel takes the necessary steps to file any such pleading under seal or otherwise prevent the public release of such information.

---

[2] As recited in the third WHEREAS clause of the Confidentiality Agreement, the Bankruptcy Court's referenced "Subpoena" is to a subpoena duces tecum which was served by plaintiffs in the bankruptcy case, dated April 29, 2011, "in connection with the Adversary Proceeding and in anticipation of the State-Law Actions."

[3] As recited in the fourth WHEREAS clause of the Confidentiality Agreement, the term "Originating Party" is defined as any person or entity who provided documents which are "responsive, nonpublic information or confidential or proprietary business, technical or financial information, including nonpublic or confidential information."

[4] As recited in the preamble of the Confidentiality Agreement, the term "Requesting Party" refers to this office, counsel for the plaintiffs herein.

By virtue of that mandate, directed by the United States Bankruptcy Court in its protective order (Ex. 2 hereto), no pleading filed in any such authorized state action, such as this one, may publicly allege the specific amount of LBO proceeds received by any defendant. As this Court can well see, Exhibit A to the complaint in this action, in its current unredacted form, sets forth, *inter alia*, the timing and amounts of defendants' receipt of LBO funds. By virtue of the U.S. Bankruptcy Court protective order, while plaintiffs may proceed with this state law action, they are required to ensure that their "local counsel takes the necessary steps to file any such pleading under seal or otherwise prevent the public release of such information." Hence, the necessity and merit of this motion are unavoidable.

### The Procedure for Sealing

8. Pursuant to 22 NYCRR § 216.1, the sealing of Court records, "in whole or in part," is authorized by Court order "upon a written finding of good cause, which shall specify the grounds thereof." There can be no doubt that the United States Bankruptcy Court's protective order, exhibiting the Confidentiality Agreement requiring that defendants' identities and their transactions, as set forth in Exhibit A to the complaint, be kept away from public access, constitutes more than sufficient "good cause." The fact that this motion seeks only the sealing of Exhibit A to the complaint, and not the entire Court file, only serves to strengthen the merit of this motion.

9. The Office of the County Clerk has published procedures for sealing, which are annexed as Exhibit 3 hereto.[5] Pursuant thereto, and in accord with 22 NYCRR § 216.1, a Court record may be partially sealed (Ex. 3 hereto at p. 5 of 9). Moreover, the party seeking a sealing order first delivers the complete unsealed prospective filing to senior county clerk personnel,

---

[5] Found at www.nycourts.gov/supctmanh/litigation_functions.htm.

who hold the prospective filing pending a motion to seal by order to show cause (*id.*, at p. 6 of 9). The order to show cause is to include a request for an immediate interim directive that the County Clerk issue an index number upon payment of the fee and seal the file pending the decision by the Court on the permanent motion to seal (*id.*). It is respectfully submitted to the Court that all foregoing Court-published procedures have been and are being adhered to in connection with this motion.

## The Exigent Circumstances Underlying this Motion

10.     The complaint asserts causes of action for fraudulent transfers against the defendants not only under the New York Debtor and Creditor Law (§ 273, 278, 279), but also under the similar enabling fraudulent transfer statutes of the states of Illinois (740 ILCS §§ 160/5, 160/8, 160/9) and Massachusetts (MGL ch 109A §§ 6, 8, 9) (*see* Ex. 1 hereto). That is because the LBO-related transactions underlying the complaint occurred in Massachusetts and Illinois. Unlike New York's six-year statute applicable to New York Debtor and Creditor Law claims (CPLR § 213[8]), the similar claims asserted under those other states' fraudulent transfer statutes, patterned after the Uniform Fraudulent Transfer Act (the "UFTA"), apply a four-year statute (*see, e.g.*, ILCS § 160/10 ("within 4 years after the transfer was made . . . ."); *Levy v Markal Sales Corp.*, 311 Ill. App. 3d 552 (2000); MGL ch. 109A, § 10; *Cavadi v DeYeso*, 458 Mass. 615 (2011)). While plaintiffs would not agree to the premise, it is conceivable that the defendants may take the position that certain of the claims in this action may be time-barred after June 4, 2011 – four years after the first LBO pay-out to the defendants on June 4, 2007, alleged in the complaint. Obviously, the need to commence this action prior to June 4, 2011, is pressing in order to preserve all of plaintiffs' from any possible defense based on limitations of time.

11.     Plaintiffs have not sat on their rights. Indeed, the Bankruptcy Court only recently lifted the automatic stay and just issued its protective order on May 19, 2011, directing that plaintiffs receive access to certain information about the defendants, but directing that plaintiffs take steps to file such information under seal (Ex. 2 hereto). In order to enable such filing, in accord with the federal bankruptcy court's mandate, this motion should be granted, and the summons and complaint must be filed before June 4, 2007. Consequently, this motion has been brought on an emergency basis, for that reason, and also in accord with the protocols of this Court (Ex. 3 hereto).

### The Return Date of this Motion and its Mode of Service

12.     As indicated by the long caption of this action, a large number of defendants will need to be served in connection with the underlying motion for a permanent sealing of Exhibit A to the complaint. Accordingly, it is respectfully requested that the Court fix a return far in advance of today, as to which, we respectfully suggest a date occurring in the first week of September.

13.     Further to the issue of service, due to the Confidentiality Agreement, endorsed by the Bankruptcy Court, we arguably are prohibited from serving a full unredacted version of Exhibit A on each shareholder defendant who will be entitled to service of this motion. That is because the exhibit will contain confidential information relating to investors other than the particular investor to which a particular service is addressed. Accordingly, we respectfully request an order which will enable plaintiffs to serve the accompanying order to show cause and

supporting papers with redacted complaint Exhibit A's, such that only the Exhibit A information relating to a particular defendant/motion-addressee will be found thereon.

