UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------------------------------ x

DEUTSCHE BANK TRUST COMPANY AMERICAS, in
its capacity as successor indenture trustee for certain series
of Senior Notes, LAW DEBENTURE TRUST
COMPANY OF NEW YORK, in its capacity as successor
indenture trustee for certain series of Senior Notes, and
WILMINGTON TRUST COMPANY, in its capacity as
successor indenture trustee for the PHONES Notes,

     Plaintiffs,

  vs.

ABU DHABI INVESTMENT AUTHORITY;
ALLIANCEBERNSTEIN L.P., in its individual and
 custodial capacities;
AIM COUNSELOR SERIES TRUST (INVESCO
 COUNSELOR SERIES TRUST);
AIM VARIABLE INSURANCE FUNDS (INVESCO
 VARIABLE INSURANCE FUNDS);
ALLIANZ INVEST KAG MBH;
AM INTERNATIONAL E MAC 63 LIMITED;
AM MASTER FUND III, LP;
AMPERE CAPITAL MANAGEMENT LP;
AQR CAPITAL MANAGEMENT LLC;
BANC OF AMERICA SECURITIES LLC;
BANK OF AMERICA, NATIONAL ASSOCIATION;
THE BANK OF NEW YORK MELLON, in its individual
 and custodial capacities;
THE BANK OF NEW YORK MELLON as trustee of
 SPDR S&P MIDCAP 400 ETF TRUST a/k/a SPDR
 MIDCAP 400 TRUST;
THE BANK OF NEW YORK MELLON as trustee of
 THE BANK OF NEW YORK MELLON EMPLOYEE
 BENEFIT COLLECTIVE INVESTMENT FUND PLAN
 f/k/a MELLON BANK, N.A. EMPLOYEE BENEFIT
 COLLECTIVE INVESTMENT FUND PLAN;
THE BANK OF NEW YORK MELLON as trustee of
 THE COLLECTIVE TRUST OF THE BANK OF NEW
 YORK;
*(continued)*

No. 11 Civ. 04522 (RJH)

**FIRST AMENDED**
**COMPLAINT**

BANK OF NEW YORK MELLON CORPORATION;  :
BARCLAYS BANK PLC;  :
BARCLAYS CAPITAL, INC.;  :
BARCLAYS CAPITAL SECURITIES LIMITED;  :
BARCLAYS CAPITAL SECURITIES LIMITED as  :
  successor to BZW SECURITIES LIMITED;  :
BEAR STEARNS ASSET MANAGEMENT, INC.;  :
BEAR STEARNS EQUITY STRATEGIES RT LLC;  :
BHF-BANK AKTIENGESELLSCHAFT;  :
BLACKROCK;  :
BLACKROCK ADVISORS (UK) LTD. f/k/a  :
  BARCLAYS GLOBAL INVESTORS LTD.;  :
BLACKROCK INSTITUTIONAL TRUST COMPANY,  :
  NATIONAL ASSOCIATION f/k/a BARCLAYS  :
  GLOBAL INVESTORS, N.A.;  :
BNP PARIBAS PRIME BROKERAGE, INC.;  :
BNP PARIBAS SECURITIES CORP.;  :
BNY MELLON, in its custodial capacity;  :
BOARD OF EDUCATION RETIREMENT SYSTEM OF  :
  THE CITY OF NEW YORK;  :
BON SECOURS HEALTH SYSTEM, INC.;  :
WILLIAM H. BROWNE;  :
CARLYLE MULTI-STRATEGY MASTER FUND LTD.;  :
CAXTON ASSOCIATES LP f/k/a CAXTON  :
  ASSOCIATES LLC;  :
CHICAGO TRADING COMPANY;  :
CITIBANK, NATIONAL ASSOCIATION, in its  :
  individual and custodial capacities;  :
CITIGROUP GLOBAL MARKETS, INC.;  :
CITIGROUP GLOBAL MARKETS LTD.;  :
COUTTS US EQUITY INDEX PROGRAMME;  :
CREDIT SUISSE SECURITIES (USA) LLC f/k/a  :
  CREDIT SUISSE FIRST BOSTON LLC;  :
DEEPHAVEN CAPITAL MANAGEMENT LLC;  :
DEL MAR ASSET MANAGEMENT, LP;  :
DEUTSCHE BANK, in its custodial capacity;  :
DEUTSCHE BANK AG, in its custodial capacity;  :
DEUTSCHE BANK AG, FILIALE AMSTERDAM;  :
DEUTSCHE BANK AG, FRANKFURT;  :
DEUTSCHE BANK SECURITIES INC., in its individual  :
  and custodial capacities;  :
*(continued)*  :
   :

2

DEUTSCHE BANK SECURITIES INC. - DB AG :
  EQUITY SWAPS OFFSHORE CONSOLIDATED :
  ACCOUNT I; :
DEUTSCHE LUFTHANSA AG; :
FORRESTAL FUNDING MASTER TRUST; :
GALLEON BUCCANEERS OFFSHORE LTD; :
GALLEON MANAGEMENT, LP; :
CLAUDIA F. GASPARINI, as beneficiary of :
  CLAUDIA F. GASPARINI IRA; :
GENERAL ELECTRIC COMPANY; :
GOLDMAN, SACHS & CO., in its individual and :
  custodial capacities; :
GOLDMAN SACHS EXECUTION & CLEARING, L.P., :
  in its individual and custodial capacities; :
GOLDMAN SACHS INVESTMENT STRATEGIES, :
  LLC, in its custodial and investment managerial :
  capacities; :
GRYPHON HIDDEN VALUES VIII L.P.; :
HALCYON ASSET MANAGEMENT LLC f/k/a :
  HALCYON MANAGEMENT CO. LLC; :
HALCYON DIVERSIFIED FUND L.P.; :
HALCYON SPECIAL SITUATIONS, L.P.; :
THE HARTFORD FINANCIAL SERVICES GROUP, :
  INC. d/b/a THE HARTFORD; :
HAVENS ADVISORS LLC; :
HIGHBRIDGE CAPITAL MANAGEMENT, LLC; :
HIGHBRIDGE EVENT DRIVEN/RELATIVE VALUE :
  FUND, LTD.; :
HIGHBRIDGE INTERNATIONAL LLC; :
HSBC BANK (CAYMAN) LIMITED f/k/a BANK OF :
  BERMUDA (CAYMAN) LTD.; :
IBM NETHERLANDS MSCI US; :
IBM PERSONAL PENSION PLAN TRUST; :
IBM RETIREMENT FUNDS; :
INKA MBH a/k/a INTERNATIONALE :
  KAPITALANAGEGESELLSCHAFT MBH a/k/a HSBC :
  INKA; :
INTERNATIONAL BUSINESS MACHINES :
  CORPORATION; :
J.P. MORGAN; :
*(continued)* :
   :
   :

J.P. MORGAN CLEARING CORP., in its individual and : 
custodial capacities; : 
J.P. MORGAN CLEARING CORP. as successor to BEAR : 
STEARNS SECURITIES CORP., in its custodial : 
capacity; : 
J.P. MORGAN SECURITIES LLC; : 
J.P. MORGAN SECURITIES LLC as successor to BEAR, : 
STEARNS & CO. INC., in its custodial capacity; : 
J.P. MORGAN SECURITIES LLC f/k/a J.P. MORGAN : 
SECURITIES INC.; : 
J.P. MORGAN SERVICES, INC.; : 
J.P. MORGAN WHITEFRIARS INC.; : 
JPMORGAN CHASE BANK, NATIONAL : 
ASSOCIATION; : 
JPMORGAN CHASE BANK, NATIONAL : 
ASSOCIATION as trustee of THE JPMORGAN CHASE : 
401(K) SAVINGS PLAN; : 
THE JPMORGAN CHASE 401(K) SAVINGS PLAN; : 
LIBERTY HARBOR MASTER FUND I, LP; : 
MAGNETAR CAPITAL LLC; : 
MAGNETAR CAPITAL MASTER FUND, LTD.; : 
MAGNETAR FINANCIAL LLC; : 
MERRILL LYNCH, in its individual and custodial : 
capacities; : 
MERRILL LYNCH FINANCIAL MARKETS, INC.; : 
MERRILL LYNCH, PIERCE, FENNER & SMITH : 
INCORPORATED, in its individual and custodial : 
capacities; : 
MERRILL LYNCH, PIERCE, FENNER & SMITH : 
INCORPORATED as successor to BANC OF : 
AMERICA SECURITIES LLC; : 
METROPOLITAN LIFE INSURANCE CO.; : 
MILTON PARTNERS LLC; : 
MORGAN STANLEY d/b/a MORGAN STANLEY : 
PRIME BROKERAGE, in its custodial capacity; : 
MORGAN STANLEY & CO. INTERNATIONAL plc : 
f/k/a MORGAN STANLEY & CO. INTERNATIONAL : 
LIMITED; : 
MORGAN STANLEY & CO. LLC f/k/a MORGAN : 
STANLEY & CO. INC., in its individual and custodial : 
capacities; : 
*(continued)* : 
 :

MORGAN STANLEY EQUALLY-WEIGHTED S&P 500 :
  FUND f/k/a MORGAN STANLEY VALUE ADDED :
  MARKET SERIES; :
MORGAN STANLEY S&P 500 INDEX FUND; :
MORGAN STANLEY SELECT DIMENSIONS :
  INVESTMENT SERIES; :
MORGAN STANLEY SMITH BARNEY LLC; :
NATIONAL FINANCIAL SERVICES LLC; :
NEW YORK CITY EMPLOYEES RETIREMENT :
  SYSTEM; :
NEW YORK CITY FIRE PENSION FUND; :
NEW YORK CITY POLICE OFFICERS' VARIABLE :
  SUPPLEMENTS FUND; :
NEW YORK CITY POLICE PENSION FUND; :
NEW YORK LIFE INSURANCE CO.; :
NEWBROOK CAPITAL ADVISORS LP; :
ODDO & CIE as successor to BANQUE D'ORSAY; :
OPPENHEIMER & CO., INC.; :
PERRY CORP.; :
PERRY PARTNERS L.P.; :
ADAM F. POTTER; :
PRISM PARTNERS II OFFSHORE FUND; :
PRUDENTIAL BACHE SECURITIES, LLC; :
R.K. MELLON COMMON TRUST FUND #3; :
RABO CAPITAL SERVICES, INC; :
SANFORD C. BERNSTEIN & CO., INC., in its individual :
  and custodial capacities; :
STARK INVESTMENTS d/b/a DEEPHAVEN FUNDS; :
STATE STREET BANK LUXEMBOURG, S.A.; :
STICHTING PENSIOENFONDS MEDISCHE :
  SPECIALISTEN; :
TBK PARTNERS, LLC; :
TIME WARNER INC. MASTER PENSION TRUST; :
TRIBECA INVESTMENTS LLC; :
TWEEDY BROWNE FUNDS INC.; :
UBS FINANCIAL SERVICES INC.; :
UBS SECURITIES LLC; :
UBS SECURITIES LLC as successor to UBS :
  SECURITIES INC.; :
USAA FEDERAL SAVINGS BANK, in its custodial :
  capacity; :
VANDERBILT PARTNERS, LLC; :
*(continued)* :