14.     It is respectfully suggested that, at such time as all parties are before the Court in connection with the within motion to seal Exhibit A to the complaint, the parties may have the opportunity to address with the Court ways to permit the full unredacted Exhibit A to the complaint available to all parties, consistent with the terms of the Confidentiality Agreement referenced in the Bankruptcy Court's order of protection (Ex. 2 hereto).

15.     No prior application for the relief requested herein has been made to this or any other Court.

WHEREFORE, it is respectfully requested that the Court grant plaintiffs' instant motion for a sealing and anonymity order in all respects, and for such immediate interim relief, and that it grant plaintiffs such other and further relief as it may deem just, proper, and equitable.

Dated: New York, New York
        June 2, 2011

_____
JEFFREY C. FOURMAUX

# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Cases No. 08-13141 (KJC)<br>Jointly Administered |
| THE OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TRIBUNE COMPANY, *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS J. FITZSIMONS, *et al.*,<br>Defendants. | Adversary Proceeding No. 10-54010 (KJC)<br><br>Ref. Nos. 8866, 8914, 8919, 8920<br>and Adv. Nos. 113, 119, 120, 121 |

## PROTECTIVE ORDER

Upon consideration of the motion (the "Motion") of the Official Committee of Unsecured Creditors (the "Committee") of Tribune Company and its various debtor-subsidiaries for entry of a protective order relating to the subpoena issued pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure by the Aurelius Plaintiff Group[1] seeking Tribune Company shareholder information, all written responses and objections thereto, and the hearing on the Motion held on May 17, 2011, and for good cause shown, the Court hereby enters the following order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure made applicable by Rule 9014 and Rule 7026 of the Federal Rules of Bankruptcy Procedure to govern disclosure of information and documents in connection with Tribune Company shareholder information sought in connection with the above-captioned bankruptcy proceedings.

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Motion.

It is hereby ORDERED that:

1.      The Motion is GRANTED.

2.      In connection with this Court's Order Granting (I) Relief from the Automatic Stay to the Extent the Automatic Stay Bars Commencement by Creditors of State Law Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to Step One Shareholders and Step Two Shareholders and (II) Leave from the Mediation Order to Permit Commencement of Litigation on Account of Such Claims (entered April 25, 2011) [D.I. 8740], the Committee is authorized to produce the subpoenaed information to the Aurelius Plaintiff Group and to any other party that requests such information pursuant to lawful process (each a "Requesting Party"),[2] provided that the Requesting Party executes and returns to counsel for the Committee a confidentiality agreement in the same form as that attached hereto as Exhibit A.

3.      The Court shall retain jurisdiction to interpret or enforce this Order.

Dated: _Mhy 19_, 2011
       Wilmington, Delaware

The Honorable Kevin J. Carey
Chief United States Bankruptcy Judge

---

[2] The Committee has also received a request from counsel for the Retiree Claimants for the same information sought by the Aurelius Plaintiff Group.

2

# EXHIBIT A

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into as of May __, 2011 by and between Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan" and together with Akin Gump, the "Requesting Party") and Zuckerman Spaeder LLP ("Zuckerman") and Landis Rath & Cobb LLP ("Landis" and together with Zuckerman, the "Producing Party"; and the Requesting Party together with the Producing Party, the "Parties," or singly a "Party"), as co-counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee").

## WITNESSETH

WHEREAS, Landis and Zuckerman on behalf of the Creditors' Committee filed Adversary Proceeding No. 10-54010 (KJC) on November 1, 2010 (the "Adversary Proceeding") in the bankruptcy cases filed under Chapter 11 of the Bankruptcy Code by the Tribune Company and certain of its affiliates (collectively, the "Debtors") titled In re Tribune Co., et al., Case No. 08-13141 (KJC) (Jointly Administered), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Bankruptcy Court has granted parties represented by the Requesting Party leave to commence civil actions to assert certain claims under applicable state law (the "State-Law Actions");

WHEREAS, the Requesting Party served the Producing Party with a Subpoena with a request for documents dated April 29, 2011 (the "Subpoena"), in connection with the Adversary Proceeding and in anticipation of the State-Law Actions;

WHEREAS, in responding to the Subpoena, the Producing Party will provide the Requesting Party with documents, as that term is defined in the subpoena ("Documents"), including Documents that contain or constitute responsive, nonpublic information or confidential or proprietary business, technical or financial information, including nonpublic or confidential information provided by one or more persons or entities (each an "Originating Party") to the Producing Party in connection with the Adversary Proceeding ("Confidential Information");

WHEREAS, any Originating Party is a third-party beneficiary of the Agreement and has an interest in protecting the confidentiality of its Confidential Information.

WHEREAS, the Parties to this Agreement acknowledge the importance of preserving the confidentiality of the Confidential Information and Confidential Information that is designated by any Originating Party as "Highly Confidential—Attorneys' Eyes Only" (as defined below) and agree to abide by this Agreement with respect thereto;

NOW, THEREFORE, the Parties hereby agree as follows:

1.      The term "Confidential Information" shall also include any notes, summaries, compilations, memoranda, minutes or similar materials disclosing or discussing Confidential Information. The Confidential Information shall be furnished or otherwise disclosed or made known to the Requesting Party and its local counsel subject to the terms and conditions of this

Agreement. This Agreement and the obligations of the Requesting Party shall apply to all Confidential Information regardless of whether it is provided by the Producing Party or its counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other agents or professionals (collectively, "Advisors").