WESTCHESTER CAPITAL MANAGEMENT, INC.;  :
WILMINGTON TRUST CO. as owner and trustee of  :
  FORRESTAL FUNDING MASTER TRUST; and  :
THE WORKERS COMPENSATION BOARD –  :
  ALBERTA,  :
                                          :
                    Defendants.  :

-------------------------------------------------------------------- x

        Plaintiffs Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined) ("**DBTCA**"), Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined) ("**Law Debenture**"), and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES Notes (as hereinafter defined) ("**Wilmington Trust**" and, together with DBTCA and Law Debenture, "**Plaintiffs**"), by and through their undersigned counsel, respectfully allege as follows:

## NATURE OF THE ACTION

       1.    This action arises from the failed leveraged buyout (the "**LBO**") of Tribune Company ("**Tribune**") in 2007 — a transaction that financial and industry analysts contemporaneously characterized as one of the most highly leveraged in history. The LBO lined the pockets of Tribune's former shareholders (the "**Shareholders**") with $8.3 billion of cash at the expense of Tribune's creditors, and precipitated Tribune's careen into bankruptcy shortly thereafter.

       2.    Plaintiffs seek to avoid and recover, as constructively fraudulent conveyances, all transfers of any proceeds received by each defendant in connection with the LBO. These transfers may be recovered from the defendants because: (a) Tribune made the

challenged transfers without receiving reasonably equivalent value or fair consideration in exchange therefor; and (b) the challenged transfers were made when Tribune (i) was, or was thereby rendered, insolvent, (ii) was engaged, or was about to engage, in a business or a transaction for which any property remaining with Tribune was an unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts that would be beyond Tribune's ability to pay as such debts matured.

*       *       *

3.      In mid-2006, Tribune's consolidated revenue was plummeting, its prospects were dimming, and its stock price had dropped to around $27 per share from a high of nearly $40 just twelve months earlier.  The largest Shareholders desperately wanted, and ultimately found, an exit strategy: On April 1, 2007, Tribune's board of directors (the "**Tribune Board**") approved a bid by billionaire Samuel Zell ("**Zell**") to acquire Tribune through an extraordinarily leveraged buyout.

4.      In its most basic form, a leveraged buyout is a corporate acquisition where the acquirer purchases the outstanding stock of a target company using borrowed funds that are guaranteed by, or secured by the assets of, the target company itself.  Because leveraged buyout transactions replace the target company's outstanding equity with new debt, the law recognizes that LBOs are inherently risky to the target company's existing creditors and invite application of fraudulent-transfer law when the target company is left unable to satisfy its obligations to its pre-LBO creditors.  As aptly described by one court, "[f]rom a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional

kinds of fraudulent transfers." Indeed, it is the cashed-out shareholders who receive the principal benefit in an LBO transaction; the target corporation, on the other hand, receives absolutely no benefit to offset the greater risk of operating as a highly leveraged enterprise.

5. Before the LBO, Tribune and its direct and indirect subsidiaries (collectively, the "**Company**") had approximately $5.6 billion of funded debt obligations and a positive equity value. As a result of the LBO, however, the Company increased its funded debt obligations by more than $8 billion and Tribune had a negative equity value.

6. The LBO was designed as a single transaction that would be implemented in two steps. Tribune executed the first step of the LBO ("**Step One**") on June 4, 2007, paying some of the Shareholders $4.3 billion (the "**Step One Shareholder Transfers**") for 52% of the outstanding stock at a premium price of $34 per share. Tribune executed the second step of the LBO ("**Step Two**") on December 20, 2007, paying Shareholders another $4 billion (the "**Step Two Shareholder Transfers**" and, together with the Step One Shareholder Transfers, the "**Shareholder Transfers**") for the remaining outstanding stock, also at the premium price of $34 per share. This transaction was a textbook fraudulent conveyance.

7. Tribune received, and the Shareholders gave, no value whatsoever in exchange for the Shareholder Transfers. To the contrary, Tribune only received the dubious honor of repurchasing its own stock, and a bloated debtload that increased to more than $13 billion — billions more than Tribune was actually worth, and nearly ten times the Company's cash flow for 2006 or projected cash flow for 2007. This highly leveraged capital structure was nothing short of reckless.

8.     The Company was a terrible candidate for an LBO.  Nearly two-thirds of the Company's cash flow was generated from its newspaper businesses.  At the time of the LBO, the publishing industry was in the midst of a deepening, well-publicized structural decline.  Print circulation and advertising revenues were falling at a rapid clip across the entire industry as readership migrated online and to other media outlets.  The consensus among analysts, market participants, and rating agencies in 2007 was that these challenges were not cyclical and that the declines in circulation and advertising were not likely to abate anytime soon — if ever.

9.     To make matters worse, the Company significantly underperformed industry averages during the years and months leading up to the LBO.  In fact, just months before the close of Step One, both management and independent analysts reported that daily circulation for the Company's largest newspapers was decreasing at a more precipitous rate than the industry average decline.  Consequently, management had no reason to assume that circulation or advertising revenue would improve over the long term or that the Company could make up any shortfalls.

10.    At the time Step One closed, the Company had already failed to meet management's projections for the first several months of 2007.  As of May 2007, year-to-date operating cash flow for the publishing segment was significantly lower than projected, and less than the prior year's actual results for the same period.  In fact, one of Tribune's largest newspapers was reported to have had "one of the worst quarters ever experienced" in the second quarter of 2007.  Consequently, just to meet full-year projections for 2007, the Company would have had to achieve an impossible trifecta during the second half of the year: turn around the

negative trend, <u>and</u> recoup the performance deficiencies from the first half, <u>and</u> significantly exceed 2006 performance.

11.     The Company did not achieve any of these objectives.  Rather, between the close of Step One and Step Two, the Company's financial and operating performance continued to deteriorate as significantly as it did rapidly.  As a result, financial and industry analysts repeatedly downgraded their expectations for the Company's performance, Tribune's stock price traded below $23 (a discount of more than 25% to the tender offer price of $34 per share), and Tribune's bond prices fell to almost 50 cents on the dollar for certain tranches of Tribune's longer term debt.

12.     Market watchers and the media had long predicted and widely publicized that the LBO would ruin Tribune.  It did.  Before the close of Step Two, it was clear that the Company would be unable to meet its operating expenses from existing resources and shortly would be in a full-blown liquidity crisis.  Less than one year later, buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and the majority of its subsidiaries jointly filed for bankruptcy on December 8, 2008 (the "**<u>Petition Date</u>**").

13.     The jointly administered bankruptcy cases are currently pending in the United States Bankruptcy Court for the District of Delaware (the "**<u>Bankruptcy Court</u>**"), Case No. 08-13141 (KJC).  On April 25, 2011, the Bankruptcy Court entered an order (the "**<u>Standing Order</u>**") that, in pertinent part (a) granted Plaintiffs relief from the automatic stay, to the extent it is applicable, to commence this action and accomplish service; and (b) ordered that this action shall be automatically stayed pending further order of the Bankruptcy Court.  Notwithstanding

the foregoing, the Standing Order expressly authorized Plaintiffs immediately to pursue, among other things, discovery as necessary to prevent any applicable statutes of limitation or time-related defenses from barring the claims asserted in this action. A copy of the Standing Order is appended hereto as Exhibit B.

14. On June 28, 2011, the Bankruptcy Court entered an order (the "**Clarification Order**") that, in pertinent part, supplemented the Standing Order to authorize any party to move pursuant to 28 U.S.C. § 1407 to consolidate or coordinate this action with any or all of the other related actions commenced by Plaintiffs. A copy of the Clarification Order is appended hereto as Exhibit C.

## THE PARTIES

### I. Plaintiffs

15. Plaintiff DBTCA is a trust company incorporated in the State of New York with its principal place of business in New York, New York. DBTCA is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of, the following debt securities issued by Tribune:

(a) the 6.25% Notes due November 10, 2026, pursuant to the indenture, dated as of March 1, 1992, between Tribune and Citibank, N.A. ("**Citibank**") as trustee, successor to The Bank of New York ("**BNY**"), Bank of Montreal Trust Company ("**BMT**"), and Continental Bank, N.A.;

(b) the 7.25% Debentures due March 1, 2013, pursuant to the indenture, dated as of January 30, 1995 (the "**1995 Indenture**"), between Tribune,

successor to The Times Mirror Company ("**Times Mirror**"), and Citibank as trustee, successor to BNY, Wells Fargo Bank, N.A. and First Interstate Bank of California;

       (c)    the 7.50% Debentures due July 1, 2023, pursuant to the 1995 Indenture;

       (d)    the 4.875% Notes due August 15, 2010, pursuant to the indenture, dated as of January 1, 1997 (the "**1997 Indenture**"), between Tribune and Citibank, as trustee, successor to BMT;

       (e)    the 5.25% Notes due August 15, 2015, pursuant to the 1997 Indenture; and

       (f)    the 5.67% Notes due December 8, 2008, pursuant to the 1997 Indenture.

       16.    Plaintiff Law Debenture is a trust company incorporated in the State of New York with its principal place of business in New York, New York. Law Debenture is the successor indenture trustee to DBTCA for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of, the holders of the following debt securities issued by Tribune:

       (a)    the 6.61% Debentures due September 15, 2027, pursuant to the indenture, dated as of March 19, 1996 (the "**1996 Indenture**"), by and between Tribune, successor to Times Mirror, and Citibank, as trustee; and

       (b)    the 7.25% Debentures due November 15, 2096, pursuant to the 1996 Indenture.