2.      All Documents that the Producing Party produces in response to the Subpoena, including Documents identifying parties who subsequently may be named as parties in the State-Law Actions, will be used solely in connection with the State-Law Actions and related proceedings. All Confidential Information furnished, disclosed or made known to the Requesting Party or its local counsel by the Producing Party or its Advisors after execution of this Agreement, whether tangible or intangible, and in whatever medium provided, including, but not limited to, in written form, orally, or through any electronic, facsimile or computer-related communication, whether disclosed intentionally or unintentionally, and all information generated by the Requesting Party or its local counsel or any of their Advisors that contains, reflects or is derived from the Confidential Information, shall be used by the Requesting Party and its local counsel solely and exclusively in connection with the State-Law Actions and related proceedings. The Requesting Party and its local counsel and each of their Advisors shall each carry out its obligations hereunder using a reasonable degree of care. For purposes of this Agreement, the term "related proceedings" shall refer to any action or proceeding commenced in any federal or state court or foreign tribunal (including, but not limited to, any court or tribunal to which the State-Law Actions are removed, transferred, or consolidated) for purposes of preserving or recovering assets, acquiring discovery in aid of and/or obtaining, enforcing, or collecting on a judgment in connection with the State-Law Actions.

3.      The Producing Party shall produce documents with the same designations as the documents produced to it by the Originating Party. Documents designated as "Highly Confidential—Attorneys' Eyes Only" contain Confidential Information that is competitively sensitive and/or proprietary to the Producing Party, the Debtors or the Originating Party, or from which competitively sensitive or proprietary information belonging to the Producing Party, the Debtors or the Originating Party could be derived. This includes, without limitation: (a) Documents containing information relating to confidential financial and/or business operations, business ventures, strategic plans, processes, designs, applications or trade secrets; and/or (b) information required to be maintained confidential by federal, state or local laws, rules, regulations or ordinances governing or relating to privacy rights, including any and all personally identifiable financial information and nonpublic personal information of customers and consumers. In addition, the Originating Party may have designated as "Confidential" those Documents that it believes in good faith constitute or contain other categories of nonpublic information that is competitive or sensitive in nature.

4.      The Requesting Party and its local counsel shall not provide Documents designated "Highly Confidential—Attorneys' Eyes Only" to any person or entity other than to: (a) attorneys, clerical, paralegal and secretarial staff employed by the Requesting Party or its local counsel, who shall be bound by this Agreement; or (b) Advisors of the Requesting Party or its local counsel who agree to be bound by this Agreement by executing the attached Exhibit A.

2

5.      Any Document produced by the Producing Party to the Requesting Party may be provided to Aurelius Capital Management, LP ("Aurelius"), provided that Aurelius agrees to be bound by this Agreement by executing the attached Exhibit A.

6.      Notwithstanding any other provision in this Agreement: (a) parties who have been identified in Documents produced in response to the Subpoena may be publicly named as parties in the State-Law Actions or related proceedings, provided, however, that any such publicly-named party shall not in any way be publicly associated, linked, or otherwise identified as having been at any point in time related to or a customer of the Originating Party; and (b) information concerning the timing and amount of payments to such parties may be included in any pleading filed by the Requesting Party or its local counsel in connection with the State-Law Actions or related proceedings, provided that the Requesting Party or its local counsel takes the necessary steps to file any such pleading under seal or otherwise prevent the public release of such information.

7.      Notwithstanding any other provision in this Agreement, nothing herein shall prevent disclosure of any information: (a) if the Requesting Party receives consent to disclose such information from either the Originating Party or the customer or client of the Originating Party; (b) that is in the public domain at the time of disclosure, was previously in the public domain, or becomes part of the public domain through no fault of the Producing Party, the Requesting Party or Originating Party; or (c) if the Requesting Party lawfully receives such information at a later date from a third party without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party. Upon receiving consent to disclose information pursuant to subsection (a) of this paragraph 7, the Requesting Party shall promptly notify the Producing Party and the Originating Party (if consent is provided by a customer or client of the Originating Party) and identify the information that may be disclosed.

8.      If the Requesting Party objects to the designation of any Documents as "Highly Confidential—Attorneys' Eyes Only" or "Confidential," or seeks a waiver of such designation, the Requesting Party will initially contact the Originating Party in an effort to resolve the dispute and, if that effort is unsuccessful, may apply to the Bankruptcy Court for relief. Upon initiating contact with the Originating Party under this paragraph 8, the Requesting Party shall promptly notify the Producing Party of such contact. Absent a written waiver or agreement from the Originating Party or an order of the Bankruptcy Court to the contrary, Documents designated "Highly Confidential—Attorneys' Eyes Only" or "Confidential" may be shown only to the Parties specified above.

9.      Should access to Documents stamped "Highly Confidential—Attorneys' Eyes Only" or "Confidential" be sought from the Requesting Party or its local counsel or any Advisor retained by any of them by any person, pursuant to subpoena or other legal process under applicable law, rule, or regulation, the Requesting Party or its local counsel, as appropriate, will, unless prohibited by applicable law or regulation: (a) promptly notify counsel to the Originating Party, and the Producing Party, in writing of the requested access; (b) prior to producing any such Documents, provide the Originating Party ten (10) business days to seek a court order preventing or limiting the production of such Documents; and (c) use best efforts to enter into a confidentiality agreement with the person seeking access to such Documents that provides the Originating Party substantially the same protections as this Confidentiality Agreement.

10.     All Confidential Information, unless otherwise specified in writing, may be used as provided herein, but shall remain the property of the Originating Party. Ninety (90) days following the closing of all State-Law Actions and related proceedings, each recipient of Confidential Information who received such Confidential Information in connection with State-Law Actions and related proceedings agrees to promptly destroy all Confidential Information, including, without limitation, all documents, reports and exhibits provided by or on behalf of the Producing Party and all working papers containing any Confidential Information or extracts therefrom. In addition, and subject to the same proviso as immediately above, each recipient agrees at that time to destroy all copies of any notes, analyses, compilations, studies or other documents that it or its Advisors prepared containing or reflecting any Confidential Information. If requested by the Producing Party or the Originating Party, after destruction each recipient of Confidential Information will deliver a certificate executed by an appropriate officer of the recipient certifying that all such materials have been destroyed.