17.     The debt securities referred to in the two preceding paragraphs collectively have a total face amount of approximately $1.263 billion, and collectively are referred to herein as the "**Senior Notes**."  As of the Petition Date, Tribune owed $1.283 billion, exclusive of accrued post-petition interest, to the holders of the Senior Notes.

18.     Plaintiff Wilmington Trust is a trust company incorporated in the State of Delaware with its principal place of business in Wilmington, Delaware.  Wilmington Trust is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of Exchangeable Subordinated Debentures due 2029 (the "**PHONES Notes**"), pursuant to the indenture, dated as of April 1, 1999 between Tribune and BMT, as trustee.  As of the Petition Date, Tribune owed $1.197 billion, exclusive of accrued post-petition interest, to the holders of the PHONES Notes.

19.     The holders of the Senior Notes and the PHONES Notes, as well as their respective successors and assigns, collectively are referred to herein as the "**Pre-LBO Noteholders**."  The Pre-LBO Noteholders have unsatisfied claims against Tribune for the payment of money on account of the Senior Notes and the PHONES Notes in an amount of no less than $2.480 billion (the "**Pre-LBO Noteholder Claims**"), exclusive of accrued post-petition interest.

20.     At the time the Step One Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

21.     At the time the Step Two Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

## II.   **Defendants**

22.   Upon information and belief, defendant Abu Dhabi Investment Authority is a sovereign wealth fund, and regularly engages in commercial activity within this State, including through a securities brokerage account in this State through which it received Shareholder Transfers.

23.   Upon information and belief, defendant AIM Counselor Series Trust (Invesco Counselor Series Trust), is a Delaware statutory trust, registered under the Investment Company Act of 1940 as an open-end series management investment company consisting of twenty separate portfolios, each authorized to issue an unlimited number of shares of beneficial interest, including two portfolios known respectively as the Invesco Equally-Weighted S&P 500 Fund and the Invesco S&P 500 Index Fund.  Upon information and belief, defendant AIM Counselor Series Trust (Invesco Counselor Series Trust) regularly solicits and transacts business in, and derives substantial revenue from, this State.  Upon information and belief, through its Invesco Equally-Weighted S&P 500 Fund and Invesco S&P 500 Index Fund, respectively, defendant AIM Counselor Series Trust (Invesco Counselor Series Trust) acquired substantially all of the assets of, and agreed to assume the liabilities of, defendant Morgan Stanley Equally-Weighted S&P 500 Fund f/k/a Morgan Stanley Value Added Market Series and defendant Morgan Stanley S&P 500 Index Fund, respectively, on or about June 1, 2010.

24.   Upon information and belief, defendant AIM Variable Insurance Funds (Invesco Variable Insurance Funds) is a Delaware statutory trust, registered under the Investment Company Act of 1940, as an open-end series management investment company, authorized to issues shares of beneficial interest in various funds or portfolios, including a portfolio known as

14

Invesco V.I. Select Dimensions Equally-Weighted S&P 500 Fund. Upon information and belief, defendant AIM Variable Insurance Funds (Invesco Variable Insurance Funds) regularly solicits and transacts business in, and derives substantial revenue from, this State. Upon information and belief, through its Invesco V.I. Select Dimensions Equally-Weighted S&P 500 Fund, AIM Variable Insurance Funds (Invesco Variable Insurance Funds) acquired substantially all of the assets of, and agreed to assume the liabilities of, defendant Morgan Stanley Select Dimensions Investment Series, Equally-Weighted S&P 500 Portfolio f/k/a Morgan Stanley Select Dimensions Investment Series, Value Added Market Portfolio on or about June 1, 2010.

25. Upon information and belief, defendant AllianceBernstein L.P. (also named in the original Complaint as "AllianceBernstein") is an asset management firm headquartered in New York, New York. Defendant AllianceBernstein L.P. is named herein in its individual and custodial capacities.

26. Upon information and belief, defendant Allianz Invest KAG mbH (named in the original complaint as "Allianz Invest KAG – Siemens" and "Allianz/Sanford") is an investment fund company, and regularly transacts business in this State, including through a securities brokerage account in this State in which it received Shareholder Transfers.

27. Upon information and belief, defendant AM International E Mac 63 Limited (named in the original Complaint as "AM International E Mac 63 Ltd/Vol Arb") is a private investment company organized under Cayman Islands law with its principal place of business in New York, New York.

28.     Upon information and belief, defendant AM Master Fund III, LP is a private investment company organized under Cayman Islands law with its principal place of business in New York.

29.     Upon information and belief, defendant Ampere Capital Management LP is an investment management firm with its principal place of business in New York, New York.

30.     Upon information and belief, defendant AQR Capital Management LLC (named in the original Complaint as "AQR Capital AQRREV") is an investment management firm, and regularly transacts business in this State, including through a securities brokerage account in this State in which it received Shareholder Transfers.

31.     Upon information and belief, defendant Banc of America Securities LLC was an investment banking firm and broker-dealer with offices in New York, New York. Upon information and belief, Banc of America Securities LLC continues to operate through its successor by merger, Merrill Lynch, Pierce, Fenner & Smith Incorporated, which has offices in New York, New York.

32.     Upon information and belief, defendant Bank of America, National Association is a national banking association organized under the laws of the United States with its main office in Charlotte, North Carolina and offices and branches in this State.

33.     Upon information and belief, defendant The Bank of New York Mellon (named in the original Complaint as "Bank of New York" and "Bank of New York Mellon") is a New York-chartered bank with its principal place of business in New York, New York. Defendant The Bank of New York Mellon is named herein in its individual and custodial capacities.

34.     Upon information and belief, defendant The Bank of New York Mellon as trustee of The Bank of New York Mellon Employee Benefit Collective Investment Fund Plan f/k/a Mellon Bank, N.A. Employee Benefit Collective Investment Fund Plan (named in the original Complaint as "Bank of New York Mellon Employee Benefit Collective Investment Fund Plan") is a New York-chartered bank with its principal place of business in New York, New York.

35.     Upon information and belief, defendant The Bank of New York Mellon as trustee of The Collective Trust of the Bank of New York (named in the original Complaint as "Collective Trust of The Bank of New York") is a New York-chartered bank with its principal place of business in New York, New York.

36.     Upon information and belief, defendant The Bank of New York Mellon as trustee of SPDR S&P MidCap 400 ETF Trust a/k/a SPDR MidCap 400 Trust (named in the original Complaint as "Bank of New York Mellon / Midcap SPDRS") is a New York-chartered bank with its principal place of business in New York, New York.

37.     Upon information and belief, defendant Bank of New York Mellon Corporation is bank holding company with its principal place of business in New York, New York.

38.     Upon information and belief, defendant Barclays Bank plc (also named in the original Complaint as "Barclays Capital Group") is a U.K. bank with a branch in New York, New York, and regularly transacts business in and derives substantial revenue from this State. Upon information and belief, Barclays Bank plc received Shareholder Transfers through, inter alia, its "Barclays Capital Group" division.  Plaintiffs reserve the right to amend this complaint

pursuant to Federal Rule of Civil Procedure 15(c)(1)(C) if discovery discloses that "Barclays Capital Group" is organized as a legal entity distinct from defendant Barclays Bank plc.

39.     Upon information and belief, defendant Barclays Capital, Inc. (also named in the original Complaint as "Bar Cap Equity Finance")  is an investment banking firm and broker-dealer with its principal place of business in New York, New York.  Upon information and belief, defendant Barclays Capital, Inc. received Shareholder Transfers through its "Bar Cap Equity Finance" division and otherwise.  Plaintiffs reserve the right to amend this complaint pursuant to Federal Rule of Civil Procedure 15(c)(1)(C) if discovery discloses that the "Bar Cap Equity Finance" is organized as a legal entity distinct from defendant Barclays Capital, Inc.

40.     Upon information and belief, defendant Barclays Capital Securities Limited is an investment banking firm and broker-dealer, and regularly transacts business in this State.

41.     Upon information and belief, defendant Barclays Capital Securities Limited as successor to BZW Securities Limited is an investment banking firm and broker-dealer, and regularly transacts business in this State.

42.     Upon information and belief, defendant Bear Stearns Asset Management, Inc. is an asset management firm with its principal place of business in New York, New York.

43.     Upon information and belief, defendant Bear Stearns Equity Strategies RT LLC is an investment management firm with its principal place of business in New York, New York..

44.     Upon information and belief, defendant BHF-Bank Aktiengesellschaft is a private bank, and regularly transacts business in this State.

45.     Upon information and belief, defendant BlackRock is a direct or indirect affiliate of BlackRock, Inc. that, in 2007, had offices at 800 Scudder Mills Road, Plainsboro, New Jersey, and employed one or more of the following persons:  Gerald Richard, Peter Hussie, and Leanne Schuessler.  Upon information and belief, BlackRock, Inc. acquired defendant BlackRock from Merrill Lynch & Co., Inc. or an affiliate thereof.  Upon information and belief, defendant BlackRock regularly solicits and transacts business in, and derives substantial revenue from, this State.  Defendant BlackRock's exact legal name will be determined in discovery.

46.     Upon information and belief, defendant BlackRock Advisors (UK) Ltd. f/k/a Barclays Global Investors Ltd. (named in the original Complaint as "Barclays Global Investors Ltd.") is an investment management firm, and regularly transacts business in this State.

47.     Upon information and belief, defendant BlackRock Institutional Trust Company, National Association f/k/a Barclays Global Investors, N.A. (named in the original Complaint as "Barclays Global Investors NA Ref Industry Alpha Ltd.") is a national banking association organized under the laws of the United States with its main office in San Francisco, California, and regularly solicits and transacts business, and derives substantial revenue from, this State.

48.     Upon information and belief, defendant BNP Paribas Prime Brokerage, Inc. is a broker-dealer with its principal place of business in New York, New York.

49.     Upon information and belief, defendant BNP Paribas Securities Corp. is a broker-dealer with its principal place of business in New York, New York.

50.     Upon information and belief, defendant BNY Mellon is a direct or indirect subsidiary of defendant Bank of New York Mellon Corporation, with its principal place of

business in New York, New York. Defendant BNY Mellon's exact legal name will be determined in discovery. Defendant BNY Mellon is named herein in its custodial capacity.