11.     In order to facilitate the requirements of paragraphs 7, 8, 9, and 10 of this Agreement, the Producing Party shall provide the Requesting Party with information sufficient to specifically identify the Originating Party of any Document or information produced to the Requesting Party in response to the Subpoena.

12.     The Requesting Party acknowledges that irreparable damage would occur to the Originating Party if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that remedies at law for any actual or threatened breach by it of the covenants contained in this Agreement shall be inadequate and that the Originating Party will be entitled to equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this Agreement, in addition to all other remedies available to the Originating Party at law or in equity. During the pendency of the State-Law Actions and related proceedings, all Parties hereto consent to the jurisdiction and venue of the Bankruptcy Court with respect to any controversy or claims arising out of or related to this Agreement or the use or disclosure or rights pertaining to Confidential Information. Upon conclusion of all State-Law Actions and related proceedings, all Parties consent to the jurisdiction and venue of the federal and state courts located in the State of Delaware with respect to any such controversy or claims. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

13.     The inadvertent production of privileged information by the Producing Party or the Originating Party shall not constitute a waiver of any applicable privilege and the Requesting Party and its local counsel will return to the Producing Party any such materials inadvertently produced.

4

14.     Nothing in this Agreement serves as a waiver of any objections that an Originating Party may have in any State Law Actions or related proceedings.

Executed this ___ day of May, 2011.

AKIN GUMP STRAUSS HAUER & FELD LLP

By:_____

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

By:_____

LANDIS RATH & COBB LLP

By:_____

ZUCKERMAN & SPAEDER LLP

By:_____

5

## EXHIBIT A

In connection with the Confidentiality Agreement (the "Agreement") dated May ___, 2011 between Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan" and together with Akin Gump, the "Requesting Party") and Zuckerman Spaeder LLP ("Zuckerman") and Landis Rath & Cobb LLP ("Landis" and together with Zuckerman, the "Producing Party"); and the Requesting Party together with the Producing Party, the "Parties," or singly a "Party"), as co-counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the undersigned hereby agrees as follows (capitalized terms not defined herein shall have the meanings ascribed to those terms in the Agreement):

1.      The undersigned has (i) been provided with a copy of the Agreement, (ii) read the Agreement, (iii) had an opportunity to review the Agreement with counsel, and (iv) been authorized to execute this Exhibit A to the Agreement.

2.      To the extent that the Requesting Party or its local counsel provides the undersigned with documents designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" produced pursuant to the Agreement and the Subpoena, the undersigned agrees to be bound by the Agreement and that such documents shall only be used in connection with the State-Law Actions and related proceedings and shall not be provided to anyone other than as permitted under the Agreement.

3.      Should access to Documents designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" be sought from the undersigned by any person, pursuant to subpoena or other legal process under applicable law, rule, or regulation, the undersigned agrees that, unless prohibited by applicable law or regulation, it will:  (a) promptly notify counsel to the Originating Party, and the Producing Party, in writing of the requested access; and (b) prior to producing such Documents, provide the Originating Party with a reasonable opportunity to seek a court order preventing or limiting the production of such Documents.

4.      The undersigned agrees that the inadvertent production of privileged information by the Originating Party shall not constitute a waiver of any applicable privilege and that it will return to the Originating Party any such materials inadvertently produced.

Agreed and Accepted:                           May ____, 2011

_____
(Company Name)


By:_____
       Name:
       Title:

6

# Exhibit 3

[Home]



# New York State Supreme Court

## New York County - Civil Branch

### County Clerk Litigation Functions

## THE COUNTY CLERK'S OFFICE -- LITIGATION-
RELATED FUNCTIONS

<u>Concerning</u>: Filing of Papers, Index Numbers, Certified Copies / Entry and Filing of Papers / Stipulations of Discontinuance / Judgments / Record Room / Sealing of Files and Impoundment of Papers / Commencement of Cases Under Seal and Anonymous Captions / Notice of Appeal / Judgment Docket and Lien Section / Depositing Money with the County Clerk

### A. FILINGS MADE WITH / ITEMS OBTAINED FROM THE COUNTY CLERK

Important litigation papers must be filed by counsel with the County Clerk. The chief among these are:

- Summons and complaint or summons with notice
- Petition (special proceedings)
- CPLR 3213 motion papers
- Proof of service of summons and complaint
- Poor person order
- Notice of appeal
- Proposed judgments for signature by the County Clerk

All of these documents must be submitted by counsel to Room 141B (in the basement). Specifically, papers commencing a case are submitted to the Cashier in that room with an index number purchase form and fee. For a sample of this form, **click here.** For information on fees, **click here.** Subsequent papers for filing are submitted to the Law and Equity desk in that room except for proposed judgments for signature by the County Clerk, which are to be presented to the Judgment Clerk there. An RJI, a note of issue and a jury demand must be paid for in Room 160. The last two of these three must be filed with the Trial Support Office (Room 158).

With regard to initiating papers in special proceedings and moving papers in CPLR 3213 motion/actions:

<u>Special Proceedings</u>: Counsel should file the original petition with the County Clerk (Room 141B) to commence a special proceeding. The notice of petition need not be filed with the County Clerk. CPLR 304. In a special proceeding, a duplicate original of the petition, the original notice of petition (which is process, the counterpart of the summons, D. Siegel, <u>New York Practice</u> 949 (4th ed. 2005)), and an original affidavit of service shall be filed in the Motion Support Office (Room 119); these are the papers that will be forwarded to the assigned Justice for action. The petitioner may proceed by order to show cause instead of a notice of petition (CPLR 403 (d)); the proposed order should be presented to the Ex Parte Office (Room 315).

<u>Motion/Actions under CPLR 3213</u>: The original 3213 papers should be filed with the County Clerk (Room 141B). A duplicate original of the 3213 papers and an original affidavit of service in any such motion/action shall be filed with the Motion Support Office (Room 119); these are the papers that will be forwarded to the assigned Justice for action.