51.     Upon information and belief, defendant Board of Education Retirement System of The City of New York (named in the original Complaint as "NYC Board of Education") is a pension fund with its principal place of business in New York, New York.

52.     Upon information and belief, defendant Bon Secours Health System, Inc. is a non-profit corporation which owns and/or operates hospitals and long-term care facilities in this State.

53.     Upon information and belief, defendant William H. Browne is a natural person with a place of business in New York, New York.

54.     Upon information and belief, defendant Carlyle Multi-Strategy Master Fund Ltd. is a private investment company with its principal place of business in New York, New York..

55.     Upon information and belief, defendant Caxton Associates LP f/k/a Caxton Associates LLC (named in the original Complaint as "Caxton Associates LLC") is a trading and investment firm headquartered in New York, New York..

56.     Upon information and belief, defendant Chicago Trading Company (named in the original Complaint as "Chicago Trading") is a securities trading firm with offices in New York, New York..

57.     Upon information and belief, defendant Citibank, National Association (also named in the original Complaint as "Citibank," "Citibank, N.A. Equity Derivatives," and "Citigroup Private Bank & Trust") is a national banking association organized under the laws of

the United States with its main office in Las Vegas, Nevada and offices and branches in this State. Defendant Citibank, National Association is named herein in its individual and custodial capacities.

58.     Upon information and belief, defendant Citigroup Global Markets, Inc. is an investment banking firm and broker-dealer with its principal place of business in New York, New York.

59.     Upon information and belief, defendant Citigroup Global Markets Ltd. is an investment banking firm, and regularly transacts business in this State.

60.     Upon information and belief, defendant Coutts US Equity Index Programme (named in the original Complaint as "Coutts EIP US Equity Index BGI, AIB BNY") is a U.K. mutual fund that regularly transacts business in this State.

61.     Upon information and belief, defendant Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston LLC (also named in the original Complaint as "Credit Suisse First Boston" and "CSFB Proprietary Trading US") is an investment bank and broker-dealer with its principal place of business in New York, New York.

62.     Upon information and belief, defendant Deephaven Capital Management LLC (named in the original Complaint as "Deephaven Capital Management") is an investment management company, and regularly transacted business in this State..

63.     Upon information and belief, defendant Del Mar Asset Management, LP (named in the original Complaint as "Del Mar Asset Management") is an asset management firm with its principal place of business in New York, New York.

64.     Upon information and belief, defendant Deutsche Bank (named in the original Complaint as "Deutsche Bank AQRREV") is, or is a direct or indirect subsidiary of, defendant Deutsche Bank AG, and its exact legal name will be determined in discovery. Upon information and belief, defendant Deutsche Bank regularly solicits or transacts business in this State. Defendant Deutsche Bank is named herein in its custodial capacity.

65.     Upon information and belief, defendant Deutsche Bank AG is a German bank with a branch located in New York, New York, and regularly solicits and transacts business in, and derives substantial revenue from, this State. Defendant Deutsche Bank AG is named herein in its custodial capacity.

66.     Upon information and belief, defendant Deutsche Bank AG Frankfurt is a German bank with a branch located in New York, New York, and regularly solicits and transacts business in, and derives substantial revenue from, this State.

67.     Upon information and belief, defendant Deutsche Bank AG, Filiale Amsterdam (named in the original Complaint as "DB Bank AG Amsterdam") is the Amsterdam branch of Deutsche Bank AG, and regularly transacts business in this State.

68.     Upon information and belief, defendant Deutsche Bank Securities Inc. is an investment banking firm and broker-dealer with its principal place of business in New York, New York. Defendant Deutsche Bank Securities Inc. is named herein in its individual and custodial capacities.

69.     Upon information and belief, defendant Deutsche Bank Securities Inc. - DB AG Equity Swaps Offshore Consolidated Account I is a division or account within Deutsche

Bank Securities Inc. with its principal place of business in New York, New York. Its exact legal name and status will be determined in discovery.

70. Upon information and belief, defendant Deutsche Lufthansa AG is a German airline, and regularly solicits and transacts business, contracts to provide services, and owns, uses, or possesses real property situated, in this State.

71. Upon information and belief, defendant Forrestal Funding Master Trust is a trust which regularly transacts business in this State. Upon information and belief, Wilmington Trust Company is the owner and trustee of defendant Forrestal Funding Master Trust and is a defendant in its capacity as such.

72. Upon information and belief, defendant Galleon Buccaneers Offshore, Ltd. (named in the original Complaint, together with defendants Galleon Management, LP and HSBC Bank (Bermuda) Limited, as "Galleon Management LP / Galleon Buccaneers Offshore Bank of Bermuda (Cayman) Ltd.") is a private investment company with its principal place of business in New York, New York..

73. Upon information and belief, defendant Galleon Management, LP (named in the original Complaint, together with defendants Galleon Buccaneers Offshore, Ltd. and HSBC Bank (Cayman) Limited, as "Galleon Management LP / Galleon Buccaneers Offshore Bank of Bermuda (Cayman) Ltd.") is an investment management firm with its principal place of business in New York, New York.

74. Upon information and belief, defendant Claudia F. Gasparini, as beneficiary of Claudia F. Gasparini IRA (named in the original Complaint as "Claudia F.

Gasparini I.R.A. f/b/o Claudia F. Gasparini"), is a natural person residing in Irvington, New York.

75. Upon information and belief, defendant General Electric Company is a New York corporation which regularly solicits and transacts business in, and derives substantial revenue from, this State.

76. Upon information and belief, defendant Goldman, Sachs & Co. (also named in the original Complaint as "Goldman, Sachs & Co., Inc.") is a New York limited partnership with its principal place of business in New York, New York. Defendant Goldman Sachs & Co. is named herein in its individual and custodial capacities.

77. Upon information and belief, defendant Goldman Sachs Execution & Clearing, L.P. is a broker-dealer with its principal place of business in New York, New York. Defendant Goldman Sachs Execution & Clearing, L.P. is named herein in its individual and custodial capacities.

78. Upon information and belief, defendant Goldman Sachs Investment Strategies LLC is an investment management company with its principal place of business in New York, New York. Defendant Goldman Sachs Investment Strategies LLC is named herein in is capacities as custodian and investment manager.

79. Upon information and belief, defendant Gryphon Hidden Values VIII L.P (named in the original Complaint as "Gryphon Hidden Value VIII LP") is a private investment limited partnership with its principal place of business in New York, New York.

80. Upon information and belief, defendant Halcyon Asset Management LLC f/k/a Halcyon Management Co. LLC (named in the original complaint as "Halcyon Management

Co. LLC") is an investment management company with its principal place of business in New York, New York.

81.     Upon information and belief, defendant Halcyon Diversified Fund L.P. (named in the original Complaint as "Halcyon Diversified Fund LP") is a private investment limited partnership with its principal place of business in New York, New York..

82.     Upon information and belief, defendant Halcyon Special Situations, L.P. (named in the original Complaint as "Halcyon Special Situations LP") is a private investment limited partnership with its principal place of business in New York, New York.

83.     Upon information and belief, defendant The Hartford Financial Services .Group, Inc. d/b/a The Hartford (named in the original Complaint as "The Hartford")is an insurance and financial services company with offices in New York, New York.

84.     Upon information and belief, defendant Havens Advisors LLC is an investment management company with its principal place of business in New York, New York.

85.     Upon information and belief, defendant Highbridge Capital Management, LLC is an investment management company with its principal place of business in New York, New York.

86.     Upon information and belief, defendant Highbridge Event Driven/Relative Value Fund, Ltd. (named in the original Complaint as "Relative Value Ltd / Highbridge Event Driven re Highbridge Cap Mgmt LLC") is a private investment company with its principal place of business in New York, New York.

87.     Upon information and belief, defendant Highbridge International LLC (named in the original Complaint as "Highbridge Int LLC (No 3) / A/C Highbridge Cap Cop

Maples & Calder") is a private investment company with its principal place of business in New York, New York.

88. Upon information and belief, defendant HSBC Bank (Cayman) Limited f/k/a Bank of Bermuda (Cayman) Ltd. (named in the original Complaint, together with defendants Galleon Management LP and Galleon Buccaneers Offshore, Ltd., as "Galleon Management LP / Galleon Buccaneers Offshore Bank of Bermuda (Cayman) Ltd.") is a Cayman Islands bank, and regularly transacts business in this State.

89. Upon information and belief, defendant IBM Netherlands MSCI US is a pension fund, and regularly transacts business in this State. Its exact legal name will be determined in discovery.

90. Upon information and belief, defendant IBM Personal Pension Plan Trust is a pension fund sponsored by defendant International Business Machines Corporation, and regularly transacts business in this State. Defendant IBM Personal Pension Plan Trust's exact legal name will be determined in discovery.

91. Upon information and belief, defendant IBM Retirement Funds is a pension fund sponsored by defendant International Business Machines Corporation, and regularly transacts business in this State. Defendant IBM Retirement Funds' exact legal name will be determined in discovery.

92. Upon information and belief, defendant INKA mbH a/k/a Internationale Kapitalanagegesellschaft mbH a/k/a HSBC INKA (named in the original Complaint as "INKA mbH for Sperrkonto") is a German capital investment company, and regularly transacts business in this State.

93.     Upon information and belief, defendant International Business Machines Corporation is a New York corporation with its principal place of business in Armonk, New York.

94.     Upon information and belief, defendant J.P. Morgan is a financial services company which regularly transacts business in this State.  Upon information and belief, defendant J.P. Morgan either is, or is a direct or indirect subsidiary of, JPMorgan Chase & Co., and its exact legal name will be determined in discovery.

95.     Upon information and belief, defendant J.P. Morgan Clearing Corp. is a broker-dealer with its principal place of business in Brooklyn, New York.  Defendant J.P. Morgan Clearing Corp. is named herein in its individual and custodial capacities.

96.     Upon information and belief, defendant J.P. Morgan Clearing Corp. as successor to Bear Stearns Securities Corp. (named in the original Complaint as "Bear Stearns Securities Corp.") is a broker-dealer with its principal place of business in Brooklyn, New York and is the successor by merger to Bear Stearns Securities Corp.  Defendant J.P. Morgan Clearing Corp. as successor to Bear Stearns Securities Corp. is named herein in its custodial capacity.