<u>Index Numbers</u>: When a case is being commenced, the filing party must file the initiating papers with the County Clerk and purchase an index number. Filing means the delivery of the summons with notice, summons and complaint or petition to the County Clerk (Room 141B), or

any other person designated by the Clerk for this purpose, together with the filing fee. At the time of filing, the Clerk will date stamp the original and a copy, will file the original, maintaining a record of the date of the filing, and will immediately return the copy to the filing party. CPLR 304. The index number will be issued upon the filing. CPLR 306-a. The Clerk will open a County Clerk's file and create a color-coded file jacket bearing the index number assigned to the case. Papers subsequently presented for filing will be filed in this jacket. Index numbers take the form of six digits followed by a slash and the four digits of the year the case began, e.g., 340705/2005.

Certain blocks or series of index numbers are allotted to particular types of cases. At present, the principal groups of these are:

- 100,000 - - General Assignment Cases
- 150,000 - - E-Filed General Assignment Cases
- 200,000 - - Tax Certiorari Cases
- 250,000 - - E-Filed Tax Certiorari Cases
- 300,000 - - Uncontested Matrimonial Cases
- 350,000 - - Contested Matrimonial Cases
- 400,000 - - No-Fee Cases
- 500,000-510,000 - - Article 81
- 570,000-580,000 - - Appellate Term
- 590,000 - - Third-Party Actions
- 600,000 - - Commercial Division Cases
- 650,000 - - E-filed Commercial Cases

Commencement of Cases: For information on case commencement, **click here**.

Third-Party Actions: A defendant who wishes to proceed against a non-party must file and serve a third-party summons and complaint. This third-party action (or fourth or fifth, etc.) will be an appendage of the main action. The defendant-third-party plaintiff is required to pay a filing fee for the third-party action. CPLR 1007. The County Clerk will not add a new index number to the caption to reflect the third-party action; an index number identifies an entire case (including its appendages) and there can be only one such number per case. The third-party action will be given a separate number for record-keeping purposes, which number need not appear on court papers.

Certification, Transfers, Appeals, etc.: Certified copies of court documents may be obtained at the Certification Window in Room 141B (cost $ 8.00), which also does exemplifications (see CPLR 4540), effects transfers of cases to Civil Court or other courts, handles subpoenaing of records on appeals, and accepts filings of notices of appeal.

Decisions and Orders/Entry: All decided motions and signed long form orders (as for judgments, see Section B below) are delivered to the Motion Support Office (Room 119) from Chambers. The issuance of decisions is recorded in the court's Civil Case Information System ("CCIS") computer. The decisions (except for those in matrimonial, Article 81 and sealed cases and those which the assigned Justice has directed not to be posted), with County Clerk entry stamp, are posted to the court's website (in the Supreme Court Records On-Line Library ("Scroll"), generally within two or three hours after the notation is made in CCIS, or overnight if the entry is made at the end of the day. All decisions, orders, and papers on motions are then delivered to the County Clerk (Room 141B). However, where a decision on a motion directs that an order be settled, the file will be retained in the Motion Support Office Order Section or the Commercial Division Support Office to await the submission of the proposed order and any counter-order. These files will not be delivered to the County Clerk until after the long form order has been signed by the Judge. However, the decisions directing settlement of an order will be posted on the court's website.

"Entry" consists of the recording of a document in the County Clerk's minutes (which are available in Scroll for most case types) and the file stamping of the document (the stamp reads "Filed" and the date). Entry gives effect to orders and judgments. Service of a copy of the decision and order or judgment with notice of entry causes the appellate clock to start to tick. "Entry" in the records of the Clerk is done as of the day on which the County Clerk stamps a document with the official stamp.

The County Clerk maintains a list of the entries (e.g., affidavit of service, order) made in the official record ("minutes") of each case. Handwritten minute books exist for cases prior to 1993 and computerized records for all cases from 1993 on. In addition to Scroll, the minutes may be accessed by means of courthouse terminals located in the County Clerk's Office (Rooms 141B, 103B, 109B, and 160).

Emergency Entries: Occasionally an emergency will arise requiring expedited entry of a document with the County Clerk (e.g., an order issued in the courtroom after a conference or argument of a critical matter), such as for purposes of an immediate appeal. Expedition can be achieved by the Part as follows: the document should be carried by a Court Officer or staff member to the Motion Support Office to assure immediate and proper recordation in the computer and, as appropriate, the posting of the document to the Supreme Court Records On-Line Library ("Scroll"). The court will accommodate counsel in emergencies.

Stipulations of Settlement/Discontinuance: All stipulations of settlement/discontinuance should be filed with the County Clerk in Room 160. A fee of $ 35 must be paid. CPLR 8020 (d). The defendant is responsible for filing the document and paying the fee. Id. The County Clerk will deliver the stipulation to the Trial Support Office after processing so that the court can mark its records (CCIS) to reflect the settlement/discontinuance. If a case is resolved at a time when a motion is *sub judice*, an attorney on the case should be sure to notify the assigned Justice as soon as possible so that the Judge does not waste time working on a motion that has been rendered moot.

## B. JUDGMENTS

### 1) In Special Proceedings

Special proceedings end in judgments, as do normal civil actions. Since it is usual for the decision on the initial motion to end the proceeding, the decision on Motion Sequence No. 001 will often be a decision and judgment.

### 2) In Civil Actions

Judgments in civil actions present a more complex subject..

Judgments on Default: The County Clerk is empowered by the CPLR to enter judgments on default involving a sum that is certain or can be made so by calculation. The applicant must present to the Judgment Clerk in Room 141B a copy of the summons and complaint, a statement for judgment documenting service and the default, and an affidavit by the client as to the merit of the case and the sum certain. In cases not involving a sum certain, the Court must order the entry of judgment on ex parte application or after a motion on notice. If there is a default on the motion and the court cannot direct the Clerk to enter judgment immediately, it will direct an inquest. See CPLR 3215. A defendant who appeared is entitled to notice. A non-appearing defendant is also entitled to notice if more than one year has elapsed since the default, unless the court orders otherwise. CPLR 3215(g)(1). Where an application must be made to the court, a defendant who has failed to appear may serve a written demand for, and is then entitled to, notice of any reference or assessment by a jury. CPLR 3215(g)(2). Additional notice is required for certain default judgments. CPLR 3215(g)(3) and (4). The court must sign judgments awarding equitable relief.