97.     Upon information and belief, defendant J.P. Morgan Securities LLC is an investment banking firm and broker-dealer with its principal place of business in New York, New York.

98.     Upon information and belief, defendant J.P. Morgan Securities LLC as successor to Bear, Stearns & Co. Inc. (named in the original Complaint as "Bear Stearns & Co. Inc.") is an investment banking firm and broker-dealer with its principal place of business in New York, New York, and is the successor by merger to Bear, Stearns & Co. Inc.  Defendant

27

J.P. Morgan Securities LLC as successor to Bear, Stearns & Co. Inc. is named herein in its custodial capacity.

99.     Upon information and belief, defendant J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc. (named in the original Complaint as "J.P. Morgan Securities LLC/NYSE" and "J.P. Morgan Securities Inc.") is an investment banking firm and broker-dealer with its principal place of business in New York, New York.

100.     Upon information and belief, defendant J.P. Morgan Services, Inc. is a financial services company, and regularly transacts business in this State.

101.     Upon information and belief, defendant J.P. Morgan Whitefriars Inc. is an investment management company, and regularly transacts business in this State.

102.     Upon information and belief, defendant The JPMorgan Chase 401(k) Savings Plan is a defined contribution plan, and regularly transacts business in this State.  Upon information and belief, defendant JPMorgan Chase Bank, National Association is the sponsor and trustee of The JPMorgan Chase 401(k) Savings Plan.

103.     Upon information and belief, defendant JPMorgan Chase Bank, National Association is a national banking association organized under the laws of the United States with its main office in Columbus, Ohio and offices and branches in this State.

104.     Upon information and belief, defendant JPMorgan Chase Bank, National Association as trustee of The JPMorgan Chase 401(k) Savings Plan is a national banking association with offices and branches in this State.

105. Upon information and belief, defendant Liberty Harbor Master Fund I, LP is a private investment limited partnership with its principal place of business in New York, New York.

106. Upon information and belief, defendant Magnetar Capital LLC is an asset management firm with offices in New York, New York.

107. Upon information and belief, defendant Magnetar Capital Master Fund, Ltd. (named in the original Complaint, together with defendant Magnetar Financial LLC, as "Magnetar Financial LLC / Magnetar Capital Mst Fd Ltd M&C Corporation Services Ltd.") is a private investment company, and regularly solicits and transacts business in this State.

108. Upon information and belief, defendant Magnetar Financial LLC (named in the original Complaint, together with defendant Magnetar Capital Master Fund, Ltd., as "Magnetar Financial LLC / Magnetar Capital Mst Fd Ltd M&C Corporation Services Ltd.") is an investment advisor and regularly solicits and transacts business in this State and/or has offices in New York, New York.

109. Upon information and belief, defendant Merrill Lynch is a financial services company that, in 2007, had offices at 4 World Financial Center and/or 222 Broadway, New York, New York and which regularly transacts business in this State. Upon information and belief, defendant Merrill Lynch is a direct or indirect subsidiary of Bank of America Corp., and its exact legal name will be determined in discovery. Defendant Merrill Lynch is named herein in its individual and custodial capacities.

110. Upon information and belief, defendant Merrill Lynch Financial Markets, Inc. (named in the original Complaint as "Merrill Lynch Financial Markets, Equity Financing

Group") is a investment management firm and broker-dealer with its principal place of business in New York, New York.

111.    Upon information and belief, defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated (named in the original Complaint as "Merrill Lynch, Pierce, Fenner & Smith, Inc.- Safekeeping" and "Merrill Lynch, Pierce, Fenner & Smith, Inc. - Securities Lending") is an investment banking firm and broker-dealer with offices in New York, New York. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is named herein in its individual and custodial capacities.

112.    Upon information and belief, defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated as successor to Banc of America Securities LLC (named in the original Complaint as "Merrill Lynch, Pierce, Fenner & Smith Incorporated as successor to Banc of America Securities LLC, Securities Lending Services") is an investment banking firm and broker-dealer with offices in New York, New York.

113.    Upon information and belief, defendant Metropolitan Life Insurance Co. is a New York corporation with its principal place of business in New York, New York.

114.    Upon information and belief, defendant Milton Partners LLC is an investment management firm, and regularly solicits or transacts business in this State.

115.    Upon information and belief, defendant Morgan Stanley d/b/a Morgan Stanley Prime Brokerage (named in the original Complaint as "Morgan Stanley/Prime Broker/CN") is a division of Morgan Stanley & Co. LLC or a direct or indirect subsidiary thereof, providing prime brokerage services, with its principal place of business in New York, New York. Defendant Morgan Stanley d/b/a Morgan Stanley Prime Brokerage's exact legal

name and status will be determined in discovery. Defendant Morgan Stanley d/b/a Morgan Stanley Prime Brokerage is named herein in its custodial capacity.

116. Upon information and belief, defendant Morgan Stanley & Co. International plc f/k/a Morgan Stanley & Co. International Limited is an investment banking firm, and regularly transacts business in this State.

117. Upon information and belief, defendant Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Inc. (named in the original Complaint as "Morgan Stanley & Co. Inc.") is an investment banking firm with its principal place of business in New York, New York. Defendant Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Inc. is named herein in its individual and custodial capacities.

118. Upon information and belief, defendant Morgan Stanley Equally-Weighted S&P 500 Fund f/k/a Morgan Stanley Value Added Market Series (named in the original Complaint as "MS Value Added Market Series") is a Massachusetts business trust, registered under the Investment Company Act of 1940 as an open-end management investment company, with its principal place of business in New York, New York. Upon information and belief, defendant AIM Counselor Series Trust (Invesco Counselor Series Trust), through its Invesco Equally-Weighted S&P 500 Fund, acquired substantially all of the assets of, and agreed to assume the liabilities of, defendant Morgan Stanley Equally-Weighted S&P 500 Fund f/k/a Morgan Stanley Value Added Market Series on or about June 1, 2010, but defendant Morgan Stanley Equally-Weighted S&P 500 Fund f/k/a Morgan Stanley Valued Added Market Series continues to exist as a legal entity.

119.    Upon information and belief, defendant Morgan Stanley S&P 500 Index Fund (named in the original Complaint as "MS S&P 500 Index Fund") is a Massachusetts business trust, registered under the Investment Company Act of 1940 as an open-end management investment company, with its principal place of business in New York, New York. Upon information and belief, defendant AIM Counselor Series Trust (Invesco Counselor Series Trust), through its Invesco S&P 500 Index Fund, acquired substantially all of the assets of, and agreed to assume the liabilities of, defendant Morgan Stanley S&P 500 Index Fund on or about June 1, 2010, but defendant Morgan Stanley S&P 500 Index Fund continues to exist as a legal entity.

120.    Upon information and belief, defendant Morgan Stanley Select Dimensions Investment Series (named in the original Complaint as "MS Select-Value Added Market") is a Massachusetts business trust, registered under the Investment Company Act of 1940 as an open-end management investment company, with its principal place of business in New York, New York. Upon information and belief, defendant Morgan Stanley Select Dimensions Investment Series is authorized to issue shares of beneficial interest in multiple, separate portfolios. One of those portfolios, the Equally-Weighted S&P 500 Portfolio f/k/a the Value Added Market Portfolio, received Shareholder Transfers. Upon information and belief, defendant AIM Variable Insurance Funds (Invesco Variable Insurance Funds), through its Invesco V.I. Select Dimensions Equally-Weighted S&P 500 Fund, acquired substantially all of the assets of, and agreed to assume the liabilities of, defendant Morgan Stanley Select Dimensions Investment Series' Equally-Weighted S&P 500 Portfolio f/k/a Value Added Market

Portfolio on or about June 1, 2010, but defendant Morgan Stanley Select Dimensions Investment Series continues to exist as a legal entity.

121.     Upon information and belief, defendant Morgan Stanley Smith Barney LLC is a wealth management firm and broker-dealer with its principal place of business in New York, New York.

122.     Upon information and belief, defendant National Financial Services LLC is a broker-dealer with its principal place of business in New York, New York.

123.     Upon information and belief, defendant New York City Employees Retirement System (named in the original Complaint as "NYC Employees Retirement System") is a pension fund with its principal place of business in New York, New York.

124.     Upon information and belief, defendant New York City Fire Pension Fund (named in the original Complaint as "NYC Fire Retirement System") is a pension fund with its principal place of business in New York, New York.

125.     Upon information and belief, defendant New York City Police Officers' Variable Supplements Fund (named in the original Complaint as "NYC Police Officers Variable") is a pension fund with its principal place of business in New York, New York.

126.     Upon information and belief, defendant New York City Police Pension Fund (named in the original Complaint as "NYC Police Retirement System") is a pension fund with its principal place of business in New York, New York.

127.     Upon information and belief, defendant New York Life Insurance Co. is a New York corporation with its principal place of business in New York, New York.

128. Upon information and belief, defendant Newbrook Capital Advisors LP is an investment management firm with its principal place of business in New York, New York.

129. Upon information and belief, defendant Oddo & Cie as successor to Banque D'Orsay is a investment banking and capital management firm with an office in New York, New York..

130. Upon information and belief, defendant Oppenheimer & Co., Inc. is a New York corporation with its principal place of business in New York, New York.

131. Upon information and belief, defendant Perry Corp. is an investment management company with its principal place of business in New York, New York.

132. Upon information and belief, defendant Perry Partners L.P. (also named in the original Complaint as "Perry Partners") is a private investment limited partnership with its principal place of business in New York, New York.

133. Upon information and belief, defendant Adam F. Potter is a natural person residing in New York, New York.

134. Upon information and belief, defendant Prism Partners II Offshore Fund (named in the original Complaint as "Prism Partners Offshore") is a private investment company, and regularly transacts business in this State, including through a brokerage account in this State through which it received Shareholder Transfers.

135. Upon information and belief, defendant Prudential Bache Securities, LLC is an investment management firm with its principal place of business in New York, New York.

136. Upon information and belief, defendant R.K. Mellon Common Trust Fund #3 (named in the original Complaint as "R.K. Mellon CTF #3") is a charitable trust and regularly

transacts business in this State, including through a brokerage account in this State through which it received Shareholder Transfers.