Judgments after Motions: A decision on a motion will actually be a decision and order the latter portion of which may direct the Clerk to enter judgment in favor of the plaintiff for a particular sum (again, where that can be determined on papers alone) or in favor of defendant usually dismissing the case. The Clerk will then sign and enter a judgment in accordance with the order of the Court. This will happen when counsel submits to the Judgment Clerk a judgment in proper form that substantively complies with the order of the court (the court enters judgments automatically only in matrimonial cases). On some motions (e.g., to confirm a referee's report in a foreclosure action) the Justice may sign a judgment.

Sometimes the court will issue a decision on a motion on the record. To serve notice of entry, counsel should obtain a certified copy of the transcript from the Court Reporter and append it to

a copy of the court's decision (gray sheet). Counsel should also cause a copy of the transcript to be placed in the County Clerk's file since it will likely not have been transcribed at the time the court signs and transmits the decision for filing.

An award of costs and disbursements will be included in the judgment where authorized and when the prevailing party presents a proper bill of costs. Where interest is awarded or provided for statutorily, the Judgment Clerk will calculate the amount of interest. It is customary, in orders signed by the Court that award costs, disbursements or interest, for the Court to direct that the Clerk calculate the amount of interest and tax or compute the costs and disbursements. Where a Justice signs a judgment, blank spaces will usually be left by the Justice for the dollar amount of interest, costs and disbursements, and for the resulting total sum, which spaces will be completed by the Clerk.

Where a cause of action contains a prayer for declaratory relief, the order of the Court on that claim must actually be an order and judgment and must declare as the judgment of the Court ("It is hereby adjudged and declared ....") whatever the Court has found.

Post-Trial Judgments: After a jury trial, the Part Clerk will record the outcome in the minutes. Upon request, for cases of money judgments or judgments of dismissal upon a general verdict (CPLR 5016 (b)(a general verdict is one in which the jury finds in favor of one or more parties (CPLR 4111 (a))), the Part Clerk will issue and sign an "extract" from these minutes, which lists the venue, the index number, the full title of the action (not the short-form one), the name of the Justice, the outcome of any motion affecting the caption, the verdict, and the date. The extract must account for all parties and all claims that were not submitted to the jury. Either party can then present to the Judgment Clerk in the County Clerk's Office for signature and entry a judgment dismissing the case or for a particular sum, as set forth in the extract. The Justice need never sign anything in such cases, neither an order nor the judgment itself, since the jury has provided the verdict. Extracts are not suited to complex verdicts/decisions.

Where there is a special verdict (which is one in which the jury finds the facts only, leaving it to the court to determine which party is entitled to judgment thereon (CPLR 41111 (a))), the court shall direct entry of an appropriate judgment. CPLR 5016 (b).

When settlement is directed, it occurs in the Part or in Chambers. Where questions arise about how the judgment should be framed, it is recommended that attorneys consult with the Judgment Clerk in Room 141B or the Law Secretary of the Justice.

If the trial is non-jury, the Justice will set forth the outcome on the record or in a written decision and will usually direct that a judgment in conformity therewith be settled or submitted. Whenever equitable relief is granted, the Justice needs to sign the judgment. If equitable relief is denied, the court may direct the County Clerk to enter judgment of dismissal.

### 3. Entry and Filing

Decisions and orders are recorded in the County Clerk's minutes and filed in the County Clerk's file jacket. Counsel wishing to serve notice of entry of an order should consult the Supreme Court Records On-Line Library ("Scroll") on this court's website since most decisions and orders will be posted there, very promptly after issuance, with County Clerk entry stamp.

Executed judgments are set aside in the Law and Equity Section of Room 141B in a group referred to as "unfiled judgments." These are not entered and filed by the Clerk on his own (except in matrimonial cases). Rather, the County Clerk awaits the arrival of counsel or a representative in person at the Judgment Clerk's desk with a bill of costs to secure the calculation of any interest and entry of the judgment and to effect the preparation of a judgment roll. Documentation of contractual interest rates may have to be submitted to the Judgment Clerk. The Clerk will not enter judgment without the creation of a judgment roll, which consists of the basic papers in the case (pleadings, orders, admissions, etc.). Most of these papers may be in the County Clerk's case file, in which event the attorney seeking entry of judgment need only present those that are missing for inclusion in the judgment roll. CPLR 5017.

The court's Scroll program will contain copies of judgments in unfiled form in cases included within the ambit of Scroll and will later include a copy of each judgment as filed.

## C. THE COUNTY CLERK'S RECORD ROOM

The County Clerk operates a Record Room (Room 103B in the basement, hours 9:00 A.M. - 3:00 P.M.) for maintenance of case files in all pending matters (2001 forward). Files in old matters are archived. Case files for 1996-2000 (soon to include 2001) are located at, and may be viewed at, 31 Chambers Street (7th Floor) (hours: Tuesdays and Thursdays only from 9:00 AM to 5:00 PM). Case files for cases with index numbers for the years 1984 to 1995 are in storage off site; for access, contact the County Clerk staff. Files from 1955-1983 (soon to be followed by 1984) are on microfilm at 60 Centre Street.