137. Upon information and belief, Rabo Capital Services, Inc. is a Delaware corporation with its principal place of business in New York, New York.

138. Upon information and belief, defendant Sanford C. Bernstein & Co., Inc. is an investment management firm with its principal place of business in New York, New York. Defendant Sanford C.Bernstein & Co., Inc. is named herein in its individual and custodial capacities.

139. Upon information and belief, defendant Stark Investments d/b/a Deephaven Funds (named in the original complaint as "Deephaven") is a private investment company, and regularly solicits and transacts business in this State.

140. Upon information and belief, defendant State Street Bank Luxembourg, S.A. (named in the original Complaint as "State Street Lux") is an affiliate of State Street Corporation, and regularly transacts business in this State.

141. Upon information and belief, defendant Stichting Pensioenfonds Medische Specialisten is a pension fund, and regularly transacts business in this State..

142. Upon information and belief, defendant TBK Partners, LLC is a private investment company with its principal place of business in New York, New York.

143. Upon information and belief, defendant Time Warner Inc. Master Pension Trust is a pension fund sponsored by Time Warner Inc., with its principal place of business in New York, New York.

144.     Upon information and belief, defendant Tribeca Investments LLC is an investment management company with its principal place of business in New York, New York.

145.     Upon information and belief, defendant Tweedy Browne Funds Inc. (named in the original Complaint as "Tweedy, Browne Value Fund") is a Maryland corporation, registered under the Investment Company Act of 1940 as an open-end management investment company, with its principal place of business in New York, New York.  Upon information and belief, defendant Tweedy Browne Funds Inc. maintains (and is the issuer of a series of shares of beneficial interest in) a portfolio known as the Tweedy, Browne Value Fund, which received Shareholder Transfers.

146.     Upon information and belief, defendant UBS Financial Services Inc. is a wealth management services company with offices in New York, New York.

147.     Upon information and belief, defendant UBS Securities LLC (named in the original Complaint as "UBS Securities Inc." and "UBS Securities LLC – Securities Lending") is an investment banking firm and broker-dealer with offices in New York, New York.

148.     Upon information and belief, defendant UBS Securities LLC as successor to UBS Securities Inc. (named in the original Complaint as "UBS Securities Inc.") is an investment banking firm and broker-dealer with offices in New York, New York.

149.     Upon information and belief, defendant USAA Federal Savings Bank is a federal savings bank organized under the laws of the United States, and regularly transacts business in and derives substantial revenue from this State.  Defendant USAA Federal Savings Bank is named herein in its custodial capacity.

150. Upon information and belief, defendant Vanderbilt Partners LLC is an investment company with its principal place of business in New York, New York.

151. Upon information and belief, defendant Westchester Capital Management, Inc. is an investment management firm with its principal place of business in Valhalla, New York.

152. Upon information and belief, defendant Wilmington Trust Co. as owner and trustee of Forrestal Funding Master Trust (named in the original Complaint as "Wilmington Trust Co. as owner and trustee for the US Trust") is a trust company and regularly solicits and transacts business in this State.

153. Upon information and belief, defendant The Workers Compensation Board – Alberta (named in the original Complaint as "Alberta – WCB") is a corporation formed under Alberta law, and regularly engages in commercial activity in this State, including through a securities brokerage account in this State through which it received Shareholder Transfers.

154. Each of the foregoing defendants (collectively, the "**Shareholder Defendants**"):

    (a) either– (i) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received proceeds of the Shareholder Transfers; and

    (b) either is– (i) a natural person who resides in or is domiciled in this State, (ii) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State, or (iii) a natural person or juridical entity that, upon information or belief, in person or through an agent or affiliate,

transacts business within this State or contracts to supply goods or services in this State,

regularly transacts or solicits business in this State, derives substantial revenue from

goods used or services rendered in this State, derives substantial revenue from interstate

or international commerce, maintains relations to or engages in any other persistent

course of conduct in this State, or owns, uses or possess real property situated in this

State, sufficient to afford a basis for the exercise of personal jurisdiction.

Exhibit A appended hereto and incorporated herein, includes, upon information and belief, each

Shareholder Defendant's last known address as well as the dates and dollar amounts of proceeds

of Shareholder Transfers received by such defendant.  To comply with a protective order entered

by the Bankruptcy Court, Plaintiffs have redacted certain information from Exhibit A.  Plaintiffs

will file an unredacted version of Exhibit A under seal with the permission of this Court.

## JURISDICTION AND VENUE

155.    This action was originally filed in the Supreme Court of the State of New

York, County of New York, on June 2, 2011.  It was removed to this Court by certain defendants

on July 1, 2011.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1334(b), 1441, and 1452 and 12 U.S.C. § 632 (the "Edge Act").

156.    Pursuant to 28 U.S.C. § 1334(b), this Court has original subject matter

jurisdiction over this action because it is "related to" the jointly administered Tribune bankruptcy

cases currently pending in the Bankruptcy Court insofar as, among other things: (a) this action

was commenced pursuant to the Standing Order issued by the Bankruptcy Court; (b) the

Bankruptcy Court has retained jurisdiction to hear and decide disputes relating to or arising from

the Standing Order; and (c) a judgment in favor of Plaintiffs in this action, which provides them

with an additional source of recovery, may affect the ultimate distributions Plaintiffs are entitled to receive on account of their allowed claims from (i) the Tribune bankruptcy estates and (ii) litigation trusts to be established under any confirmed plan of reorganization.

157.     The Edge Act provides that district courts of the United States have original jurisdiction over "all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations." 12 U.S.C. § 632.

158.     Pursuant to the Edge Act, this Court has original subject matter jurisdiction over this action because (a) at least five of the Shareholder Defendants, Bank of America, National Association, BlackRock Institutional Trust Company, National Association f/k/a Barclays Global Investors, N.A., Citibank, National Association, JPMorgan Chase Bank, National Association, and USAA Federal Savings Bank, are national banking associations or federal savings banks which are corporations organized under the laws of the United States; and (b) this action arises out of transactions that involve international or foreign banking or international or foreign financial operations. More specifically, the distribution of approximately $8.3 billion to Tribune's former shareholders in the LBO, including distributions to the Shareholder Defendants, was funded with loans provided by a syndicate of United States and foreign banks, including defendant Barclays Bank plc of the United Kingdom and Sumitomo Mitsui Banking Corp. of Japan. Further, hundreds of millions of dollars in Shareholder Transfers were made from the United States to recipients (including various of the Shareholder Defendants) in dozens of foreign countries, including Austria, Canada, France, Japan,

Luxembourg, the Netherlands, Switzerland, and the United Kingdom, including defendants Allianz Invest KAG mbH; Barclays Bank plc; BHF-Bank Aktiengesellschaft; Deutsche Bank AG; Deutsche Bank Aktiengesellschaft, Filiale Amsterdam; Deutsche Bank AG, Frankfurt; HSBC Bank (Cayman) Limited; INKA mbH; Oddo & Cie as successor to Banque D'Orsay; and State Street Bank Luxembourg, S.A.

159. Pursuant to Fed. R. Civ. P. 4(k)(1)(A) and N.Y. C.P.L.R. 301 or 302, this Court has personal jurisdiction over each of the Shareholder Defendants to the extent that a Shareholder Defendant is (a) a natural person who resides in or is domiciled in this State; (b) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State; or (c) a natural person or juridical entity that, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, expects or should reasonably have suspected the Shareholder Transfers to have had consequences in this State, derives substantial revenue from interstate or international commerce, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

160. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of the action is located, in this District. Venue is also proper under 28 U.S.C. § 1441(a) because this District embraces the place (viz., the County of New York) where this action was pending prior to its removal by certain defendants.

## FACTUAL BACKGROUND

### I.     The Company's Business and Historical Performance

161.    Founded in 1847, Tribune reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings. Headquartered in Chicago, Illinois, Tribune's operations are conducted through two primary business segments. Tribune's publishing segment owns major newspapers in many of the most significant markets in the United States, including the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, and Newsday. Tribune's broadcasting and entertainment segment owns numerous radio and television stations in major markets.

### II.     The Company's Financial Condition Deteriorates and the Shareholders Begin Agitating for Change.

162.    In June 2000, Tribune merged with Times Mirror, which was owned by the Chandler family. As a result of this merger, the Chandler family, through Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "**Chandler Trusts**"), became Tribune's second largest shareholder and was awarded three seats on the Tribune Board.

163.    The market did not react well to the merger with Times Mirror and, over the course of the next few years, the Company experienced a steady decline in revenues, profitability, and its stock price. In response, Tribune took repeated steps to reduce costs by liquidating assets and shedding jobs. But the numbers continued to drop. By 2006, the Company's profitability was exhibiting quarter-over-quarter declines compared to both 2004 and the majority of 2005.

164.    In or about February 2006, the Chandler Trusts' patience ran out and they began to complain about the Company's performance and to criticize the Tribune Board. The Chandler Trusts admonished the Tribune Board that, absent an upturn in Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

165.    In May 2006, the Tribune Board decided to engage in a leveraged recapitalization pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock. The Chandler Trusts' three representatives on the Tribune Board, however, voted against the transaction.

166.    In a publicly filed letter to the Tribune Board on June 13, 2006, the Chandler Trusts advised that they would not participate in the planned repurchase. The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different." The Chandler Trusts explained that "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% — substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29%)." The Chandler Trusts added that "it is the time for prompt, comprehensive action."

167.    On June 27, 2006, Tribune nonetheless announced that it had elected to proceed with the repurchase of 55 million shares through a public tender offer and a private transaction (the "**2006 Repurchase**") with the Robert R. McCormick Tribune Foundation and

the Cantigny Foundation (collectively, the "**Foundations**" and, together with the Chandler Trusts, the "**Large Shareholders**") at a cost of nearly $1.8 billion which was financed with debt. As a result of the 2006 Repurchase, the Chandler Trusts became Tribune's largest stockholders and the Foundations continued to be major shareholders.

168.     Unfortunately, the 2006 Repurchase failed to raise Tribune's stock price. To make matters worse, as a result of the 2006 Repurchase, the Company's debt materially increased by almost 50% and Moody's Investors Service cut Tribune's bond rating to "junk" status.