### 1. Sealing of Files

Matrimonial files may not be inspected except by counsel or parties to the case. DRL § 235. In addition, the files in other cases may be sealed on an individual basis by court order. See Part 216 of the Uniform Rules of the Trial Courts, which provides that the Court shall not enter an order sealing a file in whole or in part except upon a written finding of good cause specifying the grounds, taking into account the interests of the parties and the public. A sealing order should be an order separate from other orders and a copy should be directed to be served on the County Clerk; unless the attorneys make such service and thereby bring the order to the County Clerk's particular attention (see CPLR 8019 (c)), the file will not be sealed because the County Clerk cannot read all orders that are delivered to him by court staff for filing (the court processed over 34,000 decisions on motions in 2005). This order must state who is entitled to see the sealed file. Absent clarity on this point, the Clerk will seal the file and let no one see it, including the parties and counsel in the case. Usually, attorneys will want to have the order provide for access to the sealed file by attorneys of record in the case, the parties, and persons designated in writing by the attorneys of record (e.g., paralegals).

In some instances, entire case files may be sealed. However, under Part 216, case files may be sealed in part and there may well be instances in which it would not be appropriate to seal more than a part of a case file. See Danco Laboratories Ltd. v. Chemical Works, 274 A.D.2d 1, 711 N.Y.S.2d 419 (1st Dept. 2000). Thus, some files in the County Clerk's Office will be sealed in their entirety while others will be sealed in part. Any sealing order entered in a case should clearly indicate whether the entire file is to be sealed; if not, the order must clearly designate the portions that are to be so treated. Further, on each occasion during the course of a case when a portion of the file is to be sealed, a separate partial sealing order must be issued.

Documents produced during discovery but not filed are, of course, subject to such protective orders as the court may issue pursuant to CPLR 3103.

A Justice can place a document in an envelope, mark his or her initials over the flap and place an endorsement on the envelope that it is to be opened only on further order of the court. However, if a sealing order pursuant to Part 216 is not issued, the County Clerk will make the file in that case available to the public. If a member of the public opens the envelope, he or she will be subject to a contempt citation.

A device that can serve as an alternative to sealing is an order of impoundment. This order directs the County Clerk to take an individual set of motion papers or discrete items of evidence and place them in the Clerk's safe. The file itself remains unsealed, but the impounded papers cannot be read. The order may be crafted by the Justice so that the papers cannot be read by anyone, including the parties, and cannot even be transmitted to the Appellate Division with the file on an appeal until the order is lifted by the Justice who signed it. Or the order may permit access to the papers by the attorneys, the clients or others. And the order can provide that when the papers are needed for an appeal, the affected party can submit an order to the Justice to lift the impoundment order. Here again, clarity is important. Clearly such an order should only be issued in unusual circumstances. Indeed, since impoundment has the same practical effect as a partial sealing order, the considerations set forth in Part 216 should be taken into account before an order of

considerations set forth in Part 216 should be taken into account before an order of impoundment is issued.

For more information, contact the County Clerk's Office.

## 2. Commencing Actions Claimed To Be Confidential

If a party wishes to commence an action under seal or use an anonymous caption, practical problems arise. The County Clerk cannot do either without a court order. However, since the press is given access to new case filings each day, if a party files a summons and complaint and then seeks a sealing order, the confidentiality of the case can be rendered moot at the outset. A filing made in the routine way will also be listed in the County Clerk's minutes and the listing will appear in electronic attorney's services.

Sealing: Accordingly, if a party wishes to seal a file from the start, the attorney should, before any papers are filed, consult the Chief Clerk of Law and Equity (Room 141B), or the Chief Deputy County Clerk, and advise either of the desire to seal. If papers are in proper form and the index number fee is paid, the County Clerk will issue an index number but not process the filing for two or three days. This will allow the party time to file an RJI with a proposed order to show cause seeking a sealing order and a TRO sealing the file pending the decision on the request for a sealing order. As to standards governing sealing of files, see Part 216. If the TRO is granted, then that order should be promptly brought to the attention of the County Clerk's staff, who will seal the file pending the decision of the court on the main sealing request. If the attorney fails to alert senior County Clerk staff at the outset, prior to filing any papers, that sealing is sought, if, that is, the summons and complaint are simply filed in the normal manner, the information contained in the papers may be revealed before a Justice has a chance to act. Likewise, if a copy of a TRO is not promptly presented to the County Clerk, the information in question may be disclosed. The procedure described here, it should be noted, does not involve an anonymous caption. The real caption of the case will be listed in the Clerk's minutes.

If a party follows the steps outlined above and delivers to the County Clerk a summons and complaint and if the complaint contains sensitive information that the plaintiff wishes to have sealed, the plaintiff cannot be assured that the Justice to whom the case is assigned will approve the request for a TRO sealing the file pending decision on the main sealing request. Should the TRO be denied, the County Clerk will proceed to file the summons and complaint in the normal manner, meaning that those documents will be publicly accessible. It is possible that this may occur before the plaintiff has a chance to appeal the rejection of the TRO. The County Clerk will not return the documents to the plaintiff if plaintiff seeks not to proceed with the case in view of the lack of a sealing order. Since an index number will have already been issued and the documents delivered to the County Clerk for filing, the Clerk will file them.

A plaintiff may assure avoidance of disclosure of sensitive information in a complaint in the event that a TRO sealing a file is denied. The plaintiff can do this by filing a summons with notice and describing the case for sealing in the papers supporting the order to show cause. If the sealing order is denied, the plaintiff can either discontinue the action or file a complaint lacking in sensitive detail. In the alternative, the plaintiff can file a summons and a complaint lacking in sensitive detail and amend that complaint as required if the sealing application is granted.