169.     After the failed 2006 Repurchase, the Large Shareholders redoubled their efforts to effect change at Tribune.  Because of the Chandler Trusts' publicly expressed discontent and their increasing pressure on management, in September 2006, the Tribune Board announced that it had established a special committee to oversee management's exploration of transactions that might maximize the value of Tribune stock.

## III.     The LBO Is Proposed and Approved.

170.     In late January 2007, billionaire investor Zell emerged as a potential buyer for Tribune.  Before Zell's emergence on the scene, the Tribune Board had been considering transactional alternatives to placate the Large Shareholders, including a possible sale of the entire Company or select assets, as well as an internal recapitalization.

171.     Zell proposed a wholly new option.  On or about February 6, 2007, Zell wrote to the Tribune Board and proposed to acquire Tribune in an LBO transaction.

172.     Under Zell's proposal, the Company would borrow nearly $11 billion — while Zell would invest just $315 million of his own money — to buy out the Shareholders.  In

43

other words, Zell sought to acquire the Company by putting up less than 3% of the risk capital and shifting all of the risk of the transaction onto the shoulders of the Company's existing creditors.

173.    On March 10, 2007, management informed Zell that it was skeptical of proceeding with his LBO proposal because of its high degree of leverage.  Only a week before the LBO was announced, a senior Tribune officer wrote to Tribune's treasurer after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the [deal]–i.e., if we are off plan by 2% we have no value in the ESOP for 5 years."  The treasurer responded and confirmed: "yes, if we hit the down 2 case <u>there is no equity value in the first 5 yrs</u>."

174.    However, the prospect of obtaining a windfall for themselves and the Shareholders was too hard to resist.  Management dismissed the concerns over the Company's financial future and approved the LBO on April l, 2007.

175.    The merger agreement contemplated a single transaction in two steps.  In connection with Step One, Tribune would purchase 52% of Tribune's common stock in a tender offer at the premium price of $34 per share.  In connection with Step Two, Tribune would purchase all of the remaining Tribune common stock at the same premium price of $34 per share in a merger that would ultimately take Tribune private.  To finance the deal, the Company committed to borrow nearly $11 billion — more than $8.2 billion of which was funneled to the Shareholders as Shareholder Transfers.  The remainder of the loan proceeds was used to pay lender and advisor fees, transaction costs and expenses, and to refinance the debt incurred in connection with the 2006 Repurchase.

176.     Notwithstanding its two-step structure, the LBO was conceived, promoted, and proceeded as (and, in economic reality, was) an integrated transaction in which neither Step One nor Step Two was intended to occur on its own.  In fact, had there been a way to structure the LBO so that only a single step were necessary, the LBO would have been structured accordingly.

177.     The Tribune Board approved both Step One and Step Two at the same time, and promoted the LBO as a single transaction, indicating that management intended both steps to constitute one integrated transaction.  For example, on April 2, 2007, Tribune publicly announced that it had agreed to the Zell proposal.  Tribune's press release stated, in pertinent part:

> With the completion of its strategic review process, Tribune Company today announced <u>a transaction</u> which will result in the company going private and Tribune shareholders receiving $34 per share.  Sam Zell is supporting the transaction with a $315 million investment.  Shareholders will receive their consideration in <u>a two-stage transaction</u>.
>
> Upon completion of <u>the transaction</u>, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock.  Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.
>
> The first stage of <u>the transaction</u> is a cash tender offer for approximately 126 million shares at $34 per share.  The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .
>
> The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share.  Zell will make an additional investment of

$65 million in connection with the merger, bringing his investment in Tribune to $315 million.

178.    The primary structural mechanism used to execute the LBO was created for the sole purpose of generating certain tax benefits.  Those benefits, however, could only be realized upon consummation of Step Two.  Thus, the LBO made economic sense only if Step Two closed and the anticipated tax savings could be realized.

179.    The lenders that financed the LBO analyzed Step One and Step Two concurrently, and the commitment letters for both steps of the transaction were executed at the same time, cross-referenced each other, and obligated the lenders to provide financing for Step One and Step Two.  Moreover, the same exact lenders financed both steps of the LBO pursuant to a single credit agreement that interlocked the financing of both steps with a loss-sharing provision and based the fees and interest rate associated with the Step One loans upon the Company's debt load following Step Two.  On March 28, 2007, Tribune's treasurer instructed that a draft press release should state that "Tribune has received committed financing from Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

180.    As was widely acknowledged by all of the parties involved, shareholder approval for the LBO was virtually guaranteed from the LBO's inception as a result of a voting agreement with the Chandler Trusts.  Indeed, after Tribune purchased half of its outstanding common stock in connection with Step One, nearly half of the remaining shares were held by the Large Shareholders and others directly under Zell's control.

181.    At Tribune's shareholder meeting on August 21, 2007, almost 65% of Tribune's common stock outstanding (and 97% of the shares that were voted) approved Step

Two.  In the press release announcing the results of the shareholder vote, Tribune's former Chairman and CEO was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."

182.    The parties and industry experts also believed that the LBO would obtain regulatory approval from the FCC, one of the closing conditions.  As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected.  On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals associated with Step Two would be obtained.

## IV.    The Disastrous Consequences of the LBO Were Foreseeable (and Foreseen).

183.    The Shareholders approved the LBO — and reaped the financial benefits of the Shareholder Transfers — even though they knew, should have known, or had reason to know that it would render Tribune insolvent, inadequately capitalized, or unable to satisfy its obligations.  Indeed, as made clear by a cascade of contemporaneous news reports and ratings downgrades, the generally unfavorable reaction to the LBO came swiftly and loudly.

184.    On April 3, 2007 — just one day after the deal was announced — a Goldman Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment."  The analyst pointed out that the LBO's high leverage left Tribune in a "precarious financial position."

185.    A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far

too high for secularly declining businesses. . . . Debt payments should overwhelm EBITDA, by our calculations."

186.    On March 16, 2007, that same Lehman Brothers analyst warned that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy with or without the added tax savings" that Zell anticipated.

187.    On March 29, 2007, Standard & Poor's had a similar prediction and sent a letter to Tribune's treasurer, stating that it would downgrade Tribune's credit rating because "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

188.    On August 14, 2007, a Lehman Brothers analyst once again warned:

> [W]e continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% — given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year.

The analyst's cautionary warnings, of course, proved accurate.

189.    Spooked by the enormous leverage being foisted upon the Company in connection with the LBO, all of the major rating agencies consistently and continuously downgraded Tribune's debt ratings — ultimately to "junk" or "near junk" status — on nearly a dozen occasions from the time the deal was announced until Tribune filed for bankruptcy.

190.     Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO.  As soon as the LBO was announced, a growing chorus of news outlets also began reporting the substantial risk of the proposed transaction, openly questioned the proposal's soundness, and highlighted the crushing debtload that the LBO would create.

191.     For example, on April 2, 2007, the Baltimore Sun — <u>one of Tribune's own newspapers</u> — questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues."  Tribune's rivals were "dumbfounded" by the deal, observed the reporter.

192.     On April 3, 2007, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant growth."  The analyst remarked that "There just isn't a scenario that shows how this industry or this company is going to get significantly better."  The article essentially predicted that, absent a miracle, Tribune could not survive the LBO.

193.     The very same day, The New York Times reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline."

194.     In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst who indicated that "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

195.    On April 6, 2007, The New York Times characterized the proposed LBO as "one of the most absurd deals ever."

196.    On April 16, 2007, Businessweek also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged?  The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06— earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion.  Thus its debt exceeds last year's EBITDA by about ten times.  This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six.  And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now.  (Tribune's revenues declined by more than 5% in February.)

197.    On December 3, 2007, Barron's echoed this concern, reporting that "[t]he combination of a weakening economy and heavy debt loads is causing trouble for many companies that went private in leveraged buyouts since the start of 2006."  While noting the general increase in risk of LBOs, Barron's called-out Tribune in particular:  "One pending LBO that could be a financial disaster is Tribune (TRB)."

198.    Financial-market participants also recognized, almost immediately, that Tribune inevitably would crumble under the weight of the debtload imposed by the LBO.  Prices for Tribune credit-default swaps ("**CDS**"), a form of "insurance" that would pay out if Tribune defaulted on its obligations, skyrocketed on the day the LBO was announced and continued to soar through the close of Step Two.

199.    A June 7, 2007 Bloomberg News article chronicled the ever-increasing price of a Tribune CDS, and the ever-increasing risk of the LBO to Tribune's creditors:

Leveraged buyouts are financed by adding debt onto the target company, increasing the risk that existing bonds and loans may not be repaid. In Tribune's case, the perceived risk of owning its 5-year bonds tripled after Zell's buyout was reported, based on credit-default swap prices.

200. On July 20, 2007, Bloomberg News reiterated what the climbing CDS price indicated in terms of Tribune's chances of survival after the LBO:

Tribune Co. has a 50-50 chance of missing interest payments on some of the $13 billion in debt it will have after real estate investor Sam Zell buys the company, trading in the company's credit-default swaps shows.

Prices of the swaps, financial contracts used to speculate on a company's ability to repay debt, have jumped $331,000 since the first step in the sale was completed in May. It costs $770,000 to protect $10 million of Tribune bonds for five years, according to CMA Datavision, indicating a more than 50 percent risk of default. That's up from 32 percent on May 24, based on a JPMorgan Chase & Co. pricing model.

The article went on to explain that "Tribune swaps prices imply investors consider the company the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps were quoted this week by London-based CMA."

201. Although the risks to the Company's creditors were apparent, the Shareholders overwhelmingly supported the LBO: 92% of Tribune's stock was tendered at Step One, and 97% percent of voting Shareholders voted in favor of Step Two. An August 21, 2007 article in Medill Reports quoted one Tribune shareholder who succinctly summarized the Shareholders' rationale for approving the deal: "If you're making money on [the deal], sure, what the hell."

## V.    The Company's Financial Impairment and Flawed Solvency Opinions.

202.    Because of the Company's moribund financial prospects and the extraordinarily leveraged nature of the LBO, one of the closing conditions — securing viable solvency opinions in connection with both Step One and Step Two — was poised to jeopardize the deal.  And finding a firm to provide the requisite opinions turned out to be no easy task.  Indeed, Valuation Research Corporation ("**VRC**"), the financial advisory firm that ultimately provided Tribune with the necessary solvency opinions, was the last-ditch choice for Tribune after other firms declined the engagement.