Anonymous Caption: If a party wishes to proceed using an anonymous caption, he or she should bring on an order to show cause, with the real parties named in the caption, seeking an anonymous caption and a sealing order since presumably the applicant will not want to obtain an anonymous caption and yet leave the file open to public access. The OSC should include a TRO providing a directive that the County Clerk issue an index number under an anonymous caption and seal the file pending the return date on the order to show cause or decision thereon. Before the papers are filed with the County Clerk, they should be submitted to the Ex Parte

Office or the Commercial Division Support Office. They will be presented to an Ex Parte Justice, who, if in agreement, will initial the TRO. The papers can then be presented to the County Clerk senior staff (not the normal filing window in Room 141 B) for the issuance of an index number under an anonymous caption and sealing. The papers can then be filed and an RJI purchased. The back office to which the papers are submitted (the Ex Parte Office or the Commercial Division Support Office) should be informed that the papers being submitted are covered by a TRO sealing the file. The papers should be presented to the assigned Justice for further action. Normally, the matter will proceed anonymously at least until the return date on the OSC, at which time the adversary will have an opportunity to explain why confidentiality should not be continued.

## D. APPEALS

Notices: Notices of appeal must be filed with the County Clerk in Room 141B. The current fee is $ 65. No personal checks are accepted. A New York State attorney's check or a postal money order made out to the New York County Clerk, or a Visa or Mastercard credit card is required.

The Notice of Appeal must be filed in duplicate. In one legal back an original Notice of Appeal with original proof of service must be filed. In a second separate back an original Notice of Appeal, a Pre-Argument Statement, and a copy of the entered order or judgment from which appeal is to be taken must be filed. An appeal can be taken from only one order or judgment. As to the content of the Pre-Argument Statement, see Section 600.17 of the Rules of the Appellate Division, First Department.

If necessary, a corrected or amended Notice of Appeal can be filed (no fee required). The submission requirements are the same as for a Notice of Appeal except that the Notice must be the corrected/amended one and bear on the first page a statement as to what is being corrected or amended. In addition, at the time of filing, the filer shall present the original receipt of payment showing the original number. The same procedure should be followed if the document being corrected/amended is the Pre-Argument Statement.

State and City agencies can proceed without fee. Any such agency must, however, submit a letter on original letterhead bearing the original signature of the attorney of record.

The fee for a Cross-Notice of Appeal is $ 65. An original thereof, together with proof of service and a copy of the order/judgment in question must be filed in a legal back. In a separate legal back, an original Cross-Notice must also be filed.

For appeals to the Court of Appeals, the fee is $ 65. An original Notice of Appeal, plus original proof of service, must be filed in one separate legal back. In another, an original Notice must also be filed.

Subpoenaing the File: Pursuant to the rules of the First Department, appeals can be taken on a printed record, or an original one. In the case of appeals on the original record, the record is transferred to the Appellate Division as follows (fee - $ 24.50). The appellant should deliver to the County Clerk's Record Room (Room 103B) a signed attorney's subpoena (the subpoena of a self-represented litigant must be so ordered by a Justice) specifying the file to be transferred and the destination. The subpoena must be accompanied by four copies of a form of Certificate and two copies of a Statement of Attorney, signed by counsel, as well as two Pre-Argument Statements or 5531 Statements. In the Certificate, counsel must list each paper in the file that is being subpoenaed, one by one, by type of document and date of filing with the County Clerk's Office, in conformity with the County Clerk's listing in the case minutes, which are accessible in the "Supreme Court Records On-Line Library" ("Scroll"), available on this website. If the document was not filed in the County Clerk's Office, it cannot be listed on the Certificate, but should be included in the Statement of Attorney.

Counsel should retrieve the file from the Record Room, put the papers listed on the Certificate in the order listed, and bring the file and accompanying papers to the Certification counter in Room 141B, where the papers will be reviewed. Hours: 9-11AM or 1:30-2:30 PM.

Two business days are required between service of the subpoena and delivery to the First

Department.

### E. JUDGMENT DOCKET AND LIEN SECTION

The County Clerk records judgments, liens and notices of pendency electronically. The Section is located in Room 109B. Satisfactions of judgment are filed in this Section, not in the Law and Equity Section. Transcripts of judgment are issued and filed in this Section.

### F. DEPOSITING MONEY WITH THE COUNTY CLERK

From time to time a need arises in litigation for a party to deposit money with the court. The money is deposited with the County Clerk; payment must be in cash or by certified check. But the Clerk does not hold onto this money for more than a brief time (perhaps 24-48 hours). He forwards the money to the New York City Department of Finance, which records the deposit, secures the money in an account and administers that account. When the time comes to pay that money out to someone, a court order releasing the money is required. That order must be directed to the Department of Finance, not to the County Clerk, who will no longer have possession of the funds. The Department of Finance will issue a certificate to the party seeking the money reporting on the amount of money in the account at the time of the inquiry. The order should refer to the account and the amount therein and direct the Department to release the money as the court desires, less the 2 % fee of the Department.

November 2010



[ Court Offices and Functions ]  [ Summary of Courthouse Procedures ]  [ Justices ]  [ Rules of Justices ]
[ County Clerk ]  [ E-Filing ]

Case 1:11-cv-04522-NRB   Document 1   Filed 07/01/11   Page 128 of 128

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: I.A.S. PART 3

--------------------------------------------------------------- x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

                      Plaintiffs,

        vs.

ABU DHABI INVESTMENT AUTHORITY, *et al.*

                    Defendants.

--------------------------------------------------------------- x

Index No. 651517/2011

Bransten, J.

**AFFIRMATION OF SERVICE**

JEFFREY C. FOURMAUX, an attorney admitted to practice before this honorable Court, affirms the truth of the following statements under the penalties of perjury:

On June 3, 2011, I served a copy of the attached Order to Show Cause, signed by the Hon. Eileen Bransten, J.S.C., on June 2, 2011, as modified and signed by Judge Bransten on June 3, 2011 (copy attached hereto as Exhibit A), on the Office of the Clerk of the County of New York, by hand delivering the same to Mr. Joseph F. Antonelli, Chief Clerk, County Clerk's Office, in Room 300 of the Courthouse at 60 Centre Street, New York, New York 10007.

Dated: New York, New York
       June 6, 2011

                                  JEFFREY C. FOURMAUX

992261.1