203.    Tribune first approached Houlihan Lokey Howard & Zukin ("**Houlihan**"), a prominent solvency opinion firm.  Houlihan, however, expressed serious reservations regarding its ability to provide a solvency opinion in connection with such a highly leveraged transaction and declined even to accept the engagement.  Tribune scrambled to find another firm that might provide the necessary opinions.

204.    VRC was aware of Houlihan's reservations about the proposed LBO and recognized that Houlihan's reluctance raised the risk profile associated with the project.  Due to the risk attached to the highly leveraged deal, and Houlihan's disinclination to get involved, VRC was able to demand among the highest fees VRC had ever received for solvency opinion work.  In exchange, VRC provided the Tribune Board with: (a) written opinions, dated May 9, 2007, and May 24, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step One; and (b) a written opinion, dated December 20, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step Two.

205.     Two uncommon aspects of VRC's engagement are noteworthy.  First, VRC was instructed to ignore the generally accepted definition of "fair value" and, instead, to measure fair value in relation to a willing buyer and a willing seller <u>both of whom receive the favorable federal income tax treatment of the ESOP</u>.  As a result of this built-in limitation, VRC never offered any opinion as to whether Tribune or the Company would be solvent if it were to be acquired by an entity that did not receive the uniquely favorable federal income tax treatment.  Second, VRC was excused from the typical obligation to affirmatively investigate and skeptically evaluate any information provided by management.  Consequently, VRC never independently assessed the (un)reasonableness of management's unjustifiably optimistic projections upon which all of VRC's solvency opinions were based.

**(A)**     **<u>Step One</u>**

206.     VRC's Step One solvency analysis in May 2007 was based upon financial projections that were finalized by management and approved by the Tribune Board in February 2007 (the "**<u>February Projections</u>**").

207.     The February Projections were substantially higher than the Company's actual operating results.  For the three months from March through May 2007, publishing revenues and earnings were below plan by $50.6 million and $29.7 million, respectively.  During the same period, broadcasting revenues and earnings were below plan by $9.4 million and $4.6 million, respectively.

208.     Management, who received weekly "flash reports," was fully aware that the February Projections were outdated and unreliable almost immediately after they were

finalized and approved. Despite this awareness, management persistently declined to revise and update the February Projections until long after Step One had closed.

209. As a result of the foregoing, the February Projections were unreasonable and unreliable. Notwithstanding management's acknowledgements that the Company's actual results were lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued. In fact, management failed to provide any updated financial projections to VRC until late September 2007.

210. The solvency opinions provided by VRC at Step One were substantially flawed and unreliable for a number of reasons, including but not limited to:

(a) VRC blindly used the outdated, unreasonable, and unwarranted February Projections supplied by management without any critical analysis.

(b) VRC artificially separated the two steps of the LBO for purposes of its Step One solvency analysis despite the fact that the LBO was conceived of and promoted as a single, integrated transaction for which financing was fully committed.

(c) VRC improperly modified the conventional definition of "fair market value" to mean that a "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP in connection with the LBO.

(d) (VRC inappropriately reduced the weight given to its discounted cash flow analysis and increased the weight given to its higher comparable transactions analysis to increase Tribune's overall valuation.

(e) VRC incorrectly assumed that Tribune would be able to refinance its debts as they matured.

211. As of June 4, 2007, the correct fair market value of the Company's assets was approximately $10.99 billion. Tribune had obligated itself to consummate an LBO that would saddle it with debt and contingent liabilities of approximately $14.03 billion. As a consequence, and as of the closing of Step One, the Company was insolvent to the extent of approximately $3.04 billion.

212. Of course, the Company had been highly leveraged in comparison to its peers even before the LBO. After Step One, however, its debt-to-EBITDA ratio further skyrocketed to 11.4 — more than six times that of its most highly leveraged competitor, and more than eight times that of the industry average. The Company's debt-to-equity ratio (book value) plummeted below zero, to a ratio of approximately negative 3.5.

213. The Company could not service the significant amount of leverage imposed by the LBO and lacked adequate capital liquidity to operate its business following Step One. The Company had an interest-coverage ratio of 1:1, the lowest among its peers, and was unlikely to be able to cover its interest expense. The Company's operating cash flows were also insufficient to meet its debt service obligations.

214. Following Step One, the Company had insufficient capital resources to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns, and contingencies.

**(B)** **Step Two**

215. VRC's Step Two solvency analysis exhibited many of the same flaws and skewed assumptions as VRC's Step One solvency analysis, including VRC's novel and improper

definition of "fair market value" and the inappropriate weighting that VRC assigned to its different valuation methodologies.

216.    In addition, VRC's Step Two solvency analysis in December 2007 was based upon unreasonable and unreliable financial projections that were updated by management and presented, in part, to the Tribune Board in October 2007 (the "**October Projections**").

217.    The October Projections were, to some degree and in the near-term, downward revisions of the February Projections.  However, despite the continued deterioration of the Company's performance after Step One closed, certain critical forecasts in the October Projections were dramatically revised <u>upward</u> from the February Projections.

218.    For example, the October Projections assumed that, as early as 2009, Tribune's internet-based business would generate significantly greater revenues than anticipated in the February Projections and, thereby, mitigate the continuing decline in Tribune's traditional publishing business.  Yet, the internet-based business had already failed to meet management expectations in 2007.

219.    The October Projections also forecasted that, beginning in 2013 and accelerating through 2017, the Company's revenue would significantly outperform the February Projections on a consolidated basis.  It was patently unreasonable, however, for the Company to assume that each of the five years following the 2012 election year would also enjoy the benefit of the bump in revenue occasioned by swells of political advertising.

220.    As a result of the foregoing, the October Projections were unreasonable and unreliable.  Nonetheless, VRC indiscriminately relied upon the October Projections when preparing its Step Two solvency opinion.

221.    As of December 20, 2007, the correct fair market value of the Company's assets was approximately $10.44 billion.  The Company's debt and contingent liabilities totaled approximately $13.76 billion.  As a consequence, as of the closing of Step Two, the Company was insolvent to the extent of approximately $3.32 billion.

222.    Following Step Two, the Company was excessively leveraged, experiencing a debt-to-EBITDA ratio that was nearly double that of its closest peer, and more than eight times higher than the average of its other peers.  In addition, the Company was the only one of its peers that had a negative debt-to-equity ratio, and had the lowest interest-coverage ratio among its peers.

## VI.    <u>The Aftermath of the LBO</u>

223.    Because of the LBO, Tribune's funded debtload soared from more than $5 billion to nearly $14 billion — ten times greater than the Company's actual cash flow for 2006 or projected cash flow for 2007.

224.    As was widely predicted by a cacophony of financial analysts, industry experts, rating agencies, market participants, and media outlets alike, the Company's financial health deteriorated rapidly after the LBO closed.  On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions because the Company was "struggling to service th[e] debt" taken on in connection with the LBO.  None of Tribune's cost-cutting measures, however, could forestall the inevitable.

225.    Buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and its most valuable operating subsidiaries jointly filed for bankruptcy on December 8, 2008.

226.     Tribune's own publicly filed estimates in the Bankruptcy Court valued the Company at approximately $6.1 billion in 2010 — less than half of the Company's debt load at the close of Step Two.

227.     The Pre-LBO Noteholders have yet to receive payments on the Pre-LBO Noteholder Claims; and under the two plans of reorganization currently being considered before the Bankruptcy Court, the Pre-LBO Noteholders would receive initial distributions of only a small fraction of the money they are owed.

## COUNT I

### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to N.Y. Debt. & Cred. Law §§ 273, 278 & 279)

228.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

229.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

230.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

231.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

232.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the present fair salable value of Tribune's assets was less than the

amount that would have been required to pay Tribune's probable liabilities on its existing debts as they became absolute and matured.

233. Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT II

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to N.Y. DEBT. & CRED. LAW §§ 274, 278, & 279)**

234. Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

235. On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

236. On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

237. Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

238. At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which the property remaining with Tribune after making the Shareholder Transfers was an unreasonably small capital.

239. Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT III

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to N.Y. DEBT. & CRED. LAW §§ 275, 278, & 279)**

240.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

241.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

242.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

243.    Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

244.    At the time the Shareholder Transfers were made, Tribune intended or believed that it would incur debts beyond its ability to pay as they matured.

245.    Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT IV

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to 740 ILL. COMP. STAT. 160/5(a)(2), 160/8, & 160/9)**

246.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

247.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

248.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

249.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

250.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

251.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

252.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

### COUNT V

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to 740 ILL. COMP. STAT. 160/6(a), 160/8, & 160/9)**

253.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

254. On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

255. On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

256. Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

257. At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation.

258. Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT VI

**(Constructive Fraudulent Transfer
Against the Shareholder Defendants
Pursuant to MASS. GEN. LAWS ch. 109A, §§ 5(a)(2), 8, & 9)**

259. Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

260. On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

261.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

262.     In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare Trust Company, N.A. ("Computershare"), located in Braintree, Massachusetts, as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

263.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

264.     At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

265.     At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

266.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT VII

### (Constructive Fraudulent Transfer
### Against the Shareholder Defendants
### Pursuant to MASS. GEN. LAWS ch. 109A, §§ 6(a), 8, & 9)

267.   Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

268.   On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

269.   On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

270.   In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

271.   Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

272.   At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

273. At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

274. Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted by applicable law or by agreement, to assert any claims relating to the subject matter of this action against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court grant the following relief:

(a) entering a judgment against the Shareholder Defendants, finding that the Shareholder Transfers constitute constructively fraudulent transfers;

(b) avoiding the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(c) granting recovery of all amounts paid to each of the Shareholder Defendants in connection with the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(d) granting an attachment against the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(e)     imposing a constructive trust on the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(f)     granting an injunction against further disposition of the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(g)     levying execution on the Shareholder Transfers or their proceeds;

(h)     awarding Plaintiffs damages in an amount to be determined at trial;

(i)     awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(j)     awarding Plaintiffs pre- and post-judgment interest at the highest applicable rate; and

(k)     granting such other and further relief as is just and proper.

Dated: New York, New York
       August **23**, 2011

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

By: _____
    Robert J. Lack
    Hal Neier
    Amy C. Brown
    Jeffrey C. Fourmaux

7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250
rlack@fklaw.com

*Attorneys for Plaintiffs*